IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

LEROME HILSON,

           Plaintiff,

    v.

S. BEAURY, *et al.,*

           Defendants.

Civil Action No.
9:13-CV-0606 (BKS/DEP)

APPEARANCES:

FOR PLAINTIFF:

LEROME HILSON, *Pro Se*
05-A-1881
Great Meadow Correctional Facility
Box 51
Comstock, NY 12821

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN
New York State Attorney General
The Capitol
Albany, NY 12224

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

OF COUNSEL:

ADRIENNE J. KERWIN, ESQ.
Assistant Attorney General

<u>REPORT AND RECOMMENDATION</u>

This is an action brought by *pro se* plaintiff Lerome Hilson, a New York State prison inmate, pursuant to 42 U.S.C. § 1983, against three corrections employees stationed at the facility in which he was confined at the relevant times alleging that they violated his civil rights. In his complaint, Hilson contends that he was retaliated against for filing a grievance against a corrections officer who is not a defendant in this action, and was deprived of his First Amendment right to freely exercise his chosen religion when one of the defendants delayed in processing his request to change religions and another defendant refused to permit him to attend religious education classes and congregate prayer services.

Currently pending before the court in connection with the action is a motion brought by defendants seeking summary judgment dismissing plaintiff's claims as against all three defendants. For the reasons set forth below, I recommend that the motion be granted.

I.    BACKGROUND[1]

Plaintiff is a prison inmate currently being held in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") at the Great Meadow Correctional Facility ("Great Meadow"), located in Comstock, New York, where the incidents forming the basis for his claims allegedly occurred. *See generally* Dkt. No. 1; Dkt. No. 38-1 at 7. Plaintiff's complaint asserts three separate causes of action against two corrections officers and a prison chaplain arising from three discrete sets of circumstances.

A.    Retaliation by Defendant Beaury

On March 25, 2012, while being escorted within Great Meadow, plaintiff became involved in a dispute with Corrections Officers Collins and Roberts,[2] neither of whom is named as a defendant in this action. Dkt. No. 1 at 3; Dkt. No. 38-1 at 8. Although the details of the dispute are not relevant to this action, the genesis of the disagreement was plaintiff's belief that Corrections Officer Collins had harassed him without provocation and Corrections Officer Roberts had inappropriately pat-searched him. Dkt. No.

---

[1]    In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

[2]    Plaintiff originally identified this corrections officer as "Robinson" in his complaint. Dkt. No. 1 at 3. At his deposition in this matter, however, plaintiff clarified that this individual's actual last name is "Roberts." Dkt. No. 38-1 at 9.

1 at 3. On March 27, 2012, plaintiff submitted a grievance complaining of those corrections officers' actions. *Id.*; Dkt. No. 1-1 at 1-4; *see also* Dkt. No. 38-1 at 10.

According to plaintiff, his grievance against Corrections Officers Collins and Roberts triggered a retaliatory response taken against him by defendant Beaury, another corrections officer. Dkt. No. 38-1 at 10-11, 21. The alleged retaliation began on June 19, 2012, when, while plaintiff was performing his assigned duties preparing breakfast trays for inmates at the facility, defendant Beaury requested cereal from plaintiff for his personal consumption. Dkt. No. 1 at 3-4; Dkt. No. 38-1 at 14, 23-24, 25. Plaintiff informed defendant Beaury that all of the cereal available on the trays was reserved for inmates. Dkt. No. 1 at 4. Defendant Beaury responded by yelling at plaintiff, employing expletives, and adding, "'Now write a Grievance on that.'" *Id.*; Dkt. No. 38-1 at 18. Although plaintiff alleges in his complaint that, prior to this incident, defendant Beaury had harassed him with threats of retaliation for filing a grievance against Corrections Officers Collins and Roberts, at his deposition, plaintiff denied being harassed by defendant Beaury until this day. Dkt. No. 1 at 4; Dkt. No. 38-1 at 21, 25.

Following the incident, defendant Beaury issued plaintiff a misbehavior report charging him with violating four prison rules. Dkt. No. 1

at 4; Dkt. No. 1-1 at 26; Dkt. No. 38-1 at 28. According to plaintiff, the misbehavior report was based on false allegations and issued in retaliation for plaintiff's filing of a grievance against Corrections Officers Collins and Roberts. Dkt. No. 1 at 3-4; Dkt. No. 38-1 at 31, 45. As a result of the misbehavior report, plaintiff was sentenced to serve thirty days of disciplinary keeplock confinement and lost his prison job.[3] Dkt. No. 1 at 4; Dkt. No. 38-1 at 31-32, 34. Plaintiff maintains that while he was confined in keeplock, defendant Beaury disconnected the electrical power in his cell and prevented him from eating for four days. Dkt. No. 1 at 4; Dkt. No. 38-1 at 41-43.

B.  Conversion to Islam

Plaintiff alleges that in late June 2012, he submitted a change-of-religious-designation form to defendant Eric Payne, the Protestant Chaplain at Great Meadow, requesting that his designated

---

[3]      "Keeplock" is a form of confinement through which an "inmate is confined to his cell, deprived of participation in normal prison routine, and denied contact with other inmates*." Gittens v. LeFevre*, 891 F.2d 38, 39 (2d Cir. 1989); *accord*, *Warburton v. Goord*, 14 F. Supp. 2d 289, 293 (W.D.N.Y. 1998); *Tinsley v. Greene,* No. 95-CV-1765, 1997 WL 160124, at *2 n.2 (N.D.N.Y. Mar. 31, 1997) (Pooler, J., *adopting report and recommendation by* Homer, M.J.) (citing *Green v. Bauvi*, 46 F.3d 189, 192 (2d Cir. 1995)). "The most significant difference between keeplock and general population inmates is that the former do not leave their cells for out-of-cell programs unless they are a part of mandatory educational programs and general population inmates spend more time out of their cells on weekends." *Lee v. Coughlin*, 26 F. Supp. 2d 615, 628 (S.D.N.Y. 1998).

religion be changed from Protestant to Islam.[4] [Dkt. No. 1 at 6](#); [Dkt. No. 38-1 at 47](#). Although defendant Payne has no recollection of plaintiff generally, or of having had any written or verbal contact with him prior to August 2012, [Dkt. No. 38-4 at 2](#), it seems likely that the two did communicate to some degree prior to that date because defendant Payne sent plaintiff a memorandum dated August 2, 2012, that acknowledged plaintiff's request to change his religion from Protestant to Islam and attached a form to be signed, with an instruction to return it for processing so that the desired change could be effectuated. [Dkt. No. 1-1 at 75](#). Plaintiff thereafter complied by submitting the completed form, entitled "CHANGE OF RELIGIOUS DESIGNATION FORM," to defendant Payne on August 9, 2012. *Id.* at 76. On August 14, 2012, defendant Payne completed his portion of the form, and six days later, the Chaplain of Islam at Great Meadow finalized it. *Id.*

Plaintiff alleges that, because he submitted his request to change religions in late June 2012, but did not receive a response from defendant Payne until August 14, 2012, he was precluded from participating in Islamic

---

[4]     The record does not include a copy of the change-of-religious-designation form allegedly submitted by plaintiff in June. Attached to plaintiff's complaint, however, are two identical affidavits from Damon Vincent, an inmate working as a Chaplain Clerk at Great Meadow. [Dkt. No. 1-1 at 70-73](#). In those affidavits, one of which is typed and the other handwritten, Vincent states that he recalls plaintiff submitting two change-of-religious-designation forms during the months of July and August 2012. *Id.* at 70, 73. There is no reference in those affidavits to the submission of a form in June, as alleged by plaintiff.

religious practices, including fasting during Ramadan and attending seven Juma prayer services. Dkt. No. 1 at 6; Dkt. No. 38-1 at 49, 51-52.

In support of their motion for summary judgment, defendants have submitted a copy of the version of DOCCS Directive 4202, which governs changes in inmate religious designations, that was in effect in June 2012. Dkt. No. 38-1 at 68-79. According to the version of that directive in effect at the time, inmates could expect a request to change religions to be processed within thirty business days.[5] *Id.* at 71.

### C.   Missed Call-Outs

The third set of circumstances giving rise to this action centers upon defendant E. Ely's failure to provide plaintiff with call-outs for religious education classes on "numerous" occasions, including, specifically, on October 13, 2012 and November 3, 2012. Dkt. No. 1 at 8; Dkt. No. 38-1 at 52, 55. Plaintiff alleges that on those dates, defendant Ely was assigned as a block officer at Great Meadow and that his responsibilities in that role included providing inmates with call-out slips. Dkt. No. 1 at 8; Dkt. No. 38-1 at 53. Plaintiff's grievance complaining of missing religious call-outs, including on October 13, 2012, and November 3, 2012, was ultimately

---

[5]      DOCCS Directive 4202 has since been amended and now informs inmates that they can expect their requests to be processed within fourteen business days. Dkt. No. 38-4 at 9.

determined in his favor by the superintendent at Great Meadow on December 18, 2012. Dkt. No. 1-1 at 86-87.

II.    PROCEDURAL HISTORY

Plaintiff commenced this action on or about May 28, 2013, and was thereafter granted leave to proceed *in forma pauperis*. Dkt. Nos. 1, 6. In his complaint, plaintiff asserts claims under the First Amendment against defendants Beaury, Payne, and Ely in their individual and official capacities, and seeks damages and injunctive relief. *See generally* Dkt. No. 1.

On September 27, 2013, defendants filed a motion seeking dismissal of certain of plaintiff's claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Dkt. No. 15. As a result of that motion, I issued a report on August 13, 2014, recommending that plaintiff's claims for damages against the defendants in their official capacities be dismissed but that the motion otherwise be denied. Dkt. No. 23. Senior District Judge District Lawrence E. Kahn adopted that report and recommendation on September 10, 2014.[6] Dkt. No. 24.

On June 5, 2015, following the close of discovery, defendants filed a motion requesting the entry summary judgment dismissing plaintiff's remaining claims. Dkt. No. 38. In their motion, defendants assert that certain

---

[6]     Although this case was originally assigned to Judge Kahn, it has since been reassigned to District Judge Brenda K. Sannes. Dkt. No. 28.

of plaintiff's claims are procedurally barred based upon his failure to exhaust available administrative remedies before commencing suit, and additionally arguing that all three of the claims are subject to dismissal on the merits. Dkt. No. 38-10. Plaintiff has not opposed defendants' motion, which is now ripe for determination and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

## III. DISCUSSION

### A. Plaintiff's Failure to Oppose Defendants' Motion

Before turning to the merits of defendant's motion, a threshold issue to be addressed is the legal significance of plaintiff's failure to oppose defendant's motion, and specifically whether that failure should be construed as a consent to the dismissal of his complaint.

Pursuant to Local Rule 7.1(b)(3), by failing to oppose defendant's motion, plaintiff has effectively consented to the granting of the relief sought. That rule provides as follows:

> Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.

9

N.D.N.Y. L.R. 7.1(b)(3); *see also Jackson v. Fed. Express*, 766 F.3d 189, 194 (2d Cir. 2014) (holding that the district courts may enter summary judgment in favor of the moving party where the non-moving party fails to respond in opposition, but not without first "ensur[ing] that each statement of material fact is support by record evidence sufficient to satisfy the movant's burden of production" and "determin[ing] whether the legal theory of the motion is sound").

In this case, plaintiff has not responded to defendants' motion. The motion was properly filed by the defendants, and defendants, through their motion, have met their burden of demonstrating entitlement to the relief requested. With respect to the question of whether defendants have met their burden, I note that their "burden of persuasion is lightened such that, in order to succeed, [their] motion need only be 'facially meritorious.'" *See Rodriguez v. Goord*, No. 04-CV-0358, 2007 WL 4246443, at *1 (Scullin, J., *adopting report and recommendation by* Lowe, M.J.) (finding that whether a movant has satisfied its burden to demonstrate entitlement to a dismissal under Local Rule 7.1(b)(3) "is a more limited endeavor than a review of a contested motion to dismiss" (citing cases)).[7]

---

[7]     Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

Because defendants have accurately cited both proper legal authority and evidence in the record supporting the grounds on which their motion is based, and plaintiff has failed to respond in opposition to the motion to dismiss, I find that defendants' motion is facially meritorious. *Jackson*, 766 F.3d at 194. Accordingly, I recommend that the court grant defendants' motion on this basis.

It should also be noted that there are additional consequences flowing from plaintiff's failure to file an opposition to defendants' Local Rule 7.1(a)(3) Statement of Material Facts. Local Rule 7.1 provides, in part, that "[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y. L.R. 7.1(a)(3) (emphasis in original). Courts in this district have routinely enforced this rule in cases where a non-movant has failed to properly respond. *See*, *e.g.*, *Elgamil v. Syracuse Univ.*, No. 99-CV-0611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2010) (McCurn, J.) (listing cases). Undeniably, *pro se* litigants are entitled to some measure of forbearance when defending against summary judgment motions. *Jemzura v. Public Serv. Comm'n*, 961 F.Supp. 406, 415 (N.D.N.Y.1997) (McAvoy, J.). The deference owed to *pro se* litigants, however, does not extend to relieving them of the ramifications associated with the failure to

comply with the court's local rules. *Robinson v. Delgado*, No. 96-CV-0169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J., *adopting report and recommendation by* Hurd, M.J.). Stated differently, "a pro se litigant is not relieved of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Latouche v. Tompkins*, No. 09-CV-0308, 2011 WL 1103045, at *1 (N.D.N.Y. Mar. 23, 2011) (Mordue, J.).

Here, because plaintiff was warned of the consequences of failing to properly respond to defendants' Local Rule 7.1 Statement, Dkt. No. 39 at 2, and he has failed to do so, I will deem defendants' facts contained in their Local Rule 7.1(a)(3) Statement as having been admitted to the extent they are supported by accurate record citations. *See*, *e.g.*, *Latouche*, 2011 WL 1103045, at *1; *see also Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir.1996). As to any facts not contained in defendants' Local Rule 7.1(a)(3) Statement, in light of the procedural posture of this case, the court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of plaintiff. *Terry*, 336 F.3d at 137.

B.     Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the

non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

      C.    <u>Retaliation</u>

     Plaintiff first contends that defendant Beaury retaliated against him for having filed a grievance complaining of the conduct of fellow Corrections Officers Collins and Roberts. Dkt. No. 1 at 2-5. Specifically, plaintiff alleges that defendant Beaury issued him a false misbehavior report on June 19, 2012, which resulted in a finding of guilt following a disciplinary hearing, a sanction of thirty-days in keeplock confinement and the loss of his work assignment, and then deprived him of electricity and food while confined in keeplock for four days, beginning on June 22, 2012. *Id.*; *see also* Dkt. No. 38-1 at 28, 31-32, 34, 41-43, 45.

     A cognizable section 1983 retaliation claim lies when prison officials take adverse action against an inmate that is motivated by the inmate's

exercise of a constitutional right, including the free speech provisions of the First Amendment. *See Friedl v. City of N.Y.*, 210 F.3d 79, 85 (2d Cir. 2000) ("In general, a section 1983 claim will lie where the government takes negative action against an individual because of his exercise of rights guaranteed by the Constitution or federal laws."). As the Second Circuit has repeatedly cautioned, however, because such claims are easily incanted and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus, courts must approach such claims "with skepticism and particular care." *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002); *accord, Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003).

To prove a retaliation claim, a plaintiff must establish that (1) the conduct at issue was protected, (2) the defendants took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action – in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007); *Garrett v. Reynolds*, No. 99-CV-2065, 2003 WL

22299359, at *4 (N.D.N.Y. Oct. 3, 2003) (Sharpe, M.J.).

In this instance, based upon the record now before the court, it is clear that the plaintiff can establish the first of those three required elements in light of his filing of a grievance against Corrections Officers Collins and Roberts on March 27, 2012. Dkt. No. 1-1 at 1-4. It is well established that filing complaints or grievances constitutes protected activity for purposes of a First Amendment retaliation claim. *Johnson v. Eggersdorf*, 8 F. App'x 140, 144 (2d Cir. 2001); *Graham v. R.J. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996). Turning to the second element, while there is no dispute that defendant Beaury issued plaintiff a misbehavior report on June 19, 2012, Dkt. No. 1-1 at 26, an act that may constitute adverse action, *see Gill v. Pidlypchak*, 389 F.3d 379, 384 (2d Cir. 2004) ("[The plaintiff] has sufficiently alleged . . . adverse action on the part of the defendants-the filing of false misbehavior reports[.]"), defendant denies depriving plaintiff of electricity or food during his keeplock confinement between June 22-26, 2012, and there is record evidence suggesting that defendant Beaury did not work at Great Meadow on June 22-24. Dkt. No. 38-2 at 3, 8. During his deposition, however, plaintiff testified that defendant Beaury told him, on June 22, 2012, that he had turned off plaintiff's electrical power. Dkt. No. 38-1 at 42. Accordingly, a genuine dispute of fact exists as to whether defendant

Beaury was responsible for cutting off plaintiff's power or depriving him of food in June 2012. The combination of (1) filing an allegedly false misbehavior report and (2) depriving plaintiff of electricity and meals for four days may constitute adverse action for purposes of a retaliation claim. *See, e.g., Dabney v. Maddock*, No. 10-CV-0519, 2011 WL 7479164, at *4 (N.D.N.Y. Nov. 29, 2011) (Peebles, M.J.), *report and recommendation adopted by* 2012 WL 760748 (N.D.N.Y. Mar. 7, 2012) (Suddaby, J.), (finding that, in combination, allegations that the defendant harassed the plaintiff, issued him a false misbehavior report, precluded him from attending a disciplinary hearing, interfered with his access to commissary, and "interrupted the supply of electrical power to [his] cell for a period of four days" was sufficient to constitute adverse action).

Fatal to plaintiff's retaliation cause of action, however, is the absence of any record evidence from which a reasonable factfinder could conclude that there is a causal connection between plaintiff's protected activity and defendant Beaury's alleged adverse action. Defendant Beaury denies being aware that plaintiff had previously written a grievance against Corrections Officers Collins or Roberts at the time he issued plaintiff the misbehavior report. Dkt. No. 38-2 at 2. In addition, although plaintiff contends that defendant Beaury retaliated against him because he was friends with

17

Corrections Officer Roberts' husband and that Beaury worked with Roberts'

husband, Dkt. No. 38-1 at 18-21, defendant Beaury stated in his declaration

in support of the pending motion that, "while [he] knew Officer Adam

Roberts, Officer Heather Roberts' husband, [he] did not work with [Officer

Adam Roberts] in Building 7 and [they] are not and have never been social

friends." Dkt. No. 38-2 at 2-3. At plaintiff's deposition, when asked to explain

the basis for his belief that defendant Beaury retaliated against him for filing

a grievance against Corrections Officers Collins and Roberts, he testified as

follows:

> Q    And you say particularly that he said to you in
>      sum or substance, 'I'll get you for the grievance
>      you wrote on CO [Roberts]'?
> A    Yes. Like I explained to you, Officer Robert's
>      husband works in Building 7. He's the relief of
>      Beaury.
> Q    Do you remember when Beaury said this to
>      you?
> A    He said it – he said it as like you said, a
>      gesture. You can throw something out to a
>      person – you can't throw messages out or
>      comments or statements to a person without
>      them having a knowledge of it at that time
>      because they not thinking about it until later on.
> Q    Okay.
> A    'til the events occurred. So this is where all this
>      initially – Officer Roberts I guess he wasn't
>      man enough to, you know retaliate. So he
>      manipulated Officer Beaury to do his dirty
>      work.
> Q    How do you know that?
> A    I know. It happens – I have complaints here

that I will give to you later on that I will be adding down the line to redo admissions and all that. This is a common thing in Great Meadows or any other facility; all colleagues work together. That's what they say with inmates. I don't go around here – if you check my disciplinary history since I've been here, I'm not a troublemaker at all. I'm just trying to do my time. I didn't come to Great Meadows to be causing no riffraff with no officers . . . .

Q    So I want to make sure I understand. Your belief that Roberts manipulated Beaury to do his dirty work is based on how things work here at Great Meadow?

A    Yeah, it's how it works here at Great Meadow.

Q    Okay. So you never observed them having a conversation about anything?

A    I don't have to – it's a prime example . . . .

Q    Do you have your complaint in front of you?

A    Yes, I do.

Q    Okay. Can you just look at paragraph six?

A    Paragraph six.

Q    Third line down it says, 'On one particular occasion Beaury said I will get you for the grievance you wrote on CO,' what we know as Roberts now. Was that one particular occasion on June 19th?

A    Yes.

Q    All right. And he was – your belief was that he was referring to the grievance you wrote back in March?

A    Yes.

Q    Why do you think that?

A    Because that – like I explain to you again, Correction Officer Roberts, Ms. Roberts her husband works in Building 7 along with Beaury . . . .

Q    So when Beaury says to you on one time on . . . June 19th, 2012 that he'll get you for the grievance you wrote on CO H. Roberts, you

> had only written the one in March against H.
> Roberts?
> A   Yes.
> Q   Okay. Got it.
> A   And what happened was it snowballed – it
>       became a snowball effect after that.
> Q   So on June 19th, 2012 was the first time
>       Beaury ever said anything like that to you?
> A   Yes, because I never had no – I explained to
>       you, like I explained to you, I've been working
>       in Building 7 for four years with no misbehavior
>       reports until that happened with me writing the
>       complaint against H. Roberts, Corrections
>       Officer Roberts and Corrections Officer Collins.

Dkt. No. 38-1 at 18-21. This testimony reflects that plaintiff's basis for his

claim is his speculative and vague belief that corrections officers at Great

Meadow "work together." *Id.* at 18.

Three months elapsed between the filing of plaintiff's grievance and

defendant Beaury's alleged adverse action, and plaintiff has offered no

evidence to contradict defendant's sworn statement that he was unaware of

the grievance at the time he issued the misbehavior against plaintiff on June

19, 2012. In addition, defendant Beaury has offered an explanation for

issuing plaintiff the misbehavior report that does not reflect retaliatory

animus.[8] Dkt. No. 38-2 at 2.

---

[8]     In particular, defendant Beaury described the circumstances leading up to the
issuance of the misbehavior report on June 19, 2012, as follows:

> On June 19, 2012 while supervising the kitchen where
> plaintiff was working, I received at least one phone call from

Based on all of the record evidence, I find that plaintiff's vague belief that corrections officers "work together" to retaliate against inmates is not sufficient to give rise to a genuine dispute of material fact as to whether there exists a causal connection between plaintiff's protected activity and defendant Beaury's alleged adverse activity. Accordingly, I recommend that defendants' motion be granted with respect to this claim.[9]

D.    Plaintiff's First Amendment Free Exercise Claims

In his second claim, plaintiff alleges that defendant Payne unlawfully interfered with his First Amendment right to freely exercise his chosen religion by virtue of his undue delay in processing plaintiff's request to change his religious designation. Dkt. No. 1 at 5-7. In his third cause of

---

> one of the housing blocks inquiring whether the Kosher meal trays were supposed to have cereal on them. I questioned plaintiff whether the Kosher meal trays were supposed to have cereal and he told me no. I confirmed with the civilian cook that the Kosher meal trays were in fact, supposed to have cereal on them. I confronted plaintiff with this information and he began to yell at me and told me to stop bothering him with this 'bullshit.' Plaintiff's actions caused the other ten inmates in Building 7 to stop doing their work and watch him.

Dkt. No. 38-2 at 2.

[9]    It appears that plaintiff is procedurally barred from pursuing his retaliation claim to the extent it involves allegations regarding the deprivation of electricity and food between June 22-26, 2012, based on his failure to comply with the requirement to exhaust available administrative remedies before commencing suit as required under the Prison Litigation Reform Act of 1996, Pub. L. No. 104-134, 110 Stat. (1996). In light of my recommendation that plaintiff's claim be dismissed on the merits, however, I have not found it necessary to fully analyze this ground for dismissal.

action, plaintiff claims that defendant Ely denied plaintiff call outs to attend religious education classes and congregate Islamic prayers. *Id.* at 7-9.

     1.   <u>Legal Principles Governing Plaintiff's First Amendment Claims</u>

While inmates confined within prison facilities are by no means entitled to the full gamut of rights guaranteed under the United States Constitution, the free exercise clause of the First Amendment does afford them at least some measure of constitutional protection. *See Pell v. Procunier*, 417 U.S. 817, 822 (1974) ("In the First Amendment context . . . a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."). The protections afforded under the First Amendment, however, are not without limits, and the task of defining the contours of that right in a prison setting requires striking a delicate balance between the rights of inmates and the legitimate interests of prison officials tasked with maintaining prison security. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348-49 (1987); *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003); *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990).

A plaintiff asserting a First Amendment free exercise claim must, as a threshold matter, "show . . . that the disputed conduct substantially burdens his sincerely held religious beliefs." *Salahuddin v. Goord*, 467 F.3d 263,

274-75 (2d Cir. 2006).[10] In evaluating this factor, the court must be wary of "'question[ing] the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds.'" *McEachin v. McGuinnis*, 357 F.3d 197, 201 (2d Cir. 2004) (quoting *Hernandez v. Comm'r of Internal Revenue*, 490 U.S. 680, 699 (1989)). Instead, a court should consider only whether the particular plaintiff has "demonstrate[d] that the beliefs professed are sincerely held and in the individual's own scheme of things, religious." *Ford*, 352 F.3d at 588 (quotation marks omitted). Once a plaintiff satisfies this burden, defendants must then "bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct." *Salahuddin*, 467 at 275. "[T]he burden[, however,] remains with the prisoner to 'show that these penological concerns were

---

[10] I acknowledge that the Second Circuit has yet to decide whether the "substantial burden" test survived the Supreme Court's decision in *Emp't Div. v. Smith*, 494 U.S. 872, 887 (1990). *See Holland v. Goord*, 758 F.3d 215, 220 (2d Cir. 2014) ("It has not been decided in this Circuit whether, to state a claim under the First Amendment's Free Exercise Clause, a 'prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs.'" (quoting *Salahuddin*, 467 F.3d at 274-75)); *Salahuddin*, 467 F.3d at 275 n.5 (declining to address whether "a prisoner's First Amendment free-exercise claim is [] governed by the 'substantial burden' threshold requirement"). Because, however, the Second Circuit continues to apply the test, even when squarely faced with the question of its continued viability, I will assume a plaintiff must establish a substantial burden on his sincerely held beliefs to demonstrate a *prima facie* First Amendment free exercise claim. *See, e.g., Holland*, 758 F.3d at 221 ("[W]e need not decide the issue here, as even assuming the continued vitality of the substantial burden requirement, our precedent squarely dictates that [the plaintiff's] religious exercise was unconstitutionally burdened[.]"); *Salahuddin*, 467 F.3d at 274-75 ("The prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs."); *accord, Smith v. Goord*, 541 F. App'x 133, 134 (2d Cir. 2013); *Washington v. Gonyea*, 438 F. App'x 23, 26 (2d Cir. 2013); *Hall v. Ekpe*, 408 F. App'x 385, 388 (2d Cir. 2010).

irrational.'" *Ford*, 352 F.3d at 595 (quoting *Fromer v. Scully*, 874 F.2d 69, 74 (2d Cir. 1989)) (alteration omitted).

At this juncture the court next inquires into whether a defendant's conduct, which allegedly deprives the plaintiff of his free exercise rights, is reasonably related to some legitimate penological interest. *Ford*, 352 F.3d at 594; *see also Washington*, 538 F. App'x at 26 ("Even if Defendants-Appellees substantially burdened [the Plaintiff-Appellant]'s sincerely held religious beliefs, their actions do not constitute a constitutional deprivation if they were reasonably related to legitimate penological interests." (quotation marks omitted)). To determine whether a challenged regulation or decision by prison officials is reasonable,[11] courts must evaluate the following four factors:

> [(1)] [W]hether the challenged regulation or official action has a valid, rational connection to a legitimate governmental objective; [(2)] whether prisoners have alternative means of exercising a burdened right; [(3)] the impact on the guards, inmates, and prison resources of accommodating the right; and [(4)] the existence of alternative means of facilitating exercise of the right that have only a de minimis adverse effect on valid penological interests.

*Salahuddin*, 467 F.3d at 274 (footnote omitted).

---

[11]   The Second Circuit has held that "[a]n individualized decision to deny a prisoner the ability to engage in religious exercise is analyzed in the same ways as a prison regulation denying such exercise." *Salahuddin*, 467 F.3d at 274 n.4.

2.    Plaintiff's Claim Against Defendant Payne

While plaintiff has alleged that he submitted his change-of-religious-designation form in late June 2012, Dkt. No. 1 at 6; Dkt. No. 38-1 at 47, there is no other record evidence to support this claim. In an attempt to buttress this claim, plaintiff has submitted two identical affidavits from a fellow inmate who was working as a Chaplain at Great Meadow at the relevant time. Dkt. No. 1-1 at 70-73. In those affidavits, however, the inmate states that he recalls plaintiff submitting two change-of-religious-designation forms – one during July 2012 and the second in August 2012. *Id.* at 70, 73. In addition, defendant Payne has averred that there is no record at Great Meadow of plaintiff submitting the form in June 2012. Dkt. No. 38-4. Thus, aside from plaintiff's own allegations, there is no direct record evidence to support his claim that he made his request for the first time in June.

Defendant Payne did, however, send plaintiff a memorandum on August 2, 2012, that said, "You are listed under **Protestant (November 29, 2005)** and wish to change your religion to **Muslim.** Please fill out the form, sign it and return it to this office for processing." Dkt. No. 38-4 at 17 (emphasis in original). This memorandum suggests that, at some earlier point in time, plaintiff communicated his request to change religions to either

defendant Payne directly or someone else who then advised defendant Payne regarding plaintiff's intentions. Accordingly, I find that a dispute of material fact exists as to when plaintiff first notified prison officials of his desire to change his religious designations.

The court then must turn to the question of whether the delay involved in changing his religion from Protestant to Muslim constituted a substantial burden on plaintiff's sincerely held beliefs.[12] Plaintiff contends that the delay precluded him from participating in Ramadan and attending seven Juma prayer services. Dkt. No. 1 at 6; Dkt. No. 38-1 at 49, 51-52. The Second Circuit has said that "a substantial burden exists where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996) (quotation marks

---

[12] Defendants, on the other hand, appear to contend that the next question in the analysis (assuming plaintiff filed his change-of-religious-designation form was filed in late-June 2012) is whether defendant Payne was aware that plaintiff filed the form in June 2012. Dkt. No. 38-10 at 11. While this inquiry implicates the issue of personal involvement, I find a dispute of material fact exists as to when defendant Payne learned of plaintiff's request to change his religion. While plaintiff contends he submitted a form in June 2012, Dkt. No. 1 at 6; Dkt. No. 38-1 at 47, defendant Payne averred that he "ha[s] no recollection of such a request" and there is no record of this request at Great Meadow until August 2012. Dkt. No. 38-4 at 2-3. In addition, although it is unclear precisely *when*, the memorandum defendant sent to plaintiff on August 2, 2012, certainly suggests that defendant Payne learned about plaintiff's request at some time *before* he sent it. *See id.* at 17 ("You are listed under **Protestant (November 29, 2005)** and wish to change your religion to **Muslim.**" (emphasis in original)). Mindful of the court's obligation to avoid making credibility determinations at the summary judgment stage, I find that a dispute of material fact exists as to whether defendant Payne was aware that plaintiff wished to change his religion in June 2012 but waited until August to approve the request.

and alterations omitted). Plaintiff's allegations in this case suggest that he was required to violate his beliefs by being precluded from participating in any Ramadan observations and seven prayer services directly as a result of the delay in the processing of his request to change religions. Defendants have offered no evidence to contradict or otherwise undermine these allegations. While courts in this circuit have concluded that missing two religious services does not pose a substantial burden on an inmate's religion, *see, e.g., Lopez v. Cipolini*, --- F. Supp. 3d ----, No. 14-CV-2441, 2015 WL 5732076, at *11 (S.D.N.Y. Sept. 30, 2015) (collecting cases), the alleged conduct in this case clearly resulted in more severe deprivations. Thus, if plaintiff's allegations are credited, a reasonable factfinder could conclude that his rights were substantially burdened due to the delay in processing his request.

Finally, because defendants have offered no legitimate penological interest that would justify the alleged delay, the court is not unable to determine at this juncture whether the delay was reasonably related to any identified penological interest.[13]

---

[13] This should be distinguished from whether there is a penological interest in requiring inmates to register their religions at their facilities of confinement. In this regard, the Second Circuit has unequivocally determined that requiring inmates to register their religion serves multiple legitimate penological interests. *See Jackson-Bey v. Hernandez*, 115 F.3d 1091, 1096-97 (2d Cir. 1997). The issue in this case is whether defendants have offered a legitimate penological interest in delaying the processing of plaintiff's

27

Accordingly, I recommend that defendants' motion for summary judgment dismissing plaintiff's First Amendment claim asserted against defendant Payne on the merits be denied.[14]

### 3. Plaintiff's Claim Against Defendant Ely

Plaintiff's third cause of action arises from allegations that he was unable to attend Salat religious education classes held on Saturday mornings between October 13, 2012 and November 3, 2012, due to defendant Ely's failure to distribute call-out slips to him during that period.[15] Dkt. No. 1 at 7-8; Dkt. No. 38-1 at 52, 55. Abdulkadir Elmi, the Coordinating Chaplain and Iman for the Muslim faith at Great Meadow, confirms plaintiff's contention that call-outs were required for any Muslin inmate wishing to attend Salat classes in 2012. Dkt. No. 38-5 at 2. Call-out slips for religious classes at Great Meadow are distributed to inmates by housing unit officers on duty during the afternoon shift – either 3:00 p.m. to 11:00 p.m. or 4:00 p.m. to 12:00 a.m. – on the evening preceding the corresponding class. Dkt.

---

request.

[14]     As discussed below in Part III.E. of this report, however, I recommend dismissal of the claim based on my finding that defendant Payne is entitled to qualified immunity from suit.

[15]     Defendants contend that this claim is procedurally barred based on plaintiff's failure to exhaust the available administrative remedies. Dkt. No. 38-10 at 16; Dkt. No. 38-6 at 3. Plaintiff's grievance regarding the missed call-outs, however, was ultimately granted by the facility superintendent, and thus plaintiff had no reason to appeal that decision to the DOCCS Central Office Review Committee. Dkt. No. 1-1 at 84-87.

No. 38-8 at 1-2; *see also* Dkt. No. 38-2 at 53. I take judicial notice of the fact that the Saturdays during the relevant time period fell on October 13, 2012, October 20, 2012, October 27, 2012 and November 3, 2012. The call-outs for those Salat classes would therefore have been dispersed on October 12, 2012, October 19, 2012, October 26, 2012 and November 2, 2012. According to defendant Ely, and as confirmed by his time records, he was not working on October 12, 2012 or October 19, 2012, and thus would not have been responsible for distributing call-out slips on those dates. Dkt. No. 38-3 at 2, 5, 6. The record also reflects that defendant Ely worked from approximately 11:55 p.m. on Thursday, October 25, 2012, to 6:55 a.m. on Friday, October 26, 2012, and consequently was not working on that Friday evening. *Id.* at 6. He worked a double shift from 11:55 p.m. on Thursday, November 1, 2012, to 3:25 p.m. on Friday November 2, 2012, and similarly was not working when call-out slips were distributed on that date. *Id.* Accordingly, it is clear from the record now before the court, which is uncontroverted, that defendant Ely did not work on any Friday evening during the relevant time period, when call-out slips for Saturday religious education classes would have been distributed. I note, moreover, that defendant Ely has stated he never refused to provide call-out slips to

plaintiff or any other inmate at any time while it was his responsibility to do so. *Id.* at 3.

Based upon these circumstances, no reasonable factfinder could conclude that defendant Ely unlawfully violated plaintiff's First Amendment rights by refusing to provide call-out slips to preclude plaintiff from attending religious education classes or congregate religious services. I therefore recommend that defendants' motion with respect to this claim be granted.

E.    Qualified Immunity

In the event that the recommendations described above are adopted by the assigned district judge, the only claim that remains for consideration is plaintiff's First Amendment free exercise claim asserted against defendant Payne. As an alternative to dismissal on the merits, in their motion defendants have argued that defendant Payne is entitled to qualified immunity in connection with this claim. Dkt. No. 38-10 at 11-16.

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Sudler v. City of N.Y.*, 689 F.3d 159, 174 (2d Cir. 2012). The law of qualified immunity seeks to strike a balance between "the

need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. Government officials are shielded from liability by qualified immunity when making "reasonable mistakes" concerning the lawfulness of their conduct. *Sudler*, 689 F.3d at 174 (citing *Saucier v. Katz*, 533 U.S. 194, 206 (2001), *abrogated on other grounds by Pearson*, 555 U.S. 223)).

Because qualified immunity is "an immunity from suit rather than a mere defense to liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), the Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in the litigation," *Pearson*, 555 U.S. at 231 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam)).

The determination of whether a government official is immune from suit is informed by two factors. *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011). Specifically, the inquiry turns on whether the facts alleged, taken in a light most favorable to the plaintiff, show that the conduct at issue violated a statutory or constitutional right, and if so, whether that right "was clearly established at the time of the challenged conduct." *Terebesi v. Torreso*, 764 F.3d 217, 230 (2d Cir. 2014) (citing *Reichle*, 132 S. Ct. at

2093). The Supreme Court has said that an officer's "conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (quotation marks and alterations omitted). "To this end, a plaintiff need not show a case 'directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.'" *Terebesi*, 764 F.3d at 230 (quoting *al-Kidd*, 131 S. Ct. at 2083). However, "[e]ven where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton*, 505 F.3d 161, 169-70 (2d Cir. 2007) (citations omitted). This "objective reasonableness" part of the test is satisfied if "officers of reasonable competence could disagree on [the legality of the defendant's actions]." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

In this case, there is no clearly established constitutional or statutory right afforded to prison inmates to have their request to have their religious designation changed in a prison facility within two months. Indeed, inmates do not have a clearly established right to have their request to change

religions processed within any specific timeframe. While the Second Circuit explored DOCCS Directive 4202, which governs the accommodation of prisoners' religious beliefs throughout New York State, in *Jackson-Bey*, the holding of that case is that the directive's requirement that inmates register their religion "serv[es] several legitimate penological interests." *Jackson-Bey*, 115 F.3d at 1096. In that decision, the court did not discuss or otherwise opine on a constitutionally reasonable period of time for prison officials to process an inmate's request to change religions. My research regarding this particular issue did not yield any results from either the Supreme Court or any circuit court regarding the issue. *See Terebesi*, 764 F.3d at 230 ("Even if this Court has not explicitly held a course of conduct to be unconstitutional, we may nonetheless treat the law as clearly established if decisions from this or other circuits clearly foreshadow a particular ruling on the issue." (quotation marks omitted)). Accordingly, even assuming all of plaintiff's allegations against defendant Payne are true, I recommend a finding that he is entitled to qualified immunity from suit because his conduct did not trigger a statutory or constitutional question that is settled "beyond debate." *al-Kidd*, 131 S. Ct. at 2083.

IV.  <u>SUMMARY AND RECOMMENDATION</u>

Careful consideration of the record now before the court, and without the benefit of a response from the plaintiff, confirms there are no genuine disputes of material fact for trial with respect to plaintiff's retaliation claim asserted against defendant Beaury or his free exercise claim asserted against defendant Ely. In addition, although disputes of material fact exist with respect to plaintiff's claim asserted against defendant Payne, even assuming plaintiff's allegations are true, that individual is entitled to qualified immunity from suit. It is therefore hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 38) be GRANTED, and that plaintiff's complaint be DISMISSED in its entirety.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:     February 17, 2016
           Syracuse, New York

Not Reported in F.Supp.2d, 2007 WL 4246443 (N.D.N.Y.)

(Cite as: 2007 WL 4246443 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Jose RODRIGUEZ, Plaintiff,
v.
Glen S. GOORD, et al, Defendants.
No. 9:04-CV-0358 (FJS/GHL).

Nov. 27, 2007.
Jose Rodriguez, Willard, NY, pro se.

Andrew M. Cuomo, Attorney General of the State of New York, David L. Cochran, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

### DECISION AND ORDER

FREDERICK J. SCULLIN, Senior District Judge.

**\*1** The above-captioned matter having been presented to me by the Report-Recommendation of Magistrate Judge George H. Lowe filed November 6, 2007, and the Court having reviewed the Report-Recommendation and the entire file in this matter, and no objections to said Report-Recommendation having been filed, the Court hereby

**ORDERS,** that Magistrate Judge Lowe's November 6, 2007 Report-Recommendation is **ACCEPTED** in its entirety for the reasons stated therein; and the Court further

**ORDERS,** that Defendants' motion, pursuant to Local Rule 41.2(b), to dismiss for Plaintiff's failure to provide notice to the Court of a change of address, is **GRANTED;** and the Court further

**ORDERS,** that the Clerk of the Court enter judgment in favor of the Defendants and close this case.

**IT IS SO ORDERED.**

### REPORT-RECOMMENDATION

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, filed pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Frederick J. Scullin, Jr., Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c) of the Local Rules of Practice for this Court. Generally, Jose Rodriguez ("Plaintiff") alleges that, while he was an inmate at Oneida Correctional Facility in 2003 and 2004, ten employees of the New York State Department of Correctional Services ("Defendants") were deliberately indifferent to his serious medical needs, and subjected him to cruel and unusual prison conditions, in violation of the Eighth Amendment. (Dkt. No. 27 [Plf .'s Am. Compl.].) Currently pending is Defendants' motion to dismiss for failure to provide notice to the Court of a change of address, pursuant to Local Rule 41.2(b) of the Local Rules of Practice for this Court. (Dkt. No. 86.) Plaintiff has not opposed the motion, despite having been given more than six weeks in which to do so. Under the circumstances, I recommend that (1) Defendants' motion to dismiss be granted, and (2) in the alternative, the Court exercise its inherent authority to *sua sponte* dismiss Plaintiff's Amended Complaint for failure to prosecute and/or failure to comply with an Order of the Court.

### I. DEFENDANTS' MOTION TO DISMISS

Under the Local Rules of Practice for this Court, Plaintiff has effectively "consented" to the granting of Defendants' motion to dismiss, since (1) he failed to oppose the motion, (2) the motion was properly filed, and (3) Defendants have, through the motion, met their burden of demonstrating entitlement to the relief requested in the motion. L.R. 7.1(b)(3).

In particular, with regard to this last factor (i.e., that Defendants have met their burden of demonstrating entitlement to the relief requested), Defendants argue that their motion to dismiss should be granted because (1) Local Rule 41.2(b) provides that "[f]ailure to notify the Court of a change of address in accordance with [Local Rule] 10.1(b) may result in the dismissal of any pending

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4246443 (N.D.N.Y.)

(Cite as: 2007 WL 4246443 (N.D.N.Y.))

action," (2) on April 15, 2004, Plaintiff was specifically advised of this rule when (through Dkt. No. 5, at 4) the Court advised Plaintiff that "his failure to [promptly notify the Clerk's Office and all parties or their counsel of any change in his address] will result in the dismissal of his action," (3) on May 22, 2007, Plaintiff was released from the Willard Drug Treatment Center, (4) since that time, Plaintiff has failed to provide notice to the Court (or Defendants) of his new address, as required by Local Rule 10.1(b)(2), and (5) as a result of this failure, Defendants have been prejudiced in that they have been unable to contact Plaintiff in connection with this litigation (e.g., in order to depose him, as authorized by the Court on May 4, 2007). (Dkt. No. 86, Part 4, at 1-2 [Defs.' Mem. of Law].)

**\*2** Authority exists suggesting that an inquiry into the third factor (i.e., whether a movant has met its "burden to demonstrate entitlement" to dismissal under Local Rule 7.1[b][3] ) is a more limited endeavor than a review of a contested motion to dismiss.[FN1] Specifically, under such an analysis, the movant's burden of persuasion is lightened such that, in order to succeed, his motion need only be "facially meritorious." [FN2] Given that Defendants accurately cite the law and facts in their memorandum of law, I find that they have met their lightened burden on their unopposed motion. Moreover, I am confident that I would reach the same conclusion even if their motion were contested.

> FN1. *See, e.g., Hernandez v. Nash,* 00-CV-1564, 2003 U.S. Dist. LEXIS 16258, at \*7-8, 2003 WL 22143709 (N.D.N.Y. Sept. 10, 2003) (Sharpe, M.J.) (before an unopposed motion to dismiss may be granted under Local Rule 7.1[b][3], "the court must review the motion to determine whether it is *facially meritorious*" [emphasis added; citations omitted]; *Race Safe Sys. v. Indy Racing League,* 251 F.Supp.2d 1106, 1109-10 (N.D.N.Y.2003) (Munson, J.) (reviewing whether record contradicted defendant's arguments, and whether record supported plaintiff's claims, in deciding unopposed motion to dismiss, under Local Rule 7.1[b][3] ); *see also Wilmer v. Torian,* 96-CV-1269, 1997 U.S. Dist. LEXIS 16345, at \*2 (N.D.N.Y. Aug. 29, 1997) (Hurd, M.J.) (applying prior version of Rule 7.1

[b][3], but recommending dismissal because of plaintiff's failure to respond to motion to dismiss *and* the reasons set forth in defendants' motion papers), *adopted by* 1997 U.S. Dist. LEXIS 16340, at \*2 (N.D.N.Y. Oct. 14, 1997) (Pooler, J.); *accord, Carter v. Superintendent Montello,* 95-CV-0989, 1996 U.S. Dist. LEXIS 15072, at \*3 (N.D.N.Y. Aug. 27, 1996) (Hurd, J.), *adopted by* 983 F.Supp. 595 (N.D.N.Y.1996) (Pooler, J.).

> FN2. *See, e.g., Hernandez,* 2003 U.S. Dist. LEXIS 1625 at \*8.

For these reasons, I recommend that the Court grant Defendants' motion to dismiss.

## II. *SUA SPONTE* DISMISSAL

Even if Defendants have not met their burden on their motion to dismiss, the Court possesses the inherent authority to dismiss Plaintiff's Amended Complaint *sua sponte* under the circumstances. Rule 41 of the Federal Rules of Civil Procedure permits a defendant to move to dismiss a proceeding for (1) failure to prosecute the action and/or (2) failure to comply with the Federal Rules of Civil Procedure or an Order of the Court. Fed.R.Civ.P. 41(b).[FN3] However, it has long been recognized that, despite Rule 41 (which speaks only of a *motion* to dismiss on the referenced grounds, and not a *sua sponte* order of dismissal on those grounds), courts retain the "inherent power" to *sua sponte* "clear their calendars of cases that have remained dormant because of the inaction or dilatoriness of the parties seeking relief." *Link v. Wabash R.R. Co.,* 370 U.S. 626, 630, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962); *see also Saylor v. Bastedo,* 623 F.2d 230, 238 (2d Cir.1980); *Theilmann v. Rutland Hospital, Inc.,* 455 F.2d 853, 855 (2d Cir.1972). Indeed, Local Rule 41.2(a) not only recognizes this authority but *requires* that it be exercised in appropriate circumstances. *See* N.D.N.Y. L.R. 41.2(a) ("Whenever it appears that the plaintiff has failed to prosecute an action or proceeding diligently, the assigned judge *shall* order it dismissed.") [emphasis added].

> FN3. Fed.R.Civ.P. 41(b) (providing, in pertinent part, that "[f]or failure of the plaintiff to prosecute or to comply with these rules or any

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4246443 (N.D.N.Y.)

(Cite as: 2007 WL 4246443 (N.D.N.Y.))

order of court, a defendant may move for dismissal of an action or of any claim against the defendant").

**A. Failure to Prosecute**

With regard to the first ground for dismissal (a failure to prosecute the action), it is within the trial judge's sound discretion to dismiss for want of prosecution.[FN4] The Second Circuit has identified five factors that it considers when reviewing a district court's order to dismiss an action for failure to prosecute:

FN4. *See Merker v. Rice,* 649 F.2d 171, 173 (2d Cir.1981).

[1] the duration of the plaintiff's failures, [2] whether plaintiff had received notice that further delays would result in dismissal, [3] whether the defendant is likely to be prejudiced by further delay, [4] whether the district judge has taken care to strike the balance between alleviating court calendar congestion and protecting a party's right to due process and a fair chance to be heard and [5] whether the judge has adequately assessed the efficacy of lesser sanctions.[FN5]

FN5. *See Shannon v. GE Co.,* 186 F.3d 186, 193 (2d Cir.1999) (affirming Rule 41[b] dismissal of plaintiff's claims by U.S. District Court for Northern District of New York based on plaintiff's failure to prosecute the action) [citation and internal quotation marks omitted].

**\*3** As a general rule, no single one of these five factors is dispositive.[FN6] However, I note that, with regard to the first factor, Rule 41.2 of the Local Rules of Practice for this Court provides that a "plaintiff's failure to take action for four (4) months shall be presumptive evidence of lack of prosecution." N.D.N.Y. L.R. 41.2(a). In addition, I note that a party's failure to keep the Clerk's Office apprised of his or her current address may also constitute grounds for dismissal under Rule 41(b) of the Federal Rules of Civil Procedure.[FN7]

FN6. *See Nita v. Conn. Dep't of Env. Protection,* 16 F.3d 482 (2d Cir.1994).

FN7. *See, e.g., Robinson v. Middaugh,* 95-CV-0836, 1997 U.S. Dist. LEXIS 13929, at *2-3, 1997 WL 567961 (N.D.N.Y. Sept. 11, 1997) (Pooler, J.) (dismissing action under Fed.R.Civ.P. 41[b] where plaintiff failed to inform the Clerk of his change of address despite having been previously ordered by Court to keep the Clerk advised of such a change); *see also* N.D.N.Y. L.R. 41.2(b) ("Failure to notify the Court of a change of address in accordance with [Local Rule] 10.1(b) may result in the dismissal of any pending action.").

Here, I find that, under the circumstances, the above-described factors weigh in favor of dismissal. The duration of Plaintiff's failure is some six-and-a-half months, i.e., since April 22, 2007, the date of the last document that Plaintiff attempted to file with the Court (Dkt. No. 85). Plaintiff received adequate notice (e.g., through the Court's above-referenced Order of April 15, 2004, and Defendants' motion to dismiss) that his failure to litigate this action (e.g., through providing a current address) would result in dismissal. Defendants are likely to be prejudiced by further delays in this proceeding, since they have been waiting to take Plaintiff's deposition since May 4, 2007. (Dkt. No. 84.) I find that the need to alleviate congestion on the Court's docket outweighs Plaintiff's right to receive a further chance to be heard in this action.[FN8] Finally, I have considered all less-drastic sanctions and rejected them, largely because they would be futile under the circumstances (e.g., an Order warning or chastising Plaintiff may very well not reach him, due to his failure to provide a current address).

FN8. It is cases like this one that delay the resolution of other cases, and that contribute to the Second Circuit's dubious distinction as having (among the twelve circuits, including the D.C. Circuit) the longest median time to disposition for prisoner civil rights cases, between 2000 and 2005 (9.8 months, as compared to a national average of 5.7 months). Simply stated, I am unable to afford Plaintiff with further special solicitude without impermissibly burdening the Court and unfairly tipping the scales of justice against Defendant.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4246443 (N.D.N.Y.)

(Cite as: 2007 WL 4246443 (N.D.N.Y.))

**B. Failure to Comply with Order of Court**

With regard to the second ground for dismissal (a failure to comply with an Order of the Court), the legal standard governing such a dismissal is very similar to the legal standard governing a dismissal for failure to prosecute. "Dismissal ... for failure to comply with an order of the court is a matter committed to the discretion of the district court." [FN9] The correctness of a dismissal for failure to comply with an order of the court is determined in light of five factors:

FN9. *Alvarez v. Simmons Market Research Bureau, Inc.,* 839 F.2d 930, 932 (2d Cir.1988) [citations omitted].

(1) the duration of the plaintiff's failure to comply with the court order, (2) whether plaintiff was on notice that failure to comply would result in dismissal, (3) whether the defendants are likely to be prejudiced by further delay in the proceedings, (4) a balancing of the court's interest in managing its docket with the plaintiff's interest in receiving a fair chance to be heard, and (5) whether the judge has adequately considered a sanction less drastic than dismissal.[FN10]

FN10. *Lucas v. Miles,* 84 F.3d 532, 535 (2d Cir.1996) [citations omitted].

Here, I find that, under the circumstances, the above-described factors weigh in favor of dismissal for the same reasons as described above in Part II.A. of this Report-Recommendation. I note that the Order that Plaintiff has violated is the Court's Order of April 15, 2004, wherein the Court ordered Plaintiff, *inter alia,* to keep the Clerk's Office apprised of his current address. (Dkt. No. 5, at 4.) Specifically, the Court advised plaintiff that *"[p]laintiff is also required to promptly notify the Clerk's Office and all parties or their counsel of any change in plaintiff's address; his failure to do same will result in the dismissal of this action."* (*Id.*) I note also that, on numerous previous occasions in this action, Plaintiff violated this Order, resulting in delays in the action. (*See* Dkt. Nos. 47, 48, 49, 50, 54, 59, 72, 78, 79 & Dkt. Entry for 12/15/06 [indicating that mail from the Court to Plaintiff was returned as undeliverable.])

**\*4** As a result, I recommend that, should the Court decide to deny Defendants' motion to dismiss, the Court exercise its authority to dismiss Plaintiff's Amended Complaint *sua sponte* for failure to prosecute and/or failure to comply with an Order of the Court.

**ACCORDINGLY,** for the reasons stated above, it is

**RECOMMENDED** that Defendants' motion to dismiss (Dkt. No. 86) be **GRANTED%;** and it is further

**RECOMMENDED** that, in the alternative, the Court exercise its inherent authority to **SUA SPONTE DISMISS** Plaintiff's Amended Complaint for failure to prosecute and/or failure to comply with an Order of the Court.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e)..

N.D.N.Y.,2007.

Rodriguez v. Goord
Not Reported in F.Supp.2d, 2007 WL 4246443 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))



Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Lisa ELGAMIL, Plaintiff,
v.
SYRACUSE UNIVERSITY, Defendant.
**No. 99-CV-611 NPMGLS.**

Aug. 22, 2000.

Joch & Kirby, Ithaca, New York, for Plaintiff, Joseph
Joch, of counsel.

Bond, Schoeneck & King, LLP, Syracuse, New York, for
Defendant, John Gaal, Paul Limmiatis, of counsel.

MEMORANDUM-DECISION AND ORDER

MCCURN, Senior J.

INTRODUCTION

**\*1** Plaintiff brings suit against defendant Syracuse
University ("University") pursuant to 20 U.S.C. §
1681*etseq.* ("Title IX") claiming hostile educational
environment, and retaliation for complaints of same.
Presently before the court is the University's motion for
summary judgment. Plaintiff opposes the motion.

LOCAL RULES PRACTICE

The facts of this case, which the court recites below, are
affected by plaintiff's failure to file a Statement of Material
Facts which complies with the clear mandate of Local

Rule 7.1(a)(3) of the Northern District of New York. This
Rule requires a motion for summary judgment to contain
a Statement of Material Facts with specific citations to the
record where those facts are established. A similar
obligation is imposed upon the non-movant who

shall file a response to the [movant's] Statement of
Material Facts. The non-movant's response shall mirror the
movant's Statement of Material Facts by admitting and/or
denying each of the movant's assertions in matching
numbered paragraphs. Each denial shall set forth a specific
citation to the record where the factual issue arises.... *Any
facts set forth in the [movant's] Statement of material
Facts shall be deemed admitted unless specifically
controverted by the opposing party.*

L.R. 7.1(a)(3) (emphasis in original).

In moving for summary judgment, the University filed an
eleven page, twenty-nine paragraph Statement of Material
Facts, replete with citations to the record in every
paragraph. Plaintiff, in opposition, filed a two page, nine
paragraph statement appended to her memorandum of law
which failed to admit or deny the specific assertions set
forth by defendant, and which failed to contain a single
citation to the record. Plaintiff has thus failed to comply
with Rule 7.1(a)(3).

As recently noted in another decision, "[t]he Local Rules
are not suggestions, but impose procedural requirements
upon parties litigating in this District." *Osier v. Broome
County,* 47 F.Supp.2d 311, 317 (N.D.N.Y.1999). As a
consequence, courts in this district have not hesitated to
enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f) [FNI]
by deeming the facts asserted in a movant's proper
Statement of Material Facts as admitted, when, as here, the
opposing party has failed to comply with the Rule.
*See,e.g.,Phipps v. New York State Dep't of Labor,* 53
F.Supp.2d 551, 556-57 (N.D.N.Y.1999); *DeMar v.
Car-Freshner Corp.,* 49 F.Supp.2d 84, 86
(N.D.N.Y.1999); *Osier,* 47 F. Supp .2d at 317;*Nicholson
v. Doe,* 185 F.R.D. 134, 135 (N.D.N.Y.1999); *TSI Energy,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Inc. v. Stewart and Stevenson Operations, Inc.,* 1998 WL
903629, at *1 n. 1 (N.D. N.Y.1998); *Costello v. Norton,*
1998 WL 743710, at *1 n. 2 (N.D.N.Y.1998); *Squair v.
O'Brien & Gere Engineers, Inc.,* 1998 WL 566773, at *1
n. 2 (N.D.N.Y.1998). As in the cases just cited, this court
deems as admitted all of the facts asserted in defendant's
Statement of Material Facts. The court next recites these
undisputed facts.

FN1. Amended January 1, 1999.

BACKGROUND

*2 Plaintiff became a doctoral student in the University's
Child and Family Studies ("CFS") department in the
Spring of 1995. Successful completion of the doctoral
program required a student to (1) complete 60 credit hours
of course work; (2) pass written comprehensive
examinations ("comp.exams") in the areas of research
methods, child development, family theory and a specialty
area; (3) after passing all four comp. exams, orally defend
the written answers to those exams; (4) then select a
dissertation topic and have the proposal for the topic
approved; and (5) finally write and orally defend the
dissertation. Plaintiff failed to progress beyond the first
step.

Each student is assigned an advisor, though it is not
uncommon for students to change advisors during the
course of their studies, for a myriad of reasons. The
advisor's role is to guide the student in regard to course
selection and academic progress. A tenured member of the
CFS department, Dr. Jaipaul Roopnarine, was assigned as
plaintiff's advisor.

As a student's comp. exams near, he or she selects an
examination committee, usually consisting of three faculty
members, including the student's advisor. This committee
writes the questions which comprise the student's comp.
exams, and provides the student with guidance and
assistance in preparing for the exams. Each member of the
committee writes one exam; one member writes two. Two
evaluators grade each exam; ordinarily the faculty member
who wrote the question, and one other faculty member

selected by the coordinator of exams.

Roopnarine, in addition to his teaching and advising
duties, was the coordinator of exams for the entire CFS
department. In this capacity, he was generally responsible
for selecting the evaluators who would grade each
student's comp. exam, distributing the student's answer to
the evaluators for grading, collecting the evaluations, and
compiling the evaluation results.

The evaluators graded an exam in one of three ways:
"pass," "marginal" or "fail." A student who received a
pass from each of the two graders passed that exam. A
student who received two fails from the graders failed the
exam. A pass and a marginal grade allowed the student to
pass. A marginal and a fail grade resulted in a failure. Two
marginal evaluations may result in a committee having to
decide whether the student would be given a passing
grade. In cases where a student was given both a pass and
a fail, a third evaluator served as the tie breaker.

These evaluators read and graded the exam questions
independently of each other, and no indication of the
student's identity was provided on the answer.[FN2] The
coordinator, Roopnarine, had no discretion in compiling
these grades-he simply applied the pass or fail formula
described above in announcing whether a student passed
or failed the comp. exams. Only after a student passed all
four written exam questions would he or she be permitted
to move to the oral defense of those answers.

FN2. Of course, as mentioned, because one of
the evaluators may have written the question, and
the question may have been specific to just that
one student, one of the two or three evaluators
may have known the student's identity regardless
of the anonymity of the examination answer.

*3 Plaintiff completed her required course work and took
the comp. exams in October of 1996. Plaintiff passed two
of the exams, family theory and specialty, but failed two,
child development and research methods. On each of the
exams she failed, she had one marginal grade, and one
failing grade. Roopnarine, as a member of her committee,

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

authored and graded two of her exams. She passed one of them, specialty, and failed the other, research methods. Roopnarine, incidently, gave her a pass on specialty, and a marginal on research methods. Thus it was another professor who gave her a failing grade on research methods, resulting in her failure of the exam. As to the other failed exam, child development, it is undisputed that Roopnarine neither wrote the question, nor graded the answer.

Pursuant to the University's procedures, she retook the two exams she failed in January of 1997. Despite being given the same questions, she only passed one, child development. She again failed research methods by getting marginal and fail grades from her evaluators. This time, Roopnarine was not one of the evaluators for either of her exam questions.

After this second unsuccessful attempt at passing research methods, plaintiff complained to the chair of the CFS department, Dr. Norma Burgess. She did not think that she had been properly prepared for her exam, and complained that she could no longer work with Roopnarine because he yelled at her, was rude to her, and was otherwise not responsive or helpful. She wanted a new advisor. Plaintiff gave no indication, however, that she was being sexually harassed by Roopnarine.

Though plaintiff never offered any additional explanation for her demands of a new advisor, Burgess eventually agreed to change her advisor, due to plaintiff's insistence. In March of 1997, Burgess and Roopnarine spoke, and Roopnarine understood that he would no longer be advising plaintiff. After that time period, plaintiff and Roopnarine had no further contact. By June of that year, she had been assigned a new advisor, Dr. Mellisa Clawson.

Plaintiff then met with Clawson to prepare to take her research methods exam for the third time. Despite Clawson's repeated efforts to work with plaintiff, she sought only minimal assistance; this was disturbing to Clawson, given plaintiff's past failures of the research methods exam. Eventually, Clawson was assigned to write plaintiff's third research methods exam.

The first time plaintiff made any mention of sexual harassment was in August of 1997, soon before plaintiff made her third attempt at passing research methods. She complained to Susan Crockett, Dean of the University's College of Human Development, the parent organization of the CFS department. Even then, however, plaintiff merely repeated the claims that Roopnarine yelled at her, was rude to her, and was not responsive or helpful. By this time Roopnarine had no contact with plaintiff in any event. The purpose of plaintiff's complaint was to make sure that Roopnarine would not be involved in her upcoming examination as exam coordinator. Due to plaintiff's complaints, Roopnarine was removed from all involvement with plaintiff's third research methods examination. As chair of the department, Burgess took over the responsibility for serving as plaintiff's exam coordinator. Thus, Burgess, not Roopnarine, was responsible for receiving plaintiff's answer, selecting the evaluators, and compiling the grades of these evaluators; [FN3] as mentioned, Clawson, not Roopnarine, authored the exam question.

FN3. Plaintiff appears to allege in her deposition and memorandum of law that Roopnarine remained the exam coordinator for her third and final exam. *See* Pl.'s Dep. at 278; Pl.'s Mem. of Law at 9. The overwhelming and undisputed evidence in the record establishes that Roopnarine was not, in fact, the coordinator of this exam. Indeed, as discussed above, the University submitted a Statement of Material Facts which specifically asserted in paragraph 18 that Roopnarine was removed from all involvement in plaintiff's exam, including the role of exam coordinator. *See* Def.'s Statement of Material Facts at ¶ 18 (and citations to the record therein). Aside from the fact that this assertion is deemed admitted for plaintiff's failure to controvert it, plaintiff cannot maintain, without any evidence, that Roopnarine was indeed her exam coordinator. Without more than broad, conclusory allegations of same, no genuine issue of material fact exists on this question.

*4 Plaintiff took the third research methods examination

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

in September of 1997. Clawson and another professor, Dr. Kawamoto, were her evaluators. Clawson gave her a failing grade; Kawamoto indicated that there were "some key areas of concern," but not enough for him to deny her passage. As a result of receiving one passing and one failing grade, plaintiff's research methods exam was submitted to a third evaluator to act as a tie breaker. Dr. Dean Busby, whose expertise was research, was chosen for this task. Busby gave plaintiff a failing grade, and began his written evaluation by stating that

[t]his is one of the most poorly organized and written exams I have ever read. I cannot in good conscience vote any other way than a fail. I tried to get it to a marginal but could not find even one section that I would pass.

Busby Aff. Ex. B.

The undisputed evidence shows that Clawson, Kawamoto and Busby each evaluated plaintiff's exam answer independently, without input from either Roopnarine or anyone else. Kawamoto and Busby did not know whose exam they were evaluating. [FN4] Importantly, it is also undisputed that none of the three evaluators knew of plaintiff's claims of sexual harassment.

> [FN4.] Clawson knew it was plaintiff's examination because she was plaintiff's advisor, and wrote the examination question.

After receiving the one passing and two failing evaluations, Burgess notified plaintiff in December of 1997 that she had, yet again, failed the research methods exam, and offered her two options. Although the University's policies permitted a student to only take a comp. exam three times (the original exam, plus two retakes), the CFS department would allow plaintiff to retake the exam for a fourth time, provided that she took a remedial research methods class to strengthen her abilities. Alternatively, Burgess indicated that the CFS department would be willing to recommend plaintiff for a master's degree based on her graduate work. Plaintiff rejected both offers.

The second time plaintiff used the term sexual harassment in connection with Roopnarine was six months after she was notified that she had failed for the third time, in May of 1998. Through an attorney, she filed a sexual harassment complaint against Roopnarine with the University. This written complaint repeated her allegations that Roopnarine had yelled at her, been rude to her, and otherwise had not been responsive to her needs. She also, for the first time, complained of two other acts:

1. that Roopnarine had talked to her about his sex life, including once telling her that women are attracted to him, and when he attends conferences, they want to have sex with him over lunch; and

2. that Roopnarine told her that he had a dream in which he, plaintiff and plaintiff's husband had all been present.

Prior to the commencement of this action, this was the only specific information regarding sexual harassment brought to the attention of University officials.

The University concluded that the alleged conduct, if true, was inappropriate and unprofessional, but it did not constitute sexual harassment. Plaintiff then brought this suit. In her complaint, she essentially alleges two things; first, that Roopnarine's conduct subjected her to a sexually hostile educational environment; and second, that as a result of complaining about Roopnarine's conduct, the University retaliated against her by preventing her from finishing her doctorate, mainly, by her failing her on the third research methods exam.

**\*5** The University now moves for summary judgment. Primarily, it argues that the alleged conduct, if true, was not sufficiently severe and pervasive to state a claim. Alternatively, it argues that it cannot be held liable for the conduct in any event, because it had no actual knowledge of plaintiff's alleged harassment, and was not deliberately indifferent to same. Finally, it argues that plaintiff is unable to establish a retaliation claim. These contentions are addressed below.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

DISCUSSION

The principles that govern summary judgment are well established. Summary judgment is properly granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the court must draw all factual inferences and resolve all ambiguities in favor of the nonmoving party. See Torres v. Pisano, 116 F.3d 625, 630 (2d Cir.1997). As the Circuit has recently emphasized in the discrimination context, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial." Danzer v. Norden Sys., Inc., 151 F.3d 50, 54 (2d Cir.1998). Rather, there must be either an absence of evidence that supports plaintiff's position, see Norton v. Sam's Club, 145 F.3d 114, 117-20 (2d Cir.), cert. denied, 525 U.S. 1001 (1998), "or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." Danzer, 151 F.3d at 54. Yet, as the Circuit has also admonished, "purely conclusory allegations of discrimination, absent any concrete particulars," are insufficient to defeat a motion for summary judgment. Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.1985). With these principles in mind, the court turns to defendant's motion.

*I. Hostile Environment*

Title IX provides, with certain exceptions not relevant here, that

[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

Recently, the Supreme Court reiterated that Title IX is enforceable through an implied private right of action, and that monetary damages are available in such an action.

See Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, , 118 S.Ct. 1989, 1994 (1998) (citing Cannon v. University of Chicago, 441 U .S. 677 (1979) and Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60 (1992)).

A. Severe or Pervasive

Provided that a plaintiff student can meet the requirements to hold the school itself liable for the sexual harassment, [FN5] claims of hostile educational environment are generally examined using the case law developed for hostile work environment under Title VII. See Davis, 119 S.Ct. at 1675 (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986), a Title VII case). Accord Kracunas v. Iona College, 119 F.3d 80, 87 (2d Cir.1997); Murray v. New York Univ. College of Dentistry, 57 F.3d 243, 249 (2d Cir.1995), both abrogated on other grounds by Gebser, 118 S.Ct. at 1999.

FN5. In Gebser, 118 S.Ct. at 1999, and Davis v. Monroe County Bd. of Educ., 526 U.S. 629, , 119 S.Ct. 1661, 1671 (1999), the Supreme Court explicitly departed from the respondeat superior principles which ordinarily govern Title VII actions for purposes of Title IX; in a Title IX case it is now clear that a school will not be liable for the conduct of its teachers unless it knew of the conduct and was deliberately indifferent to the discrimination. Defendant properly argues that even if plaintiff was subjected to a hostile environment, she cannot show the University's knowledge and deliberate indifference. This argument will be discussed below.

It bears noting that courts examining sexual harassment claims sometimes decide first whether the alleged conduct rises to a level of actionable harassment, before deciding whether this harassment can be attributed to the defendant employer or school, as this court does here. See, e.g., Distasio v. Perkin Elmer Corp., 157 F.3d 55 (2d Cir.1998). Sometimes, however, courts first examine whether the defendant can be held liable for the conduct,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

and only then consider whether this conduct is actionable. *See,e.g.,Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767 n. 8 (2d Cir.1998). As noted in *Quinn,* the Circuit has not instructed that the sequence occur in either particular order. *Seeid.*

**\*6** In *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22 (1993), the Supreme Court stated that in order to succeed, a hostile environment claim must allege conduct which is so "severe or pervasive" as to create an " 'objectively' hostile or abusive work environment," which the victim also "subjectively perceive[s] ... to be abusive." *Richardson v. New York State Dep't of Corr. Servs .,* 180 F.3d 426, 436 (alteration in original) (quoting *Harris,* 510 U.S. at 21-22). From this court's review of the record, there is no dispute that plaintiff viewed her environment to be hostile and abusive; hence, the question before the court is whether the environment was "objectively" hostile. *Seeid.* Plaintiff's allegations must be evaluated to determine whether a reasonable person who is the target of discrimination would find the educational environment "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victim['s] educational experience, that [this person is] effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

Conduct that is "merely offensive" but "not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive" is beyond the purview of the law. *Harris,* 510 U.S. at 21. Thus, it is now clear that neither "the sporadic use of abusive language, gender-related jokes, and occasional testing," nor "intersexual flirtation," accompanied by conduct "merely tinged with offensive connotations" will create an actionable environment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998). Moreover, a plaintiff alleging sexual harassment must show the hostility was based on membership in a protected class. *SeeOncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 77 (1998). Thus, to succeed on a claim of sexual harassment, a plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimina[tion] ... because of ... sex." *Id.* at 81 (alteration

and ellipses in original).

The Supreme Court has established a non-exclusive list of factors relevant to determining whether a given workplace is permeated with discrimination so severe or pervasive as to support a Title VII claim. *SeeHarris,* 510 U.S. at 23. These include the frequency of the discriminatory conduct, its severity, whether the conduct was physically threatening or humiliating, whether the conduct unreasonably interfered with plaintiff's work, and what psychological harm, if any, resulted from the conduct. *Seeid.;Richardson,* 180 F.3d at 437.

Although conduct can meet this standard by being either "frequent" or "severe," *Osier,* 47 F.Supp.2d at 323, "isolated remarks or occasional episodes of harassment will not merit relief [ ]; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." ' *Quinn,* 159 F.3d at 767 (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 n. 5 (2d Cir.1995)). Single or episodic events will only meet the standard if they are sufficiently threatening or repulsive, such as a sexual assault, in that these extreme single incidents "may alter the plaintiff's conditions of employment without repetition." *Id.AccordKotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (2d Cir.1992) ("[t]he incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief.").

**\*7** The University quite properly argues that the conduct plaintiff alleges is not severe and pervasive. As discussed above, she claims that she was subjected to behavior by Roopnarine that consisted primarily of his yelling at her, being rude to her, and not responding to her requests as she felt he should. This behavior is insufficient to state a hostile environment claim, despite the fact that it may have been unpleasant. *See,e.g.,Gutierrez v. Henoch,* 998 F.Supp. 329, 335 (S.D.N.Y.1998) (disputes relating to job-related disagreements or personality conflicts, without more, do not create sexual harassment liability); *Christoforou v. Ryder Truck Rental, Inc.,* 668 F.Supp. 294, 303 (S.D.N.Y.1987) ("there is a crucial difference between personality conflict ... which is unpleasant but legal ... [and sexual harassment] ... which is despicable and illegal."). Moreover, the court notes that plaintiff has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

failed to show that this alleged behavior towards her was sexually related-an especially important failing considering plaintiff's own testimony that Roopnarine treated some males in much of the same manner. *See,e.g.,* Pl.'s Dep. at 298 ("He said that Dr. Roopnarine screamed at him in a meeting"). As conduct that is "equally harsh" to both sexes does not create a hostile environment, *Brennan v. Metropolitan Opera Ass'n, Inc.,* 192 F.3d 310, 318 (2d Cir.1999), this conduct, while demeaning and inappropriate, is not sufficiently gender-based to support liability. See *Osier,* 47 F.Supp.2d at 324.

The more detailed allegations brought forth for the first time in May of 1998 are equally unavailing. These allegations are merely of two specific, isolated comments. As described above, Roopnarine told plaintiff of his sexual interaction(s) with other women, and made a single, non-sexual comment about a dream in which plaintiff, plaintiff's husband, and Roopnarine were all present. Accepting as true these allegations, the court concludes that plaintiff has not come forward with evidence sufficient to support a finding that she was subject to abuse of sufficient severity or pervasiveness that she was "effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

*Quinn,* a recent Second Circuit hostile work environment case, illustrates the court's conclusion well. There, plaintiff complained of conduct directed towards her including sexual touching and comments. She was told by her supervisor that she had been voted the "sleekest ass" in the office and the supervisor deliberately touched her breasts with some papers he was holding. 159 F.3d at 768. In the Circuit's view, these acts were neither severe nor pervasive enough to state a claim for hostile environment. *See id.* In the case at bar, plaintiff's allegations are no more severe than the conduct alleged in *Quinn,* nor, for that matter, did they occur more often. Thus, without more, plaintiff's claims fail as well.

**\*8** Yet, plaintiff is unable to specify any other acts which might constitute sexual harassment. When pressed to do so, plaintiff maintained only that she "knew" what Roopnarine wanted "every time [she] spoke to him" and that she could not "explain it other than that's the feeling [she] had." Pl.'s Dep. at 283-85, 287, 292. As defendant

properly points out, these very types of suspicions and allegations of repeated, but unarticulated conduct have been shown to be insufficient to defeat summary judgment. See *Meiri,* 759 F.2d at 998 (plaintiff's allegations that employer " 'conspired to get of [her];' that he 'misconceived [her] work habits because of his subjective prejudice against [her] Jewishness;' and that she 'heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us,' " are conclusory and insufficient to satisfy the demands of Rule 56) (alterations and ellipses in original); *Dayes v. Pace Univ.,* 2000 WL 307382, at *5 (S.D.N.Y.2000) (plaintiff's attempts to create an appearance of pervasiveness by asserting "[t]he conduct to which I was subjected ... occurred regularly and over many months," without more "is conclusory, and is not otherwise supported in the record [and] therefore afforded no weight"); *Quiros v. Ciba-Geigy Corp.,* 7 F.Supp.2d 380, 385 (S.D.N.Y.1998) (plaintiff's allegations of hostile work environment without more than conclusory statements of alleged discrimination insufficient to defeat summary judgment); *Eng v. Beth Israel Med. Ctr.,* 1995 U.S. Dist. Lexis 11155, at *6 n. 1 (S.D.N.Y.1995) (plaintiff's "gut feeling" that he was victim of discrimination was no more than conclusory, and unable to defeat summary judgment). As plaintiff comes forward with no proper showing of either severe or pervasive conduct, her hostile environment claim necessarily fails.

B. Actual Knowledge / Deliberate Indifference

Even if plaintiff's allegations were sufficiently severe or pervasive, her hostile environment claim would still fail. As previously discussed, *seesupra* note 5, the Supreme Court recently departed from the framework used to hold defendants liable for actionable conduct under Title VII. See *Davis,* 119 S.Ct. at 1671; *Gebser,* 118 S.Ct. at 1999. Pursuant to these new decisions, it is now clear that in order to hold an educational institution liable for a hostile educational environment under Title IX, it must be shown that "an official who at minimum has authority to address the alleged discrimination and to institute corrective measures on the [plaintiff's] behalf *has actual knowledge of [the] discrimination* [.]" *Gebser,* 118 S.Ct. at 1999 (emphasis supplied). What's more, the bar is even higher: after learning of the harassment, in order for the school to be liable, its response must then "amount to deliberate

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

indifference to discrimination[,]" or, "in other words, [ ] *an official decision by the [school] not to remedy the violation."Id.* (Emphasis supplied). *Accord**Davis,* 119 S.Ct. at 1671* ("we concluded that the [school] could be liable for damages only where the [school] itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge."). This requires plaintiff to show that the school's "own deliberate indifference effectively 'cause[d]' the discrimination." *Id.* (alteration in original) (quoting *Gebser,* 118 S.Ct. at 1999). The circuits that have taken the question up have interpreted this to mean that there must be evidence that actionable harassment continued to occur *after* the appropriate school official gained actual knowledge of the harassment. *See**Reese v. Jefferson Sch. Dist.,* 208 F.3d 736, 740 (9th Cir.2000); *Soper v. Hoben,* 195 F.3d 845, 855 (6th Cir.1999); *Murrell v. School Dist. No. 1, Denver Colo.,* 186 F.3d 1238, 1246 (10th Cir.1999); *Wills v. Brown Univ.,* 184 F.3d 20, 26-27 (1st Cir.1999). There is no serious contention that plaintiff can satisfy this requirement.

**\*9** By the time plaintiff complained to Dean Crockett of sexual harassment in August of 1997, it is uncontested that her alleged harasser had no contact with her. Nor, for that matter, did he ultimately have any involvement in the third retake of her exam. She had a new advisor, exam committee and exam coordinator. Quite simply, by that point, Roopnarine had no involvement with her educational experience at all.[FN6] This undisputed fact is fatal to plaintiff's claim. As discussed above, the Supreme Court now requires some harm to have befallen plaintiff *after* the school learned of the harassment. As there have been no credible allegations of subsequent harassment, no liability can be attributed to the University.[FN7]*See**Reese,* 208 F.3d at 740 ("There is no evidence that any harassment occurred after the school district learned of the plaintiffs' allegations. Thus, under *Davis,* the school district cannot be deemed to have 'subjected' the plaintiffs to the harassment.").

FN6. Of course, plaintiff contends that the University had notice of the harassment prior to this time, through her complaints to Burgess that she no longer could work with Roopnarine, because he yelled at her, was rude to her, and refused to assist her with various requests. But it is undisputed that she never mentioned sexual harassment, and provided no details that might suggest sexual harassment. Indeed, as pointed out by defendant, plaintiff *herself* admits that she did not consider the conduct sexual harassment until another person later told her that it might be, in June of 1997. *See* Pl.'s Dep. at 258-59, 340. As a result, plaintiff can not seriously contend that the University was on notice of the alleged harassment before August of 1997.

FN7. As mentioned previously, *seesupra* note 3, plaintiff maintains without any evidentiary support that Roopnarine played a role in her third exam. This allegation is purely conclusory, especially in light of the record evidence the University puts forward which demonstrates that he was not, in fact, involved in the examination.

As plaintiff's allegations of harassment are not severe or pervasive enough to state a claim, and in any event, this conduct can not be attributed to the University, her hostile environment claim is dismissed.

*II. Retaliation*

Plaintiff's retaliation claim must be dismissed as well. She cannot establish an actionable retaliation claim because there is no evidence that she was given failing grades due to complaints about Roopnarine. *See**Murray,* 57 F.3d at 251 (retaliation claim requires evidence of causation between the adverse action, and plaintiff's complaints of discrimination). The retaliation claim appears to be based exclusively on plaintiff's speculative and conclusory allegation that Roopnarine was involved in or influenced the grading of her third research methods exam.[FN8] In any event, the adverse action which plaintiff claims to be retaliation must be limited to her failing grade on the third research methods exam, since plaintiff made no complaints of sexual harassment until August of 1997, long after plaintiff failed her second examination. *See**Murray,* 57 F.3d at 251 (retaliation claim requires proof that defendant had knowledge of plaintiff's protected activity at the time of the adverse reaction); *Weaver v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Ohio State Univ.*, 71 F.Supp.2d 789, 793-94 (S.D.Ohio) ("[c]omplaints concerning unfair treatment in general which do not specifically address discrimination are insufficient to constitute protected activity"), *aff'd,* 194 F.3d 1315 (6th Cir.1999).

FN8. As properly noted by defendant, *see* Def. Mem. of Law at 28 n. 14, plaintiff's complaint alleges that a number of individuals retaliated against her, but in her deposition she essentially conceded that she has no basis for making a claim against anyone other than Roopnarine and those who graded her third exam. *See* Pl.'s Dep. at 347-53.

The undisputed evidence establishes that Roopnarine had no role in the selection of who would grade plaintiff's exam. Nor, for that matter, did he grade the exam; this was done by three other professors. Each of these professors has averred that they graded the exam without any input or influence from Roopnarine. More importantly, it is undisputed that none of the three had any knowledge that a sexual harassment complaint had been asserted by plaintiff against Roopnarine, not surprising since two of the three did not even know whose exam they were grading. Plaintiff's inability to show that her failure was causally related in any way to her complaint of harassment is fatal to her retaliation claim.[FN9]

FN9. Plaintiff's claim also fails to the extent that the school's refusal to let her take the research methods exam for a fourth time was the retaliatory act she relies upon. It is undisputed that the University's policies for CFS department students only allow a comp. exam to be given three times. *See* Gaal Aff. Ex. 53. Plaintiff cannot claim that the University's refusal to depart from its own policies was retaliation without some concrete showing that its refusal to do so was out of the ordinary, i.e., that it had allowed other students to take the exam a fourth time without a remedial course, when these other students had not engaged in some protected activity. *See* *Murray,* 57 F.3d at 251 (there is "no allegation either that NYU selectively enforced its academic standards, or that the decision in

[plaintiff's] case was inconsistent with these standards.").

CONCLUSION

*10 For the aforementioned reasons, Syracuse University's motion for summary judgment is GRANTED; plaintiff's claims of hostile environment and retaliation are DISMISSED.

IT IS SO ORDERED.

N.D.N.Y.,2000.
Elgamil v. Syracuse University
Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)

(Cite as: 1998 WL 278264 (N.D.N.Y.))



Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

Anthony ROBINSON, Plaintiff,

v.

Jane DELGADO, Hearing Officer and Lieutenant; and
Donald Selsky, Director of Inmate Special Housing
Program, Defendants.

No. 96-CV-169 (RSP/DNH).

May 22, 1998.

Anthony Robinson, Veterans Shelter, Brooklyn, for
Plaintiff, Pro Se.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Attorney for Defendants, Albany, Ellen Lacy
Messina, Esq., Assistant Attorney General, of Counsel.

ORDER

POOLER, D.J.

**\*1** Anthony Robinson, a former inmate incarcerated
by the New York State Department of Corrections
("DOCS"), sued two DOCS employees, alleging that they
violated his right to due process in the course of a
disciplinary proceeding and subsequent appeal. On
September 9, 1997, defendants moved for summary
judgment. Defendants argued that plaintiff failed to
demonstrate that the fifty days of keeplock confinement
that he received as a result of the hearing deprived him of
a liberty interest within the meaning of the Due Process
Clause. Plaintiff did not oppose the summary judgment
motion, and Magistrate Judge David N. Hurd
recommended that I grant it in a report-recommendation
filed April 16, 1998. Plaintiff did not file objections.

Because plaintiff did not file objections, I "need only
satisfy [myself] that there is no clear error on the face of
the record in order to accept the recommendation."
Fed.R.Civ.P. 72(b) advisory committee's note. After
reviewing the record, I conclude that there is no clear error
on the face of the record. After being warned by
defendants' motion that he must offer proof in admissible
form that his disciplinary confinement imposed an
"atypical and significant hardship on the inmate in relation
to the ordinary incidents of prison life," Robinson failed
to offer any such proof. *Sandin v. Conner,* 515 U.S. 472,
115 S.Ct. 2293, 2300, 132 L.Ed.2d 418 (1995).
Consequently, he cannot maintain a due process challenge.
*Id.* Therefore, it is

ORDERED that the report-recommendation is
approved; and it is further

ORDERED that defendants' motion for summary
judgment is granted and the complaint dismissed; and it is
further

ORDERED that the Clerk of the Court serve a copy

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)

(Cite as: 1998 WL 278264 (N.D.N.Y.))

of this order on the parties by ordinary mail.

HURD, Magistrate J.

REPORT-RECOMMENDATION

The above civil rights action has been referred to the undersigned for Report and Recommendation by the Honorable Rosemary S. Pooler, pursuant to the local rules of the Northern District of New York. The plaintiff commenced the above action pursuant to 42 U.S.C. § 1983 claiming that the defendants violated his Fifth, Eighth, and Fourteenth Amendment rights under the United States Constitution. The plaintiff seeks compensatory and punitive damages.

Presently before the court is defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. However:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P 56(e).

In addition, "[f]ailure to file any papers as required by this rule shall, unless for good cause shown, be deemed by the court as consent to the granting or denial of the motion, as the case may be." L.R. 7.1(b)(3).

*2 The defendants filed their motion on September 9, 1997. The response to the motion was due on October 23, 1997. It is now five months beyond the date when the plaintiff's response was due, and he has failed to file any papers in opposition to defendants' motion.

Therefore, after careful consideration of the notice of motion, affirmation of Ellen Lacy Messina, Esq., with exhibits attached, and the memorandum of law; and there being no opposition to the motion; it is

RECOMMENDED that the motion for summary judgment be GRANTED and the complaint be dismissed in its entirety.

Pursuant to 28 U.S.C. § 636(b)(l), the parties have ten days within which to file written objections to the foregoing report. *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696(1992). Such objections shall be filed with the Clerk of the Court with a copy to be mailed to the chambers of the undersigned at 10 Broad Street, Utica, New York 13501. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(l); Fed.R.Civ.P. 72, 6(a), 6(e); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of HHS,* 892 F.2d 15, 16 (2d Cir.1989); and it is

ORDERED, that the Clerk of the Court serve a copy of this Order and Report-Recommendation, by regular mail, upon the parties to this action.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)

(Cite as: 1998 WL 278264 (N.D.N.Y.))

N.D.N.Y.,1998.

Robinson v. Delgado

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Valery LATOUCHE, Plaintiff,
v.
Michael C. TOMPKINS, C.O., Clinton Correctional
Facility; Dean E. Laclair, C.O., Clinton Correctional
Facility; Jeffrey R. Ludwig, C.O ., Clinton Correctional
Facility; Michael B. King, Sgt., Clinton Correctional
Facility; D. Mason, C.O., Clinton Correctional Facility;
B. Malark, C.O., Clinton Correctional Facility; John
Reyell, C.O., Clinton Correctional Facility; Bob
Fitzgerald, R.N., Clinton Correctional Facility; John
Doe, C.O. (C.O. Gallery Officer Company Upper F–6);
John Doe, C.O. (Mess Hall Supervising C.O.),
Defendants.
No. 9:09–CV–308 (NAM/RFT).

March 23, 2011.
Valery LaTouche, Ossining, NY, pro se.

Eric T. Schneiderman, Attorney General for the State of
New York, Krista A. Rock, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

**MEMORANDUM–DECISION AND ORDER**

NORMAN A. MORDUE, Chief Judge.

**INTRODUCTION**

**\*1** In this *pro se* action under 42 U.S.C. § 1983,
plaintiff, an inmate in the custody of the New York State
Department of Correctional Services ("DOCS"), claims
that defendants violated his Eighth Amendment rights as
a result of a physical altercation. Defendants moved for
summary judgment pursuant to Rule 56 of the Federal
Rules of Civil Procedure (Dkt. No. 46) and plaintiff
opposed the motion. (Dkt. No. 53). The motions were
referred to United States Magistrate Judge Randolph F.
Treece for a Report and Recommendation pursuant to 28
U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c).

Magistrate Judge Treece issued a Report and
Recommendation (Dkt. No. 60) recommending that
defendants' motion be granted in part and denied in part.
Specifically, Magistrate Judge Treece recommended
awarding summary judgment dismissing the following: (1)
plaintiff's claims for monetary relief against all defendants
in their official capacity; (2) plaintiff's claims of medical
indifference against defendant Fitzgerald; and (3)
plaintiff's allegations of verbal harassment by defendant
Mason. Magistrate Judge Treece also recommended
denying defendants' motion for summary judgment on
plaintiff's excessive force claims against defendants
Tompkins, LaClair, Mason, Malark and Reyell and
plaintiff's failure to protect claims against defendants
Ludwig and King.

Defendants filed specific objections to portions of the
Report and Recommendation arguing: (1) that the
Magistrate Judge erred in "overlooking" plaintiff's failure
to comply with Local Rule 7.1(a) (3); (2) that the
Magistrate Judge erred when he failed to apply the
*Jeffreys* exception as plaintiff's testimony was incredible
as a matter of law; and (3) plaintiff's excessive force
claims against defendant Reyell are subject to dismissal
for lack of personal involvement. (Dkt. No. 61). Plaintiff
does not object to the Report and Recommendation. (Dkt.
No. 62).

In view of defendants' objections, pursuant to 28
U.S.C. § 636(b) (1)(c), this Court conducts a *de novo*
review of these issues. The Court reviews the remaining
portions of the Report–Recommendation for clear error or
manifest injustice. *See Brown v. Peters,* 1997 WL 599355,
*2–3 (N.D.N.Y.),* *af'd without op.,* 175 F.3d 1007 (2d
Cir.1999); *see also Batista v. Walker,* 1995 WL 453299,
at *1 (S.D.N.Y.1995)* (when a party makes no objection to
a portion of the report-recommendation, the Court reviews
that portion for clear error or manifest injustice). Failure
to object to any portion of a report and recommendation
waives further judicial review of the matters therein. *See
Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993).

**DISCUSSION**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))

## I. Local Rule 7.1(a)(3)

The submissions of *pro se* litigants are to be liberally construed. *Nealy v. U.S. Surgical Corp.,* 587 F.Supp.2d 579, 583 (S.D.N.Y.2008). However, a *pro se* litigant is not relieved of the duty to meet the requirements necessary to defeat a motion for summary judgment. *Id.* (citing *Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 50 (2d Cir.2003)). Where a plaintiff has failed to respond to a defendant's statement of material facts, the facts as set forth in defendant's Rule 7.1 statement will be accepted as true to the extent that (1) those facts are supported by the evidence in the record, and (2) the non-moving party, if he is proceeding *pro se,* has been specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment. *Littman v. Senkowski,* 2008 WL 420011, at *2 (N.D.N.Y.2008) (citing *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996)). [FN1]

FN1. Local Rule 7.1(a)(3) provides:

Summary Judgment Motions

Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits. It does not, however, include attorney's affidavits. *Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion.*

The moving party shall also advise *pro se* litigants about the consequences of their failure to respond to a motion for summary judgment. See also L.R. 56.2.

The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs. *The Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.*

Local Rule 7.1(a)(3) (emphasis in original).

**\*2** The record herein contains few undisputed facts. Plaintiff and defendants disagree on many of the events that transpired and provide conflicting accounts of the circumstances surrounding the incident. In support of the motion, defendants properly filed a Statement of Material Facts pursuant to Local Rule 7.1 and notified plaintiff about the consequences of his failure to respond to the motion for summary judgment. Plaintiff does not dispute that he received such notification from defendants. Plaintiff responded with a handwritten "Statement of Facts", without citations to the record, and failed to specifically admit or deny defendants' factual statements as required by Local Rule 7.1. However, plaintiff also annexed a copy of his deposition transcript. In the deposition, upon questioning from defense counsel, plaintiff testified as follows:

Q. ... Have you read the complaint?

A. Yes, ma'am.

Q. So, you are aware of its contents?

A. Yes, ma'am.

Q. Did anyone help you prepare the complaint?

A. No, ma'am.

Q. Are there any statements contained in the complaint that you now wish to change or modify?

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))

A. I'm not sure.

Q. Well, let me ask you this: So, do you adopt this document under oath as true to the best of your knowledge?

A. Yes, ma'am.

Transcript of Plaintiff's Deposition at 13.

A verified complaint may be treated as an affidavit for the purposes of a summary judgment motion and may be considered in determining whether a genuine issue of material fact exists. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (the plaintiff verified his complaint by attesting under penalty of perjury that the statements in the complaint were true to the best of his knowledge). Based upon the aforementioned colloquy, the Court deems plaintiff's complaint to be "verified" and as such, will treat the complaint as an affidavit. *See Torres v. Caron,* 2009 WL 5216956, at *3 (N.D.N.Y.2009). While plaintiff has not formally and technically complied with the requirements of Local Rule 7.1(a)(3), his opposition to defendants' motion contains sworn testimony. In light of his *pro se* status and the preference to resolve disputes on the merits rather than "procedural shortcomings", to the extent that plaintiff's "Statement of Facts" and assertions in the complaint do not contradict his deposition testimony, the Court will consider those facts in the context of the within motion. *See Mack v. U.S.,* 814 F.2d 120, 124 (2d Cir.1987); *see also Liggins v. Parker,* 2007 WL 2815630, at *8 (N.D.N.Y.2007) (citing *Lucas v. Miles,* 84 F.3d 532, 535 (2d Cir.1996)) The Court has reviewed plaintiff's complaint and compared the allegations with the testimony presented at his deposition and adopts Magistrate Judge Treece's summary of the "facts" as presented by both parties.[FN2]

> FN2. While the Court adopts Magistrate Judge Treece's recitation of defendants' and plaintiff's versions of the facts, the Court does not adopt the reasoning set forth in the Footnote 2 of the Report and Recommendation.

## II. *Jeffreys* **Exception**

Defendants argue that the Court should apply *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) and award summary judgment dismissing all claims of excessive force based upon plaintiff's implausible and contradictory claims.

**\*3** "It is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment' ". *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir.2006) (citing *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997) (unfavorable assessments of a plaintiff's credibility are not "within the province of the court on a motion for summary judgment")). A narrow exception to this general rule was created by the Second Circuit in *Jeffreys:*

> While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether "the jury could reasonably find for the plaintiff," and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account. Under these circumstances, the moving party still must meet the difficult burden of demonstrating that there is no evidence in the record upon which a reasonable factfinder could base a verdict in the plaintiff's favor.

> *Id.* at 554 (internal citations and citations omitted).

Here, while plaintiff relies exclusively on his own testimony, for *Jeffreys* to apply, the testimony must also be "contradictory and incomplete". In this regard, defendants argue that plaintiff's allegations are contradicted by his prior accounts of the incident. Defendants cite to the record and argue that plaintiff told Fitzgerald that, "I hit the officer first" and that "I was hurt when I was subdued". Moreover, defendants point out that these statements were documented in an Inmate Injury Report executed by plaintiff.

Plaintiff does not deny making the aforementioned statements. However, in his deposition, plaintiff explained

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))

those discrepancies and testified:

Q. —did Nurse Fitzgerald ask you any questions while he was examining you?

A. I think he asked me how am I feeling, how did this happen?

Q. And what did you say?

A. I told him I was nervous and that [sic] whatever officer D. Mason told me to tell him.

Q. What did you say?

A. I told him I was nervous and whatever officer D. Mason told me to tell him, which was that I got hurt being subdued—

Q. Which was—

A. —and that I started this.

Q. And is that the truth?

A. No.

Q. Why did you tell the nurse that?

A. Because I was being forced to.

Q. Forced to how?

A. By the officers that [sic] was there.

Q. Did you sign a form admitting that you hit the officer first and you were hurt when you were subdued?

A. Yes, ma'am.

Q. Why did you do that?

A. Because the [sic] officer D. Mason kept smacking me for me to do that.

Transcript of Plaintiff's Deposition at 53–54.

**\*4** In the Report and Recommendation, Magistrate Judge Treece concluded that plaintiff's "fear of retribution" was a plausible explanation for the discrepancies in his testimony. This Court agrees and adopts the Magistrate Judge's conclusions. *See Langman Fabrics v. Graff Californiawear, Inc.,* 160 F.3d 106, 112–13 (2d Cir.1998); *see also Cruz v. Church,* 2008 WL 4891165, at \*5 (N.D.N.Y.2008) ("[t]he Court notes that ... it would be have difficulty concluding that [the][p]laintiff's statement of June 5, 2005, and his statement of June 16, 2005, are wholly irreconcilable, given his proffered explanation that he made the statement of June 5, 2005, out of fear of retribution by [the] [d]efendants).

Defendants also argue that plaintiff cannot identify which individuals participated in the attack; that plaintiff's injuries are consistent with the brief use of force as described by defendants to subdue plaintiff; and that plaintiff's version is contradicted by defendants' affidavits. Magistrate Judge Treece found that plaintiff was able to identify some individuals involved in the assault which, "stands in stark contrast to the plaintiff in *Jeffreys* who was unable to identify any of the officers involved in the alleged assault". Upon review of the record, as it presently exists, the Court agrees and finds that plaintiff's testimony is not wholly conclusory or entirely inconsistent to warrant application of the *Jeffreys* exception. *See Percinthe v. Julien,* 2009 WL 2223070, at \*7 (S.D.N.Y.2009) (the court rejected the defendants' argument that the plaintiff's claims were subject to dismissal for implausibility as his injuries did not reflect the attack that he described and his description of the incident changed over time holding that the plaintiff's testimony, "[did] not reach the level of inconsistency and lack of substantiation that would permit the Court to dismiss on these grounds").

Magistrate Judge Treece provided an extensive summary of the record and applicable law and found that the evidence did not support deviating from the established rule that issues of credibility are not resolved on summary judgment. On review, the Court agrees with the Magistrate's recommendations and concludes that the *Jeffreys* exception does not apply. Accordingly, the Court accepts and adopts the Report and Recommendation on this issue.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))

### III. Reyell's Personal Involvement

Defendants argue that the Magistrate Judge erred when he failed to dismiss the complaint against Reyell on the grounds that he was not personally involved in the attack. Defendants claim that the "RRO erroneously cites plaintiff's declaration as stating that 'it was defendant Reyell and another officer who removed the shirt' ". Defendants claim that the declaration and complaint clearly state that, "Officer Rock orchestrated the removal of plaintiff's shirt". [FN3] Defendants argue that the assertions in plaintiff's declaration (submitted in response to the motion for summary judgment) and complaint are contradicted by plaintiff's deposition testimony. Defendants claim that plaintiff testified that Reyell tried to cover up the incident by removing the shirt he was wearing.

> FN3. Officer Rock is not a defendant herein.

**\*5** The Court has reviewed plaintiff's complaint, declaration and deposition transcript and finds defendants' summary of plaintiff's assertions to be inaccurate. In plaintiff's complaint, on page 8, plaintiff alleges:

> Feeling extremely weak the claimant responded with a shake of his head. Once this performance was over with Correctional Officer R. Rock, the individual who held on to the photograph camera and who is responsible for capturing the claimant's injuries [sic] photos pointed to the claimant's bloodly [sic] stain kitchen white colored uniform [ ] as co-workers....

> Correctional Officer D. Mason then roughly removed the article of clothing and with the help of on[e] other they discarded the item of clothings [sic].

In Paragraph 22 of plaintiff's declaration, he states:

> Officer Rock, the individual who held the photograph camera and was responsible for capturing LaTouche injuries pointed to LaTouche [sic] bloody kitchen white colored uniform to his coworker asking them to remove the article of clothing before he take [sic] any pictures. Mason then roughly removed the clothing and with the help of an other [sic] officer they discarded the items of clothing.

In his deposition, plaintiff testified:

Q. What about Defendant Reyell, why are you suing Reyell?

A. Because defendant Reyell, that's the officer that was holding the camera and he tried to cover up the incident.

Q. How so?

A. That's when him and the other officer that was there, when they was searching me, strip searching me they took my shirt and they kept screaming something about let's remove this bloodstained shirt, let's remove this bloodstained shirt, we can't have this for the camera.

> \* \* \*

Q. Reyell and another officer took your shirt off?

A. Yes, ma'am.

Q. Do you remember the other officer's name?

A. No, ma'am.

Transcript of Plaintiff's Deposition at 63–64.

Here, the Magistrate Judge stated that any inconsistency or discrepancy [in plaintiff's testimony], "go[es] to the weight ... accorded to plaintiff's testimony". The Court agrees. Any discrepancies or inconsistencies in plaintiff's testimony are for a jury to assess. In the Second Circuit case of *Fischl v. Armitage,* the plaintiff/inmate alleged that he was assaulted in his cell by other inmates. *Fischl,* 128 F.3d at 54. The district court dismissed the plaintiff's complaint as against one defendant based upon "inconsistent statements". *Id.* The Second Circuit vacated the judgment of the district court holding:

> [T]he district court apparently questioned whether there had been an attack on Fischl at all, principally because of inconsistencies in his accounts of the event, his failure to report such an attack to prison workers in the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))

area on that morning, and the failure of those workers to notice any indications that he had been beaten. That skepticism, however, rests on both a negative assessment of Fischl's credibility and the drawing of inferences adverse to Fischl.

**\*6** Likewise, inconsistent statements by Fischl as to, for example, whether it was five, six, or seven inmates who attacked him, and as to what he observed or overheard just prior to the attack, go to Fischl's credibility. While inconsistencies of this sort provide ammunition for cross-examination, and they may ultimately lead a jury to reject his testimony, they are not a proper basis for dismissal of his claim as a matter of law. The jury might well infer, for example, that while Fischl was under siege he was understandably unable to take an accurate census of the number of inmates holding him and kicking him in the face.

*Fischl,* 128 F.3d at 56.

In this matter, without a credibility assessment of plaintiff, the record does not warrant an award of summary judgment. Accordingly, the Court adopts the Magistrate's recommendation and denies summary judgment on this issue.

## CONCLUSION

It is therefore

**ORDERED** that the Report and Recommendation of United States Magistrate Judge Randolph F. Treece (Dkt. No. 60) is adopted; and it is further

**ORDERED** that for the reasons set forth in the Memorandum–Decision and Order herein, defendants' motion for summary judgment is granted in part and denied in part; and it is further

**ORDERED** that the Clerk provide copies of this Order to all parties.

**IT IS SO ORDERED.**

N.D.N.Y.,2011.

Latouche v. Tompkins
Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Troy GARRETT, Plaintiff,
v.
Edward REYNOLDS, Superintendent, Mohawk Corr.
Facility; James A. Mance, Deputy Superintendent of
Programs; John O'Reilly,[FN1] Deputy Superintendent; J.
Burge, First Deputy; M. Maher, DSS; R. Centore,
Correctional Officer, Defendants.

> FN1. In this case, the defendants maintain and
> the docket confirms that defendant John O'Reilly
> has never been served. Service must be made
> upon a defendant within 120 days of filing the
> complaint or any claims against that defendant
> will be dismissed. See Fed.R.Civ.P. 4(m). The
> original complaint, which named O'Reilly, was
> filed on November 26, 1999, and the amended
> complaint was filed on July 13, 2001. However,
> O'Reilly was never served. Since this defendant
> has never been served, this court lacks
> jurisdiction over him, and this court recommends
> the dismissal of this defendant.

No. Civ.9:99CV2065NAMGLS.

Oct. 7, 2003.
Troy Garrett, Peekskill, NY, Plaintiff, pro se.

Hon. Eliot Spitzer, Attorney General State of New York,
Syracuse, NY, for the Defendants.

Maria Moran, Asst. Attorney General, of counsel.

*REPORT-RECOMMENDATION*

SHARPE, Magistrate J.
    I. *Introduction* [FN2]
> FN2. This matter was referred to the undersigned
> for a Report-Recommendation by the Hon.

Norman A. Mordue, United States District
Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and
Local Rule 72.3(c).

**\*1** Plaintiff, *pro se* Troy Garrett filed an action under
42 U.S.C. § 1983 claiming that the defendants violated his
civil rights when they retaliated against him for his
activities as an IGRC representative by subjecting him to
verbal harassment, physical abuse and subsequently, a
transfer. Garrett also claims that the supervisory
defendants failed to properly investigate his complaints
and failed to train/supervise their employees. This court
recommends denying the motion for summary judgment in
part and granting it in part.

    II. *Procedural History*

    On July 13, 2001, Garrett filed an amended complaint
against the defendants claiming that they violated his civil
rights under the First, Sixth Eighth, and Fourteenth
Amendments.[FN3] On September 28, 2001, the defendants
filed a motion for summary judgment. On January 18,
2002, this court issued an order informing Garrett of his
obligation to file a response and extended his time to
respond for thirty days. On April 24, 2002, this court
granted an additional sixty days to respond to the
defendants' motion. Despite having been given multiple
opportunities to respond, Garrett has failed to file a
response.

> FN3. Although Garrett claims to be raising
> violations under the Sixth, Eighth, and
> Fourteenth Amendments, the only viable claim
> based on this court's interpretation of the
> complaint is under the First Amendment for
> retaliation.

    III. *Facts* [FN4]

> FN4. The facts are taken from the defendants'
> statement of undisputed material facts since
> Garrett failed to file a response.

    On June 17, 1999, Garrett filed a grievance against

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

Officer Kelley for verbal harassment.[FN5] This grievance was denied by the Central Office Review Committee (CORC) on July 21, 1999. On March 19, 2000, Garrett filed a grievance claiming that defendant Burge used intimidation tactics. Defendant Reynolds investigated the grievance and it was denied based on a finding that no harassment occurred. Garrett appealed to the CORC and they denied the grievance on April 5, 2000. On April 10, 2000, defendant Centore wrote a misbehavior report against Garrett for creating a disturbance and employee harassment. On April 12, 2000, Lieutenant Manell presided over Garrett's Tier 2 disciplinary hearing and he was found guilty of both charges. He was given a 21 day recreation penalty, and loss of packages and commissary. However, his recreation penalty was suspended and deferred. Garrett appealed the determination and it was affirmed on April 19, 2000.

FN5. Not a party in this suit.

On April 17, 2000, Garrett filed a grievance against Centore for harassment. Burge denied his grievance on May 4, 2000, and subsequently, the CORC denied it. On May 12, 2000, Garrett sent a letter to Burge concerning further harassment by Centore. On May 16, 2000, Garrett filed another grievance against Centore for harassment. His grievance was denied on May 26, 2000. After Garrett appealed, his grievance was again denied by the CORC. On June 22, 2000, the Superintendent's Office received a letter from Garrett alleging that Centore threw a piece of paper with a picture of a plunger and the words "always gets the job done" into his cell. He wrote a grievance against Centore for harassment due to the paper that he threw into his cell. Burge forwarded the grievance to the CORC on August 10, 2000. The CORC accepted the grievance on August 30, 2000, in order to investigate.

**\*2** On June 23, 2000, the Inspector General's Office interviewed Garrett at the Mohawk Correctional Facility regarding his complaints of Centore. That same day, Captain Naughton filed an administrative segregation recommendation. On June 29, 2000, an administrative segregation hearing was held. On July 14, 2000, Garrett was transferred [FN6] to the Mid-State Correctional Facility.

FN6. The defendants suggest that Garrett has failed to exhaust his administrative remedies concerning his transfer. They claim that he agreed to the transfer and participated in the administrative hearing which resulted in his transfer. The issue of transfer will not be addressed in this Report-Recommendation because the court has insufficient information to determine whether he exhausted his remedies.

Finally, Garrett filed a claim alleging that his property was lost or damaged on October 8, 1999. However, he was paid $75.00 for this claim and he signed a release on December 13, 1999.

IV. *Discussion*

A. *Legal Standard*

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *accord F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994). The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir.1999). "When a motion for summary judgment is made and supported ... an adverse party may not rest upon the mere allegations or denials of the ... pleading, but the adverse party's response, by affidavits or as otherwise provided in [Federal Rule of Civil Procedure 56(e) ], must set forth specific facts showing that there is a genuine issue for trial." *St. Pierre v. Dyer,* 208 F.3d 394, 404 (2d Cir.2000). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Rexford Holdings, Inc. v. Biderman,* 21 F.3d 522, 525 (2d Cir.1994)(alternation in original) (citation omitted). However, it is well settled that on a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party. *Tenenbaum v. Williams,* 193 F.3d 581, 593 (2d Cir.1999).

Furthermore, in a *pro se* case, the court must view the submissions by a more lenient standard than that accorded

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

to "formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U .S. 519, 520 (1972); *see Estelle v. Gamble,* 429 U.S. 97, 106 (1976); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)(a court is to read a *pro se* party's "supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest"). Indeed, the Second Circuit has stated that "[i]mplicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training." *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983). Any ambiguities and inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990); *see LaFond v. General Physics Serv. Corp.,* 50 F.3d 165, 171 (2d Cir.1995).

**\*3** This liberal standard, however, does not excuse a *pro se* litigant from following the procedural formalities of summary judgment. *Showers v. Eastmond,* 00 CIV. 3725, 2001 WL 527484, at \*2 (S.D.N.Y. May 16, 2001). More specifically, Local Rule 7.1(a)(3) of this court specifically provides that "any facts set forth in the [moving party's] Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party." Local Rule 7.1(a)(3) further requires that the "non-movant shall file a Statement of Material Fact which mirrors the movant's statement in matching numbered paragraphs and which set forth a specific reference to the record where the material fact is alleged to arise." The courts of the Northern District have adhered to a strict application of Local Rule 7.1(a)(3)'s requirement on summary judgment motions. *Giguere v. Racicot,* 00-CV-1178, 2002 WL 368534, at \*2 (N.D.N.Y. March 1, 2002)(interalia citing *Bundy Am. Corp. v. K-Z Rental Leasing, Inc.,* 00-CV-260, 2001 WL 237218, at \*1 (N.D.N.Y. March 9, 2001)).

Furthermore, this Circuit adheres to the view that nothing in Rule 56 imposes an obligation on the court to conduct a search and independent review of the record to find proof of a factual dispute. *Amnesty America v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002). As long as the local rules impose a requirement that parties provide specific record citations in support of their statement of material facts, the court may grant summary judgment on that basis. *Id.* at 470-71.

In this case, Garrett did not file a response to the motion for summary judgment. Consequently, this court will accept the properly supported facts contained in the defendants' 7.1 Statement (*Dkt. No. 49* ) as true for purposes of this motion.[FN7] With this standard in mind, the court now turns to the sufficiency of Garrett's claims.

> FN7. The court notes that this does not apply to the various conclusions of law contained in the defendants' 7.1 Statement.

B. *Eleventh Amendment*

In Garrett's complaint, he raises claims against the defendants in their official and individual capacities. The Eleventh Amendment provides that: "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI. Although the Amendment does not specifically prohibit suits against a state by its own citizens, the Supreme Court has consistently applied that immunity to such cases. See *Burnette v. Carothers,* 192 F.3d 52, 57 (2d Cir.1999)(citing *Edelman v. Jordan,* 415 U.S. 651, 662-63 (1974)). Moreover, it is well established that Eleventh Amendment immunity applies not only when a state is a named defendant, but when liability must be paid from state coffers. See *New York City Health & Hosp. Corp. v. Perales,* 50 F.3d 129, 134 (2d Cir.1995)(citing *Edelman,* 415 U .S. at 665); *Dawkins v. State of New York,* 93-CV-1298, 1996 WL 156764, at \*2 (N.D.N.Y. Mar. 28, 1996).

**\*4** In this case, Garrett raises claims against the defendants in their official and individual capacities. Since the Eleventh Amendment bars official capacity claims against these state officers, this court recommends dismissal of Garrett's claims against the defendants in their official capacity.

C. *Retaliation*

In this case, Garrett claims that during the course of his appointment as an IGRC representative, he has been subjected to repeated acts of harassment, both verbal and

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

physical, threatened with physical assaults, placed into disciplinary confinement in the SHU, and transferred.[FN8] The Second Circuit has held that retaliation against a prisoner for pursuing a grievance is actionable under § 1983. *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996). Moreover, the Second Circuit has recognized both the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated. Thus, prisoners' claims of retaliation are examined with skepticism and particular care. *See Flaherty v. Coughlin,* 713 F.2d 10 (2d Cir.1983).

> FN8. This case turns on the interpretation of the complaint. Garret's complaint is not a model of clarity and as noted, he has failed to file a response to the motion for summary judgment. Nonetheless, a careful reading of Garrett's opening paragraph under the title "Facts" compels this court to interpret this complaint as one claiming retaliation for his activities and status as an IGRC representative.

In order for a plaintiff to prevail on a First Amendment retaliation claim, a plaintiff must advance non-conclusory allegations establishing: (1) that the speech or conduct at issue was protected; (2) that the defendant took adverse action against the plaintiff; and, (3) that there was a causal connection between the protected speech and the adverse action. *See Dawes v. Walker,*[FN9] 239 F.3d 489, 492 (2d Cir.2001) (citation omitted) *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002). If Garrett makes these showings, DOCS may evade liability if it demonstrates that it would have disciplined or transferred him " 'even in the absence of the protected conduct." ' *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citations omitted).

> FN9. Dawes' complaint was dismissed pursuant to Fed.R.Civ.P. 12(b)(6).

An inmate has a constitutional right to be protected from retaliation based upon his activities as an IGRC representative. *Alnutt v. Cleary,* 913 F.Supp. 160, 170 (W.D.N.Y.1996). However, a claim brought under "42 U.S.C. § 1983 is not designed to rectify harassment or verbal abuse." *Gill v. Hoadley,* 261 F.Supp 2d 113, 129

(N.D.N.Y.2003)(citing *Alnutt,* 913 F.Supp at 165-66)). Ordinarily, a claim for verbal harassment is not actionable under 42 U.S.C. § 1983. *Aziz Zarif Shabazz v. Picco,* 994 F.Supp. 460, 474 (S.D.N.Y.1998). Moreover, "verbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Aziz Zarif Shabazz,* 994 F.Supp. at 474.

In this case, Garrett claims that defendant Centore harassed him for his activities as an IGRC representative. Garrett also claims that he was removed as an IGRC representative when he was transferred. In addition, Garrett claims that defendants Reynolds, Mance, Burger and Maher failed to properly investigate his allegations against Centore. Garrett claims that these defendants failed to properly investigate his claims in retaliation for his activities as an IGRC representative.

**\*5** More specifically, Garrett claims that Reynolds and Mance recalled IGRC passes for one day in order to interfere with an investigation inquiry into a correctional officer's conduct involving inmates who were left in the yard during inclement weather. Finally, Garrett claims that his property was destroyed while he was in the SHU.[FN10] Garrett filed grievances against Centore in April, May, and June of 2000. One of his complaints involved Centore throwing a folded piece of paper into his cell which had a picture of a plunger with the words "always gets the job done" on it. On June 23, 2000, he was placed in administrative segregation in the SHU. Three weeks later he was transferred.[FN11]

> FN10. However, the defendants provide the court with documents which show that he was paid $75.00 in settlement of this claim.

> FN11. The defendants maintain that Garrett failed to exhaust this claim. At this juncture, it is unclear whether or not he exhausted this claim. As such, this court cannot, as a matter of law, recommend dismissal because the court has insufficient information to determine this issue.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

Viewing the facts in the light most favorable to Garrett, the non-moving party, this court cannot, as a matter of law, find that Garrett fails to state a claim for which relief can be granted. He claims that he was retaliated against for his activities as an IGRC representative. As noted, verbal harassment alone will not constitute a violation of a prisoner's constitutional rights but in this case, it appears that he was transferred for his activities as an IGRC representative. The defendants rely on numerous grievances which were denied by the CORC to show that their actions were proper. They also claim that Garrett has failed to show injury, however, at this juncture of the litigation with virtually no discovery in this case, this court cannot recommend dismissal as a matter of law.

D. *Personal Involvement*

It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)(*citation omitted* ). Since there is no respondeat superior liability, the defendant must be shown to have personal involvement in the alleged violation of rights. *Al- Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989)*. Supervisory officials cannot be held liable under § 1983 solely for the acts of their subordinates. *See Monell v. Department of Social Serv.,* 436 U.S. 658, 690-695 (2d Cir.1978). However, a supervisory official can be held liable for constitutional violations if he or she: (1) directly participated in the violation; (2) failed to remedy the violation after learning of it through a report or appeal; (3) created a custom or policy fostering the violation after learning of it; or (4) was grossly negligent in supervising subordinates who caused the violation. *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (citing *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)).

Garrett contends that defendants Reynolds and Mance allowed staff members under their supervision to violate his rights. More specifically, Mance refused to properly investigate Garrett's complaints. Garrett also claims that defendant Burge refused to grant his request for redress against defendant Centore. Finally, Garrett claims that the defendants collectively failed to properly train and supervise their employees.

**\*6** The defendants contend that the claims against the supervisory defendants should be dismissed for lack of personal involvement. However, this court finds this contention without merit since it appears that all of the defendants were involved in the investigation process of Garrett's complaint and he accuses all of them of continuing the alleged constitutional violation by failing to properly investigate the grievances he filed. Accordingly, this court recommends denying the defendants' motion for summary judgment based on the lack of personal involvement.

WHEREFORE, for the foregoing reasons, it is hereby

RECOMMENDED, that Garrett's claims against the defendants in their official capacity under the Eleventh Amendment should be dismissed since these claims are barred; and it is further

RECOMMENDED, that defendant O'Reilly be dismissed since he was never served; and it is further

RECOMMENDED, that the defendants' motion for summary judgment be denied in all other respects; and it is further

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation upon the parties by regular mail.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2003.

Garrett v. Reynolds
Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2011 WL 7479164 (N.D.N.Y.)

(Cite as: 2011 WL 7479164 (N.D.N.Y.))

H

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Bartram Yihni DABNEY,[FN1] Plaintiff,
FN1. In both the caption and body of his
complaint, which was apparently typed with the
assistance of fellow inmates working in the
prison law library at the Clinton Correctional
Facility, plaintiff's name is spelled as "Dadney".
*See* Complaint (Dkt. No. 1) pp. 1, 2. From the
signature page of that complaint as well as
publicly available records from the New York
State Department of Corrections and Community
Supervision ("DOCCS"), however, it appears
that plaintiff's name is correctly spelled as
"Dabney".

v.

Dr. Raymond MADDOCK, Physician, Great Meadow
Correctional Facility, and M. Stormer, Corrections
Officer, Great Meadow Correctional Facility,
Defendants.
Civil Action No. 9:10–CV–0519 (GTS/DEP).

Nov. 29, 2011.
Bartram Yihni Dabney, Dannemora, NY, pro se.

Hon. Eric T. Schneiderman, Office of the Attorney
General, William J. McCarthy, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.
**\*1** *Pro se* plaintiff Bartram Yihni Dabney, a New
York State prison inmate, has commenced this action
pursuant to 42 U.S.C. § 1983 alleging that he has suffered
several constitutional deprivations arising out of his
incarceration. [FN2] Plaintiff's complaint names eighteen

separate defendants in varying positions, all employed at
the prison facility at which he was confined at the relevant
times, and asserts an amalgamation of claims against those
defendants ranging from alleged deprivation of his rights
under the First, Eighth, and Fourteenth Amendments to the
United States Constitution to violation of the Religious
Land Use and Institutionalized Persons Act of 2000
("RLUIPA"), 42 U.S.C. § 2000cc–1 *et seq.*

FN2. In his complaint, which is sworn to under
penalty of perjury, Dabney claims not to have
previously brought any other lawsuit in federal
court relating to his imprisonment. *See*
Complaint (Dkt. No. 1) p. 2. Despite this sworn
representation, the court's records reveal that this
is the fifth civil rights action filed by Dabney in
this court since 1994. *Dabney v. Ricks, et al.,* No.
94–CV–1058, *Dabney v. Coombe, et al.,* No.
95–CV–1633, *Dabney v. Eagen, et al.,*
03–CV–184, *Dabney v. Goord, et al.,*
04–CV–944, and *Dabney v. Fischer, et al.,*
10–CV–1109.

Plaintiff's claims in this action were significantly
narrowed as a result of a decision rendered by the court
upon initial review of Dabney's *in forma pauperis*
application and accompanying complaint, pursuant to 28
U.S.C. §§ 1915(e)(2)(B) and 1915A, prior to service and
appearances on behalf of the defendants. As a result of
that review and the court's initial filing order, the sole
surviving claims include a First Amendment retaliation
claim against Corrections Officer Stormer and a deliberate
medical indifference cause of action against Raymond
Maddock, a physician employed at the prison in which
plaintiff was housed at the relevant times. Those
defendants, who have since been served, now seek
dismissal of the remaining claims for failure to state a
cause of action upon which relief may be granted. For the
reasons set forth below, I am unable to say at this early
procedural juncture that plaintiff has not stated a plausible
retaliation claim against defendant Stormer, but I do find
that his claim against defendant Maddock lacks palpable
facial merit.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 7479164 (N.D.N.Y.)

(Cite as: 2011 WL 7479164 (N.D.N.Y.))

I. *BACKGROUND*[FN3,FN4]

> **FN3.** In light of the procedural posture of this case, the following recitation is drawn principally from plaintiff's amended complaint, the contents of which have been accepted as true for purposes of the pending motion. *See Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555–56, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007)); *see also Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1733, 1734, 12 L.Ed.2d 1030 (1964). In addition, when evaluating defendants' motion I have also considered the materials submitted by the plaintiff in opposition to the defendants' motion, Dkt. No. 27, to the extent they are consistent with the allegations set forth in his complaint. *See Donhauser v. Goord,* 314 F.Supp.2d 119, 121 (N.D.N.Y.2004) (Hurd, J.).

> **FN4.** While plaintiff's complaint, as originally constituted, was wide-ranging and concerned a number of events, both related and unrelated, in the following background section I have included only those salient facts relating to the two claims that survived the court's initial review.

Plaintiff is a prison inmate entrusted to the custody and care of the DOCCS (formerly known as the New York State Department of Correctional Services, or "DOCS"); while he is currently designated elsewhere, plaintiff was confined in the Great Meadow Correctional Facility ("Great Meadow"), located in Comstock, New York, at the times relevant to his claims in the action. *See generally* Complaint (Dkt. No. 1).

In his complaint plaintiff alleges that Corrections Officer Stormer unlawfully retaliated against him, in violation of his rights under the First Amendment, in return for Dabney having filed one or more grievances against that defendant as well as other prison workers alleged to be his friends. Complaint (Dkt. No. 1) ¶¶ 6–11. As adverse retaliatory action, plaintiff alleges that defendant Stormer verbally harassed him and filed a false misconduct report resulting in disciplinary proceedings,

which he was precluded from attending in person; denied him commissary access in order to permit his purchase of such items as tobacco, stamps, and personal hygiene products; and severed the electrical supply to his cell, leaving him without television access, or lights for four days. *Id.*

**\*2** Plaintiff's claims against the other remaining defendant, Dr. Raymond Maddock, a physician at Great Meadow, stem from an alleged denial of access to adequate medical care. Complaint (Dkt. No. 1) ¶¶ 40–41. Plaintiff asserts that Dr. Maddock wrongfully deprived him of a permit for medical boots, necessitated by a bullet lodged in his right femur and the surgical removal of a toenail, and additionally complains of the denial of a permit for back and hand braces, and inadequate treatment of Hepatitis C. *Id.* Plaintiff alleges that in response to his request for treatment of the latter condition Dr. Maddock told him to "drink coffee". *Id.*

II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on May 3, 2010, filing a complaint comprised of ten separate causes of action and naming as defendants. eighteen DOCCS employees assigned to Great Meadow. Dkt. No. 1. Accompanying plaintiff's complaint was an application for leave to proceed *in forma pauperis* ("IFP"). Dkt. No. 2. On January 4, 2011, District Judge Glenn T. Suddaby issued a decision and order in which, *inter alia,* he granted plaintiff's IFP application and dismissed all but two of the claims asserted by the plaintiff in his complaint on the basis that they lacked facial merit, without prejudice and with leave to replead. Dkt. No. 14. As a result of that decision and plaintiff's failure to amend, the sole remaining claims in this action are a First Amendment retaliation claim against Corrections Officer Stormer and an Eighth Amendment deliberate medical indifference cause of action against Dr. Raymond Maddock.

The two remaining defendants, who have now been served, moved on March 17, 2011 seeking dismissal of the remaining two causes of action for failure to state a claim upon which relief may be granted, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, additionally asserting their entitlement to qualified immunity from suit. Dkt. No. 24. Defendants' motion,

which plaintiff has opposed, *see* Dkt. No. 27, is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

### III. *DISCUSSION*

#### A. *Governing Legal Standard*

A motion to dismiss a complaint, brought pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal,* 556 U.S. 662, ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955, 167 L.Ed.2d 929). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). *Id.* While modest in its requirement, that rule commands that a complaint contain more than mere legal conclusions; "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal,* 129 S.Ct. at 1950.

**\*3** To withstand a motion to dismiss, a complaint must plead sufficient facts which, when accepted as true, state a claim which is plausible on its face. *Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (citing *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.' " *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974).

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Cooper,* 378 U.S. at 546, 84 S.Ct. at 1734; *Miller v. Wolpoff & Abramson, LLP,* 321 F.3d 292,

300 (2d Cir.2003), *cert. denied,* 540 U.S. 823, 124 S.Ct. 153, 157 L.Ed.2d 44 (2003); *Burke v. Gregory,* 356 F.Supp.2d 179, 182 (N.D.N.Y.2005) (Kahn, J.). However, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. *Iqbal,* 129 S.Ct. at 1949. In the wake of Twombly and *Iqbal,* the burden undertaken by a party requesting dismissal of a complaint under Rule 12(b)(6) remains substantial; the question presented by such a motion is not whether the plaintiff is likely ultimately to prevail, " 'but whether the claimant is entitled to offer evidence to support the claims.' " *Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.,* 223 F.Supp.2d 435, 441 (S.D.N.Y.2001) (quoting *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995)) (citations and quotations omitted).

#### B. *Legal Sufficiency of Plaintiff's Retaliation Claim*

In his first cause of action plaintiff asserts that defendant Stormer engaged in a series of actions toward him, motivated by his filing of grievances against Stormer and his friends. Defendants maintain that this claim, while surviving the court's initial, *sua sponte* review, fails to state a plausible cause of action. Although this is less than clear, it appears the defendant's argument is focued upon the alleged inability of plaintiff to meet the adverse action prong of the governing retaliation test.

When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies. *See Franco v. Kelly,* 854 F.2d 584, 588–90 (2d Cir.1988). As the Second Circuit has repeatedly cautioned, however, such claims are easily incanted and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus; courts must therefore approach such claims "with skepticism and particular care." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (same).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 7479164 (N.D.N.Y.)

(Cite as: 2011 WL 7479164 (N.D.N.Y.))

**\*4** In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Dawes,* 239 F.3d at 492 (2d Cir.2001). If the plaintiff carries this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

As can be seen, analysis of retaliation claims requires thoughtful consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two. When such claims, which are exceedingly case specific, are stated in only a conclusory fashion, without any allegations of fact tending to show the requisite elements of protected conduct, adverse action, and a nexus between the two, dismissal is warranted.

Plaintiff alleges that he engaged in protected activity by filing grievances against defendant Stormer and his friends. It is well established that the right to petition the government for the redress of grievances is a fundamental right that derives from the First Amendment, and the filing of grievances thus can constitute protected conduct. *Franco,* 854 F.2d at 590; *see also Alnutt v. Cleary,* 913 F.Supp. 160, 169 (W.D.N.Y.1996). Plaintiff's retaliation claim therefore satisfies the first of the three prongs of the governing retaliation standard.

Plaintiff further asserts that in retaliation for the filing of those grievances defendant Stormer retaliated by

harassing him, making religious remarks, issuing a false misbehavior report, and failing to allow him to attend a resulting disciplinary hearing Complaint (Dkt. No. 1) ¶ 6–7, 10–11. In addition, plaintiff alleges that defendant Stormer interfered with his access to the commissary in order to purchase necessary supplies and interrupted the supply of electrical power to his cell for a period of four days. *Id.* at ¶¶ 8–9. Applying a Rule 12(b)(6) standard in order to gauge the sufficiency of these allegations, in his January 4, 2011 decision District Judge Suddaby found that while in isolation potentially none of those allegations rises to a level sufficient to support a finding of adverse action, collectively they could suffice to constitute adverse action.[FN5] *See* Memorandum Decision and Order (Dkt. No. 14) pp. 16–17. Defendants' motion provides no basis to disturb that finding.

> FN5. In his decision District Judge Suddaby did note that the interference with Dabney's right to be present during a disciplinary hearing could alone suffice to establish an adverse action. *See* Memorandum Decision and Order dated January 4, 2011 (Dkt. No. 14) p. 17.

**\*5** Neither Judge Suddaby's decision nor defendants' pending motion addresses the third element of the retaliation claim, requiring a showing of a connection between the protected activity and allegedly resulting adverse action. That required link can be supplied, among other things, by the fact that adverse action closely followed the protected activity, thereby giving rise to an inference of relatedness. *Mateo v. Gundrum,* No. 9:10–CV–1103, 2011 WL 5325790, at \*6 (N.D.N.Y. Aug.30, 2011) (Lowe, M.J.) (citing *Espinal v. Goord,* 558 F.3d 119, 129 (2d Cir.2009)), *Report and Recommendation Adopted,* 2011 WL 5325794 (N.D.N.Y. Nov.3, 2011) (Sharpe, J.).[FN6]

> FN6. Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Appended decisions deleted for Westlaw purposes.]

In this instance, plaintiff alleges that he filed a grievance against defendant Stormer on November 13,

Not Reported in F.Supp.2d, 2011 WL 7479164 (N.D.N.Y.)

(Cite as: 2011 WL 7479164 (N.D.N.Y.))

2008 and that several of the adverse actions now claimed to have been retaliatory closely followed, including the denial of commissary slips on that same day, the loss of power to his cell thirteen days later, and the denial of the right to be present at his misconduct hearing on November 29, 2008.[FN7] These allegations are sufficient to plausibly support a finding of a connection between plaintiff's protected activity and the adverse actions alleged. Accordingly, since the plaintiff has made a plausible showing at this early procedural juncture sufficient to meet the three essential elements of a cognizable retaliation claim, I recommend that the portion of defendants' motion seeking dismissal of that cause of action be denied.

> FN7. The chronology concerning the inability of plaintiff to appear at his disciplinary hearing is unclear. At one point in his complaint plaintiff alleges that defendant Stormer and another co-defendant conspired on November 29, 2008 to deny him the right to be present at a misconduct hearing. Complaint (Dkt. No. 1) ¶ 10. At another point he references the denial of his right to be present at a disciplinary hearing on April 5, 2009. *Id.* at ¶ 11. It appears from the complaint, and the court assumes, that plaintiff is alleging the denial of his right to be present at two separate disciplinary hearings, one held in November 2008 and the other in April 2009.

### C. *Medical Indifference Cause of Action*

The other surviving claim in this action is set forth in plaintiff's tenth cause of action, which succinctly alleges that defendant Maddock has denied him a permit for medical boots, a back brace and a hand brace, and additionally has provided inadequate treatment for his Hepatitis C condition. In their motion defendants assert that these allegations fail to support a plausible claim of violation of plaintiff's rights under the Eighth Amendment.

Claims that prison officials have intentionally disregarded an inmate's medical needs fall under the umbrella of protection from the imposition of cruel and unusual punishment afforded by the Eighth Amendment. *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291, 50 L.Ed.2d 251 (1976). The Eighth Amendment prohibits punishment that involves the "unnecessary and

wanton infliction of pain" and is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Id.; see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)). To satisfy their obligations under the Eighth Amendment, prison officials must "ensure that inmates receive adequate food, shelter, and medical care, and must take reasonable measures to guarantee the safety of inmates." *Farmer,* 511 U.S. at 832, 114 S.Ct. at 1976 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984)) (internal quotations omitted).

**\*6** A claim alleging that prison officials have violated the Eighth Amendment by inflicting cruel and unusual punishment must satisfy both objective and subjective requirements. *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009); *Price v. Reilly,* No. 07–CV–2634 (JFB/ARL), 2010 WL 889787, at \*7–8 (E.D.N.Y. Mar.8, 2010). Addressing the objective element, to prevail a plaintiff must demonstrate a violation sufficiently serious by objective terms, "in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996). With respect to the subjective element, a plaintiff must also demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.' " *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999). Claims of medical indifference are subject to analysis utilizing this Eighth Amendment paradigm. *See Salahuddin v. Goord,* 467 F.3d 263, 279–81 (2d Cir.2006).

### 1. *Objective Requirement*

Analysis of the objective, "sufficiently serious," requirement of an Eighth Amendment medical indifference claim begins with an inquiry into "whether the prisoner was actually deprived of adequate medical care ...", and centers upon whether prison officials acted

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 7479164 (N.D.N.Y.)

(Cite as: 2011 WL 7479164 (N.D.N.Y.))

reasonably in treating the plaintiff. *Salahuddin,* 467 F.3d at 279. A second prong of the objective test addresses whether the inadequacy in medical treatment was sufficiently serious. *Id.* at 280. If there is a complete failure to provide treatment, the court must look to the seriousness of the inmate's medical condition. *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003). If, on the other hand, the complaint alleges that treatment was provided but was inadequate, the seriousness inquiry is more narrowly confined to that alleged inadequacy, rather than focusing upon the seriousness of the prisoner's medical condition. *Salahuddin,* 467 F.3d at 280. "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in treatment ... [the focus of] the inquiry is on the challenged delay or interruption, rather that the prisoner's underlying medical condition alone." *Id.* (quoting *Smith,* 316 F.3d at 185) (internal quotations omitted). In other words, at the heart of the relevant inquiry is the seriousness of the medical need, and whether from an objective viewpoint the temporary deprivation was sufficiently harmful to establish a constitutional violation. *Smith,* 316 F.3d at 186. Of course, "when medical treatment is denied for a prolonged period of time, or when a degenerative medical condition is neglected over sufficient time, the alleged deprivation of care can no longer be characterized as 'delayed treatment', but may properly be viewed as a 'refusal' to provide medical treatment." *Id.* at 186, n. 10 (quoting *Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000)).

*7 Since medical conditions vary in severity, a decision to leave a condition untreated may or may not raise constitutional concerns, depending on the circumstances. *Harrison,* 219 F.3d at 136–37 (quoting, *inter alia, Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)). Relevant factors informing this determination include whether the plaintiff suffers from an injury or condition that a " 'reasonable doctor or patient would find important and worthy of comment or treatment' ", a condition that " 'significantly affects' " a prisoner's daily activities, or " 'the existence of chronic and substantial pain.' " *Chance,* 143 F.3d at 702 (citation omitted); *Lafave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at *3 (N.D.N.Y. Apr.3, 2002) (Sharpe, M.J.) (citation omitted).

The allegations supporting plaintiff's deliberate indifference claim are inadequate to plausibly satisfy the objective prong of the deliberate indifference test. Plaintiff's complaint fails to provide elaboration concerning the condition requiring that he be provided with a back brace and hand brace. While plaintiff does provide some information regarding the need for medical boots for recreation, indicating that he has a bullet lodged in his right femur and has had a toenail surgically removed, these allegations fall far short of establishing the existence of a condition of urgency, capable of producing death, degeneration or extreme pain.[FN8] *See, e.g., Harris v. Morton,* No. 9:05–CV–1049, at *3, n.2 (N.D.N.Y. Feb. 29, 2008) (Kahn, J. and Treece, M.J.) ("We note that although Plaintiff states he suffered from a 'snapped' neck, he does not indicate he suffered from anything other than a generic neck injury."); *Bennett v. Hunter,* No. 9:02–CV–1365, 2006 WL 1174309, *3 (N.D.N.Y. May 1, 2006) (Scullin, S.J. and Lowe, M.J.) (pinched nerve not a serious medical need); *Jones v. Furman,* No. 02–CV–939F, 2007 WL 894218, at *10 (W.D.N.Y. Mar.21, 2007) (soreness, pain in and a lump behind his right ear, lump on the back of his head, small abrasions on his nose and knuckle, and bruising to his back, ribs do not constitute the requisite serious medical need) (citing *Hemmings v. Gorczyk,* 134 F.3d 104, 109 (2d Cir.1998)); *Tapp v. Tougas,* No. 9:05–CV–0149, 2008 WL 4371766, at * 9 (N.D.N.Y. Aug.11, 2008) (Peebles, M.J.) (citing *Peterson v. Miller,* No. 9:04–CV–797, 2007 WL 2071743, at *7 (N.D.N.Y. July 13, 2007) (noting that a "dull pain" in plaintiff's back and persistent rash on plaintiff's foot did not raise a constitutional issue) (citation omitted), *Report and Recommendation Adopted in Part and Rejected in Part,* 2008 WL 4371762 (N.D.N.Y. Sep 18, 2008) (Mordue, C.J.); *Salaam v. Adams,* No. 03–CV–0517, 2006 WL 2827687, *10 (N.D.N.Y. Sept. 29, 2006) (intermittent back pain requiring pain relievers and physical therapy, a gastrointestinal problem with stomach pains, and a psychological problem requiring Wellbutrin and/or Neurontin did not constitute serious medical conditions) (Kahn, J. and Lowe, M.J.); *see also Ford v. Phillips,* No. 05 Civ. 6646, 2007 WL 946703, at *12 & n. 70 (S.D.N.Y. Mar. 27, 2007) (finding that plaintiff's allegations of bruises, abrasions, and blood in his urine for a few weeks did not constitute a sufficiently serious condition giving rise to a medical indifference claim);

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 7479164 (N.D.N.Y.)

(Cite as: 2011 WL 7479164 (N.D.N.Y.))

*Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001) (cut finger with "skin ripped off" is insufficiently serious); *Bonner v. N.Y. City Police Dep't,* No. 99 Civ. 3207, 2000 WL 1171150, at *4 (S.D.N.Y. Aug. 17, 2000) (inability to close hand due to swelling insufficiently serious to constitute Eighth Amendment violation); *Gomez v. Zwillinger,* 1998 U.S. Dist. LEXIS 17713, at *16 (S.D.N.Y. November 6, 1998) (back pain and discomfort not sufficiently serious).

FN8. Although this information is not included in plaintiff's complaint, in his papers in opposition to defendants' motion plaintiff identifies a condition resulting in his need for a neck and back brace as chronic arthritis, Plaintiff's Memorandum (Dkt. No. 27) at p. 5. *Hale v. Rao,* No. 9:08–CV–1612, 2009 WL 3698420, at *3, n. 8 (N.D.N.Y. Nov.3, 2009) (Hurd, D.J. and Lowe, M.J.) ("[I]n cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they are consistent with the allegations in the complaint.). Nonetheless, he has failed to allege enough to establish the existence of a serious medical condition. *Veloz v. New York,* 35 F.Supp.2d 305, 309, 312 (S.D.N.Y.1999) (prisoner's foot problem, which involved arthritis and pain, did not constitute a serious medical need); *Veloz v. New York,* 339 F.Supp.2d 505, 522–26 (S.D.N.Y.2004) (plaintiff's chronic back pain and mild to moderate degenerative arthritis of spinal vertebrae did not establish a serious medical need); *but see Sereika v. Patel,* 411 F.Supp.2d 397, 406 (S.D.N.Y.2006) (allegations of "severe pain ... [and] reduced mobility ..." in the shoulder are sufficient to raise a material issue of fact as to a serious medical need).

**\*8** To be sure, as Judge Suddaby has held, the other condition implicated in plaintiff's medical indifference claim, Hepatitis C, potentially constitutes a serious medical condition. *See, e.g., Motta v. Wright,* 9:06–CV–1047, 2009 WL 1437589, at *15 (N.D.N.Y. May 20, 2009) ("No one disputes that [Hepatitis C] is a 'serious medical condition.' ") (Mordue, C.J. and

DiBianco, M.J.); *Muniz v. Goord,* 9:04–CV–0479, 2007 WL 2027912, at *8, n. 38 (N.D.N.Y. July 11, 2007) (McAvoy, J. and Lowe, M.J.) ("the bulk of district court decisions addressing the issue finds that Hepatitis C is a serious medical need.") (citing cases). The objective prong of the deliberate indifference standard, however, requires the court to look beyond whether a serious medical condition exists to determine if there has been a complete failure to provide treatment, or instead inadequate or delayed treatment. *Salahuddin,* 467 F.3d at 280. In this case, it is unclear from plaintiff's complaint whether the sole response by Dr. Maddock to his Hepatitis C condition and symptomology was the advice that he "drink coffee", and particularly whether there has been a complete absence of treatment. Under the circumstances, I am unable to conclude that a plausible claim has been stated meeting the objective element of the deliberate indifference test.

2. *Subjective Element*

The second, subjective requirement for establishing an Eighth Amendment medical indifference claim mandates a showing of a sufficiently culpable state of mind, or deliberate indifference, on the part of one or more of the defendants. *Salahuddin,* 467 F.3d at 280 (citing *Wilson v. Seiter,* 501 U.S. 294, 300, 111 S.Ct. 2321, 2325, 115 L.Ed.2d 271 (1991)). Deliberate indifference, in a constitutional sense, exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Farmer); Waldo v. Goord,* No. 97–CV–1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.) (same). Deliberate indifference is a mental state equivalent to subjective recklessness as the term is used in criminal law. *Salahuddin,* 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839–40, 114 S.Ct. 1970, 128 L.Ed.2d 811).

In addition to failing to meet the objective prong of the controlling deliberate indifference test, plaintiff's complaint also fails to include facts which, if proven, would demonstrate defendant Maddock's subjective

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 7479164 (N.D.N.Y.)

(Cite as: 2011 WL 7479164 (N.D.N.Y.))

indifference to plaintiff's serious medical condition.

Because plaintiff's complaint fails to demonstrate the existence of a plausible deliberate indifference claim meeting both the objective and subjective prongs of the governing test, I recommend that his deliberate medical indifference claim be dismissed.

### D. *Qualified Immunity*

**\*9** In their motion defendants assert their entitlement to qualified immunity from suit as an additional basis for dismissal of plaintiff's claims against them.

Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (citations omitted). "In assessing an officer's eligibility for the shield, 'the appropriate question is an objective inquiry: whether a reasonable officer could have believed that [his or her actions were] lawful, in light of clearly established law and the information the officer[ ] possessed." *Kelsey v. County of Schoharie,* 567 F.3d 54, 61 (2d Cir.2009) (quoting *Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). The law of qualified immunity seeks to strike a balance between the need to hold government officials accountable for irresponsible conduct and the need to protect them from "harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009). In *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the Supreme Court "mandated a two-step sequence for resolving government official's qualified immunity claims." *Pearson,* 555 U.S. at 232, 129 S.Ct. at 815–16. The first step required the court to consider whether, taken in the light most favorable to the party asserting immunity, the facts alleged show that the conduct at issue violated a constitutional right, [FN9] *Kelsey,* 567 F.3d at 61, with "the second step being whether the right is clearly established", *Okin v. Village of Cornwall–On–Hudson Police Dep't,* 577 F.3d 415, 430, n. 9 (citing *Saucier* ).[FN10] Expressly recognizing that the purpose of the qualified immunity doctrine is to ensure

that insubstantial claims are resolved prior to discovery, the Supreme Court recently retreated from the prior *Saucier* two-step mandate, concluding in *Pearson* that because "[t]he judges of the district courts and courts of appeals are in the best position to determine the order of decisionmaking [that] will best facilitate the fair and efficient disposition of each case", those decision makers "should be permitted to exercise their sound discretion in deciding which of the ... prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." [FN11] *Pearson,* 555 U.S. at 236, 242, 129 S.Ct. at 818, 821. In other words, as recently emphasized by the Second Circuit, the courts "are no longer required to make a 'threshold inquiry' as to the violation of a constitutional right in a qualified immunity context, but we are free to do so." *Kelsey,* 567 F.3d at 61 (citing *Pearson,* 129 S.Ct. at 821) (emphasis in original).

> **FN9.** In making the threshold inquiry, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151, 150 L.Ed.2d 272.

> **FN10.** In *Okin,* the Second Circuit clarified that the " 'objectively reasonable' inquiry is part of the 'clearly established' inquiry", also noting that "once a court has found that the law was clearly established at the time of the challenged conduct and for the particular context in which it occurred, it is no defense for the [government] officer who violated the clearly established law to respond that he held an objectively reasonable belief that his conduct was lawful." *Okin,* 577 F.3d at 433, n. 11 (citation omitted).

> **FN11.** Indeed, because qualified immunity is "an immunity from suit rather than a mere defense to liability ...", *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), the Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in the litigation." *Pearson,* 555 U.S. at 231, 129 S.Ct. 815 (quoting *Hunter v.*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 7479164 (N.D.N.Y.)

(Cite as: 2011 WL 7479164 (N.D.N.Y.))

*Bryant,* 502 U.S. 224, 227, 112 S.Ct. 524, 116 L.Ed.2d 589, ––––– (1991) (per curiam)).

**\*10** For courts engaging in a qualified immunity analysis, "the question after *Pearson* is 'which of the two prongs ... should be addressed in light of the circumstances in the particular case at hand.' " *Okin,* 577 F.3d 430, n. 9 (quoting *Pearson* ). "The [Saucier two-step] inquiry is said to be appropriate in those cases where 'discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all.' " *Kelsey,* 567 F.3d at 61 (quoting *Pearson,* 129 S.Ct. at 818).

In this case, I am unable to conclude that qualified immunity should be invoked in this case. Both of the rights at stake in plaintiff's first and tenth causes of action were established long before the relevant conduct in this case. Since I have already found that plaintiff has failed to state a deliberate medical indifference claim, there is no need under *Saucier* and *Pearson* to address the second prong of the governing test with respect to that claim. Turning to plaintiff's retaliation cause of action, I am unable to conclude at this early procedural juncture that a reasonable person in defendants' circumstances would have believed that his or her conduct did not run afoul of plaintiff's well-established First Amendment right to be free from unlawful retaliation for having engaged in protected conduct. I therefore recommend against a finding of qualified immunity in favor of defendant Stormer in connection with plaintiff's first cause of action.

### E. *Whether to Permit Leave to Replead*

Having determined that plaintiff's deliberate medical indifference cause of action is insufficiently stated, the next question to be addressed is whether he should be afforded leave to amend in an effort to state a cognizable Eighth Amendment claim. Ordinarily, a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend *at least* once if there is any indication that a valid claim might be stated. *Branum v. Clark,* 927 F.2d 698, 704–05 (2d Cir.1991) (emphasis added); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires"); *see also*

*Mathon v. Marine Midland Bank, N.A.,* 875 F.Supp. 986, 1003 (E.D.N.Y.1995) (leave to replead granted where court could not say that under no circumstances would proposed claims provide a basis for relief). In this instance, I discern no basis for finding that the plaintiff is not entitled to the benefit of this general rule, given the procedural history of the case.

In the event that the plaintiff does opt for amendment, he is advised that the law in this circuit clearly provides that "complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Hunt v. Budd,* 895 F.Supp. 35, 38 (N.D.N.Y.1995) (McAvoy, C.J.) (citing *Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987) (other citations omitted)); *Pourzandvakil v. Humphry,* No. 94–CV–1594, 1995 U.S. Dist. LEXIS 7136, at *24–25 (N.D.N.Y. May 22, 1995) (Pooler, D.J.) (citation omitted). In any amended complaint, plaintiff therefore must clearly set forth the facts, including the wrongful acts that give rise to the claim, the dates, times and places of the alleged acts, and each individual(s) who committed each alleged wrongful act. Such an amended complaint, must replace the existing second amended complaint, must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the court, *see* *Harris v. City of N.Y.,* 186 F.3d 243, 249 (2d Cir.1999) (citing *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994)); Fed.R.Civ.P. 10(a), and should specifically allege facts indicating the involvement of each of the named defendants in the constitutional deprivations alleged in sufficient detail to establish the they were tangibly connected to those deprivations. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

### F. *Protective Order*

**\*11** In their motion defendants have also moved pursuant to Federal Rule of Civil Procedure Rule 26(c)(1) for a protective order staying discovery pending the resolution of defendants' motion to dismiss. Rule 26(c)(1) of the Federal Rules of Civil Procedure provides, in relevant part, that

[a] party or any person from whom discovery is sought may move for a protective order in the court where the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 7479164 (N.D.N.Y.)

(Cite as: 2011 WL 7479164 (N.D.N.Y.))

action is pending ... The Court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following: (A) forbidding the disclosure or discovery.

Fed.R.Civ.P. 26(c)(1). This rule is often invoked to avoid potentially expensive and wasteful discovery during the pendency of a determination which could potentially reshape pending claims. *See, e.g., Spencer Trask Software and Information Services, LLC v. RPost Intern. Ltd., 206 F.R.D. 367, 368 (S.D.N.Y.2002)* (granting stay of discovery pending determination of motion to dismiss where court found defendants presented "substantial arguments" for dismissal of many if not all of the claims in the lawsuit); *United States v. Cnty. of Nassau, 188 F.R.D. 187, 188–89 (E.D.N.Y.1999)* (granting stay of discovery during the pendency of a motion to dismiss where the "interests of fairness, economy and efficiency ... favor[ed] the issuance of a stay of discovery," and where the plaintiff failed to claim prejudice in the event of a stay.).

In this case, until the issues are framed and a standard Rule 16 pretrial scheduling order is issued, no useful purpose would be served in permitting the parties to engage in discovery. Moreover, the court has been presented with no reason to conclude that plaintiff will be prejudiced by a modest delay occasioned by a stay of discovery at this stage. Accordingly, I recommend that defendants' request for a stay of discovery be granted.

IV. *SUMMARY AND RECOMMENDATION*

In their motion defendants challenge the two remaining claims in this action. Addressing first plaintiff's retaliation cause of action against defendant Stormer, I conclude that his complaint plausibly alleges the three necessary elements of a retaliation claim and therefore recommend against dismissal of that cause of action. Plaintiff's medical indifference claim against defendant Maddock, however, does not contain sufficient factual support to permit the court to conclude that a plausible Eighth Amendment violation has been stated. Accordingly, I recommend dismissal of that cause of action, with leave to replead.

Based upon the foregoing it is hereby respectfully

RECOMMENDED that defendants' motion to dismiss (Dkt. No. 24) be GRANTED, in part, and that plaintiff's tenth cause of action, alleging deliberate medical indifference, be DISMISSED, with leave to replead, but that defendants' motion otherwise be DENIED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette, 984 F.2d 85 (2d Cir.1993).*

**\*12** It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

N.D.N.Y.,2011.

Dabney v. Maddock
Not Reported in F.Supp.2d, 2011 WL 7479164 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2012 WL 760748 (N.D.N.Y.)

(Cite as: 2012 WL 760748 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Bartram Yihni DABNEY, Plaintiff,
v.
Dr. Ray MADDOCK, Physician, Great Meadow
Correctional Facility; and M. Stormer, Corrections
Officer, Great Meadow Correctional Facility,
Defendants.
No. 9:10–CV–0519 (GTS/DEP).

March 7, 2012.
Bartram Yihni Dabney, Dannemora, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State
of New York, William J. McCarthy, Jr., Esq., Assistant
Attorney General, of Counsel, Albany, NY, for
Defendants.

### *MEMORANDUM–DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* prisoner
civil rights action filed by Bartram Yihni Dabney
("Plaintiff") against the above-captioned New York State
correctional employees ("Defendants"), are the following:
Defendants' motion to dismiss Plaintiff's Complaint for
failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6);
United States Magistrate Judge David E. Peebles'
Report–Recommendation recommending Defendants
motion be granted in part and denied in part; and
Plaintiff's Objection to the Report–Recommendation.
(Dkt.Nos.24, 33, 34.) For the reasons set forth below,
Magistrate Judge Peebles' Report–Recommendation is
accepted and adopted in its entirety; Defendants' motion
is granted in part and denied in part; Plaintiff's Eighth
Amendment inadequate-medical-care claim against
Defendant Dr. Raymond Maddock is dismissed with leave
to replead during the pendency of this action in
accordance with Fed.R.Civ.P. 15; and Plaintiff's First

Amendment retaliation claim against Defendant
Corrections Officer M. Stormer survives Defendants'
motion.

### I. RELEVANT BACKGROUND

#### A. Plaintiff's Complaint

Plaintiff filed his Complaint on May 3, 2010. (Dkt.
No. 1.) By the Court's Decision and Order dated January
4, 2011, all of Plaintiff's claims were dismissed, except for
the following two claims: (1) Plaintiff's First Amendment
retaliation claim against Defendant Stormer, arising from
the adverse action allegedly taken by Defendant Stormer
between November 13, 2008, and November 29, 2008
(asserted in Plaintiff's First Cause of Action); and (2)
Plaintiff's Eighth Amendment inadequate-medical-care
claim against Defendant Maddock, arising from the
wrongful and reckless denial of various medical care and
permits between approximately August of 2009 and
February of 2010 (constituting Plaintiff's Tenth Cause of
Action). (Dkt. No. 14.)

Because this Decision and Order is intended primarily
for the review of the parties, the Court will not recite in
detail the factual allegations giving rise to these claims,
but will refers the reader the Court's Decision and Order
of January 4, 2011, and Magistrate Judge Peebles'
Report–Recommendation, which accurately summarize
those factual allegations. (Dkt.Nos.14, 33.)

#### B. Magistrate Judge Peebles' Report–Recommendation

On November 29, 2011, Magistrate Judge Peebles
issued a Report–Recommendation recommending that
Defendants' motion to dismiss for failure to state a claim
be granted in part and denied in part in the following
respects: that Plaintiff's Eighth Amendment
inadequatemedical-care claim against Defendant Dr.
Raymond Maddock be dismissed with leave to replead
during the pendency of this action in accordance with
Fed.R.Civ.P. 15; and that Plaintiff's First Amendment
retaliation claim against Defendant Corrections Officer M.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 760748 (N.D.N.Y.)

(Cite as: 2012 WL 760748 (N.D.N.Y.))

Stormer survive Defendants' motion. (*See generally* Dkt. No. 33.) [FN1] More specifically, Magistrate Judge Peebles concluded that Plaintiff's Eighth Amendment inadequate-medical-care claim was deficiently pled for each of two alternative reasons: (1) even when construed with the utmost of special liberality Plaintiff's Complaint does not allege facts plausibly suggesting that, even after Defendant Stormer's treatment of Plaintiff, Plaintiff suffered from a condition of urgency, one that may produce death, degeneration or extreme pain; and (2) even when construed with the utmost of special liberality Plaintiff's Complaint does not allege facts plausibly suggesting that Defendant Stormer acted with a sufficiently culpable mental state (akin to criminal recklessness) during the time in question. (*Id.* at 13–22.)

> FN1. Magistrate Judge Peebles also recommended that the Court grant Defendants' additional request for a stay of discovery pending the Court's issuance of a decision on Defendants' motion to dismiss. (Dkt. No. 33, at 27–29.) Because it appears from the docket sheet that no discovery has occurred since the filing of Defendants' motion, the Court finds that it is not necessary to address this aspect to Defendants' motion.

## C. Plaintiff's Objection to the Report–Recommendation

*2 On December 9, 2011, Plaintiff filed an Objection to the Report–Recommendation. (Dkt. No. 34.) Liberally construed, Plaintiff's Objection asserts the following three arguments in support of challenge to Magistrate Judge Peebles' recommendation that the Court dismiss (without prejudice) Plaintiff's inadequate-medical-care claim against Defendant Dr. Raymond Maddock: (1) Defendant Maddock knowingly refused to continue the pain medication that a prior treating physician had prescribed for Plaintiff to treat his arthritis condition; (2) in addition, Defendant Maddock knowingly refused to continue the permits for a medical boot, back brace, and hand brace that a prior treating physician had issued to Plaintiff to treat his arthritis condition; and (3) Dr. Maddock knowingly failed to follow DOCS guidelines governing the treatment of inmates afflicted with Hepatitis C. (*Id* .)

## II. APPLICABLE LEGAL STANDARDS

## A. Standard of Review Governing a Report–Recommendation

When a *specific* objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to a *de novo* review. Fed.R.Civ.P. 72(b)(2); 28 U.S.C. § 636(b)(1)(C). To be "specific," the objection must, with particularity, "identify [1] the portions of the proposed findings, recommendations, or report to which it has an objection and [2] the basis for the objection." N.D.N.Y. L.R. 72.1(c).[FN2] When performing such a *de novo* review, "[t]he judge may ... receive further evidence...." 28 U.S.C. § 636(b)(1). However, a district court will ordinarily refuse to consider evidentiary material that could have been, but was not, presented to the magistrate judge in the first instance.[FN3]

> FN2. *See also Mario v. P & C Food Markets, Inc.,* 313 F.3d 758, 766 (2d Cir.2002) ("Although Mario filed objections to the magistrate's report and recommendation, the statement with respect to his Title VII claim was not specific enough to preserve this claim for review. The only reference made to the Title VII claim was one sentence on the last page of his objections, where he stated that it was error to deny his motion on the Title VII claim '[f]or the reasons set forth in Plaintiff's Memorandum of Law in Support of Motion for Partial Summary Judgment.' This bare statement, devoid of any reference to specific findings or recommendations to which he objected and why, and unsupported by legal authority, was not sufficient to preserve the Title VII claim.").

> FN3. *See Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137–38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40, n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional

Not Reported in F.Supp.2d, 2012 WL 760748 (N.D.N.Y.)

(Cite as: 2012 WL 760748 (N.D.N.Y.))

testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *cf. U.S. v. Raddatz,* 447 U.S. 667, 676, n. 3, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980) ("We conclude that to construe § 636(b)(1) to require the district court to conduct a second hearing whenever either party objected to the magistrate's credibility findings would largely frustrate the plain objective of Congress to alleviate the increasing congestion of litigation in the district courts."); Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition ("The term 'de novo' does not indicate that a secondary evidentiary hearing is required.").

When only a *general* objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed.R.Civ.P. 72(b)(2),(3); Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition.[FN4] Similarly, when an objection merely reiterates the *same arguments* made by the objecting party in its original papers submitted to the magistrate judge, the Court subjects that portion of the report-recommendation challenged by those arguments to only a *clear error* review.[FN5] Finally, when *no* objection is made to a portion of a report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition. When performing such a "clear error" review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Id.* [FN6]

FN4. *See also Brown v. Peters,* 95–CV–1641, 1997 WL 599355, at *2–3 (N.D.N.Y. Sept.22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion,* 175 F.3d 1007 (2d Cir.1999).

FN5. *See Mario,* 313 F.3d at 766 ("Merely referring the court to previously filed papers or arguments does not constitute an adequate objection under either Fed.R.Civ.P. 72(b) or Local Civil Rule 72.3(a)(3)."); *Camardo v. Gen. Motors Hourly–Rate Emp. Pension Plan,* 806

F.Supp. 380, 382 (W.D.N.Y.1992) (explaining that court need not consider objections that merely constitute a "rehashing" of the same arguments and positions taken in original papers submitted to the magistrate judge); *accord, Praileau v. Cnty. of Schenectady,* 09–CV–0924, 2010 WL 3761902, at *1, n. 1 (N.D.N.Y. Sept.20, 2010) (McAvoy, J.); *Hickman ex rel. M.A.H. v. Astrue,* 07–CV–1077, 2010 WL 2985968, at *3 & n. 3 (N.D.N.Y. July 27, 2010) (Mordue, C.J.); *Almonte v. N.Y.S. Div. of Parole,* 04–CV–0484, 2006 WL 149049, at *4 (N.D.N.Y. Jan.18, 2006) (Sharpe, J.).

FN6. *See also Batista v. Walker,* 94–CV–2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is made, so long as those sections are not facially erroneous.") (internal quotation marks and citations omitted).

After conducting the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1)(C).

**B. Standard of Review Governing a Dismissal Pursuant to Fed.R.Civ.P. 12(b)(6)**

**\*3** The legal standard governing a dismissal pursuant to Fed.R.Civ.P. 12(b)(6) was correctly recited in the Court's Decision and Order of January 4, 2011, and Magistrate Judge Peebles' Report–Recommendation. (Dkt. No. 14, at 5–10; Dkt. No. 33, at 6–8.) As a result, this standard is incorporated by reference in this Decision and Order, which (again) is intended primarily for the review of the parties.

**III. ANALYSIS**

As an initial matter, when liberally construed, Plaintiff's Objection *attempts* to challenge both Magistrate Judge Peebles' finding regarding the objective prong of the deliberate-indifference test, and the subjective prong of that test. Specifically, with regard to the objective prong, Plaintiff argues that, when Defendant treated Plaintiff, Plaintiff had already been prescribed pain medication by

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 760748 (N.D.N.Y.)

(Cite as: 2012 WL 760748 (N.D.N.Y.))

a prior treating physician. (Dkt. No. 34.) Similarly, with regard to the subjective prong, Plaintiff argues that, when Defendant treated Plaintiff, Defendant knew about the prescription and permits issued by Plaintiff's prior treating physician. (*Id.*) (In addition, Plaintiff argues that Defendant failed to follow DOCS guidelines governing the treatment of inmates afflicted with Hepatitis C.)

The problem is that both assertions are late-blossoming in that they were never presented in Plaintiff's Complaint. (Dkt. No. 1, at ¶¶ 40–41.) Nor were they asserted in Plaintiff's papers in opposition to Defendants' motion. (Dkt. No. 27, at 7–9.) As a result, they could not be considered by Magistrate Judge Peebles in his Report–Recommendation. (Dkt. No. 33.) As explained above in Part II.A. of this Decision and Order, a district court will ordinarily refuse to consider material that could have been, but was not, presented to the magistrate judge in the first instance. Here, the Court finds that considering these late-blossoming allegations as "challenges" to a report-recommendation that never had the benefit of the allegations would frustrate the purpose of the Magistrates Act. (The Court notes that the third argument asserted in Plaintiff's Objection, which regards Defendant Maddock's failure to follow DOCS guidelines governing the treatment of inmates afflicted with Hepatitis C, is merely a reiteration of the same argument made by Plaintiff in his original papers submitted to the Magistrate Judge Peebles.)

For these reasons, the Court finds that it need subject Magistrate Judge Peebles' Report–Recommendation to a clear-error review, which it survives. Even if the Court were to subject the Report–Recommendation to a *de novo* review, it would reach the same conclusion: the Court can find no error in the Report–Recommendation; Magistrate Judge Peebles employed the proper standard, accurately recited the facts, and reasonably applied the law to those facts. (*Id.*) As a result, Magistrate Judge Peebles' Report–Recommendation is accepted and adopted in its entirety for the reasons stated therein.

The Court would add only that, even if it were to construe Plaintiff's Objections as effectively amending his Complaint (which, again, it does not, given the waste of judicial resources that would result), it would find that those amended allegations (as presented in Plaintiff's

two-page Objections and two-paragraph Tenth Cause of Action) fail to state an Eighth Amendment inadequate-medical-care claim against Defendant Maddock.

**\*4** For these reasons, and for the reasons stated by Magistrate Judge Peebles in his Report–Recommendation, Plaintiff's First Amendment retaliation claim against Defendant Stormer survives Defendants' motion, and Plaintiff's claims against Defendant Maddock are dismissed with leave of the Court to replead during the pendency of this action in accordance with Fed.R.Civ.P. 15.

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Peebles' Report–Recommendation (Dkt. No. 33) is ***ACCEPTED*** and ***ADOPTED*** in its entirety; and it is further

**ORDERED** that Defendants' motion to dismiss (Dkt. No. 24) is ***GRANTED*** in part, and ***DENIED*** in part, in the following respects:

(1) Plaintiff's Eighth Amendment inadequate-medical-care claim against Defendant Dr. Raymond Maddock (constituting Plaintiff's Tenth Cause of Action) is **DISMISSED with leave to replead** during the pendency of this action in accordance with Fed.R.Civ.P. 15; but

(2) Plaintiff's First Amendment retaliation claim against Defendant Stormer (asserted in Plaintiff's First Cause of Action) **SURVIVES** Defendants' motion; and it is further

**ORDERED** that Defendant Stormer shall file and serve an answer to plaintiff's complaint by 3/28/12; and then this case shall be referred to the Magistrate Judge to issue pretrial scheduling deadlines. The clerk is directed to terminate Defendant Maddock from this action.

N.D.N.Y.,2012.

Dabney v. Maddock
Not Reported in F.Supp.2d, 2012 WL 760748 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 760748 (N.D.N.Y.)

(Cite as: 2012 WL 760748 (N.D.N.Y.))

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

2015 WL 5732076
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Jason LOPEZ, Plaintiff,

v.

Sergeant CIPOLINI and Correction
Officer Burguess, Defendants.

No. 14–CV–2441 (KMK).
|
Signed Sept. 30, 2015.

**Synopsis**

**Background:** Prisoner brought § 1983 action against prison
officials, asserting claims for violation of her Free Exercise
Clause rights under the First Amendment, the Religious
Land and Institutionalized Person Act (RLUIPA), and the
Fourteenth Amendment's Equal Protection Clause, based on
allegations that she was prohibited from attending religious
services, violation of the Eighth Amendment, based on
allegations that she was verbally harassed, and violation
of Title VII and the Equal Protection Clause, based on
allegations that she was fired from her work position in
prison. Officials moved to dismiss.

**Holdings:** The District Court, Kenneth M. Karas, J., held that:

[1] dismissal of prisoner's § 1983 claim against prison official
for failure to exhaust administrative remedies was warranted;

[2] prison's alleged failure to respond to prisoner's grievance
against prison officials did not render administrative remedies
unavailable to prisoner;

[3] prisoner's allegation that officials prohibited her from
attending religious services was insufficient to support claim
for violation of Free Exercise Clause;

[4] dismissal of prisoner's RLUIPA claim was warranted;

[5] prison official's alleged act of making statements
regarding prisoner's hair and sexuality, if proven, did not rise
to level of violation of Eighth Amendment; and

[6] prisoner's allegation that prison officials prevented her
from attending religious services was sufficient to support
claim for violation of Equal Protection Clause.

Motion granted in part and denied in part.

West Headnotes (33)

**[1] Federal Civil Procedure**
  👉 Pro Se or Lay Pleadings

  For purposes of a motion to dismiss for failure to
  state a claim, a pro se litigant's submissions are
  held to less stringent standards than those drafted
  by lawyer. Fed.Rules Civ.Proc.Rule 12(b)(6), 28
  U.S.C.A.

  Cases that cite this headnote

**[2] Federal Civil Procedure**
  👉 Matters considered in general

  Although, generally, in adjudicating a motion
  to dismiss for failure to state a claim, a district
  court must confine its consideration to facts
  stated on the face of the complaint, in documents
  appended to the complaint or incorporated in
  the complaint by reference, and to matters of
  which judicial notice may be taken, in deciding
  a motion to dismiss a pro se complaint, it is
  appropriate for a court to consider materials
  outside the complaint to the extent that they are
  consistent with the allegations in the complaint,
  including documents that a pro se litigant
  attaches to his opposition papers, allegations
  contained in plaintiff's memorandum of law, at
  least where those allegations are consistent with
  the allegations in the complaints, information
  provided in affidavits, and statements by the
  plaintiff submitted in response to a defendant's
  request for a pre-motion conference. Fed.Rules
  Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

  Cases that cite this headnote

**[3] Federal Civil Procedure**
  👉 Motion and proceedings thereon

A pro se plaintiff's failure to oppose a defendant's motion to dismiss for failure to state a claim does not, by itself, require the dismissal of the claims; rather, even though a party is to be given a reasonable opportunity to respond to an opponent's motion, the sufficiency of a complaint is a matter of law that the court is capable of determining based on its own reading of the pleading and knowledge of the law. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

Cases that cite this headnote

**[4]** **Prisons**

 Exhaustion of Other Remedies

The requirement, under the PLRA, that an inmate must exhaust all administrative remedies as are available prior to bringing an action with respect to prison conditions applies to all personal incidents while in prison, and includes actions for monetary damages despite the fact that monetary damages are not available as an administrative remedy. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

Cases that cite this headnote

**[5]** **Prisons**

 Exhaustion of Other Remedies

The requirement, under the PLRA, that an inmate exhaust all administrative remedies as are available prior to bringing an action with respect to prison conditions requires "proper exhaustion," which means using all steps that the agency holds out, and doing so properly, which entails completing the administrative review process in accordance with the applicable procedural rules. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

1 Cases that cite this headnote

**[6]** **Prisons**

 Pleading

**Prisons**

 Evidence

On considering a motion to dismiss for failure to exhaust administrative remedies under the

PLRA, defendants bear the burden of proof, and prisoner plaintiffs need not plead exhaustion with particularity. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

Cases that cite this headnote

**[7]** **Prisons**

 Exhaustion of Other Remedies

A court may not dismiss an action, brought by a prisoner confined to a jail, prison, or correctional facility, with respect to prison conditions, for failure to exhaust administrative remedies under the PLRA, unless it determines that such remedies are available. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

Cases that cite this headnote

**[8]** **Prisons**

 Evidence

Whether an administrative remedy was available to a prisoner in a particular prison or prison system, as required for the prisoner to exhaust that administrative remedy, under the PLRA, is ultimately a question of law, and defendants bear the initial burden of establishing, by pointing to legally sufficient sources such as statutes, regulations, or grievance procedures, that a grievance process exists and applies to the underlying dispute. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

Cases that cite this headnote

**[9]** **Prisons**

 Pleading

A motion to dismiss an action regarding prison conditions for failure to exhaust administrative remedies, as required under the PLRA, should be granted only if nonexhaustion is clear from the face of the complaint, and none of the exceptions to the exhaustion requirement are germane, including: (1) that administrative remedies were unavailable to the prisoner; (2) that defendants either waived the defense or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable

misunderstanding of the grievance procedures, justified the prisoner's failure to comply with the exhaustion requirement. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.; Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

Cases that cite this headnote

[10]     **Civil Rights**
        👉 Criminal law enforcement; prisons

Dismissal of prisoner's § 1983 claim against prison official, in which she alleged that the official violated her Eighth Amendment rights by verbally harassing her during recreation and violated Title VII and the Equal Protection Clause when he fired her from her work position in prison, was required, based on prisoner's failure to exhaust administrative remedies pursuant to PLRA; grievance procedure, under which prisoner was required, prior to filing lawsuit, to file her grievance with Inmate Grievance Resolution Committee (IGRC), appeal an adverse IGRC decision to facility superintendent, and appeal an adverse decision by superintendent to Central Office Review Committee (CORC), was available to prisoner, prisoner filed grievance with IGRC, and filed lawsuit prior to appealing IGRC's adverse decision to facility superintendent. U.S.C.A. Const.Amends. 8, 14; Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.; 42 U.S.C.A. § 1983; Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a); Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; 7 NYCRR 701.5(a)(2).

Cases that cite this headnote

[11]     **Prisons**
        👉 Exhaustion of Other Remedies

Under the PLRA, when a prisoner does not properly exhaust his or her administrative remedies before filing suit regarding prison conditions, the action must be dismissed; this is so even if the claim has since been exhausted. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.;

Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

Cases that cite this headnote

[12]     **Civil Rights**
        👉 Criminal law enforcement; prisons

Central Office Review Committee's (CORC) alleged failure to respond to prisoner's grievance against prison official, in which she alleged that the official violated her Eighth Amendment rights by verbally harassing her during recreation and violated Title VII and the Equal Protection Clause when he fired her from her work position in prison, did not render administrative remedies, which prisoner was required to exhaust, under PLRA, prior to filing § 1983 lawsuit, unavailable to prisoner, where prisoner filed lawsuit prior to appealing facility superintendent's adverse decision, regarding her complaint, to CORC. U.S.C.A. Const.Amends. 8, 14; Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.; 42 U.S.C.A. § 1983; Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a); Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; 7 NYCRR 701.5(a)(2).

Cases that cite this headnote

[13]     **Prisons**
        👉 Pleading

Under the PLRA, a prisoner's failure to exhaust administrative remedies prior to bringing a lawsuit regarding prison conditions is an affirmative defense and, therefore, the issue of exhaustion is generally not amenable to resolution by way of a motion to dismiss. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.; Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

Cases that cite this headnote

[14]     **Prisons**
        👉 Exhaustion of Other Remedies

A prisoner's failure to exhaust administrative remedies prior to filing lawsuit regarding prison

conditions, as required under the PLRA, is merely a procedural flaw that can be cured simply by exhausting those remedies and reinstituting suit. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

Cases that cite this headnote

**[15]    Prisons**
  Exhaustion of Other Remedies

Generally, merely alerting prison officials as to the nature of an alleged wrong for which redress is sought does not constitute proper exhaustion of administrative remedies as required under the PLRA's requirement that administrative remedies be exhausted prior to initiating a lawsuit regarding prisoner conditions. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

Cases that cite this headnote

**[16]    Prisons**
  Exhaustion of Other Remedies

Regardless of whether a prisoner's informal complaints put prison officials on notice of the prisoner's grievance in a substantive sense, to satisfy the administrative remedy exhaustion requirement of the PLRA, a prisoner must also procedurally exhaust his or her available remedies prior to filing a lawsuit regarding prison conditions. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

Cases that cite this headnote

**[17]    Constitutional Law**
  Prisons and Pretrial Detention

Because a prisoner's First Amendment rights are balanced against the interests of prison officials charged with complex duties arising from the administration of the penal system, a prisoner's Free Exercise claims are judged under a reasonableness test less restrictive than ordinarily applied to alleged infringements of fundamental constitutional rights. U.S.C.A. Const.Amend. 1.

Cases that cite this headnote

**[18]    Constitutional Law**
  Prisons and Pretrial Detention

To be entitled to protection under the free exercise clause of the First Amendment, a prisoner must make a threshold showing that the disputed conduct substantially burdened his or her sincerely held religious beliefs. U.S.C.A. Const.Amend. 1.

Cases that cite this headnote

**[19]    Constitutional Law**
  Prisons and Pretrial Detention

A substantial burden on a prisoner's religious exercise exists, as required to entitle a prisoner to protection under the Free Exercise Clause of the First Amendment, where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs. U.S.C.A. Const.Amend. 1.

Cases that cite this headnote

**[20]    Constitutional Law**
  Prisons and Pretrial Detention

Once a prisoner establishes a substantial burden on his or her religious exercise, as required for the prisoner to be entitled to protection under the Free Exercise Clause of the First Amendment, the defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct; the burden then shifts to the prisoner to show that these articulated concerns were irrational. U.S.C.A. Const.Amend. 1.

Cases that cite this headnote

**[21]    Prisons**
  Religious Practices and Materials

RLUIPA protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion, and provides a more stringent

standard than does the First Amendment, barring the government from imposing a substantial burden on a prisoner's free exercise unless the challenged conduct or regulation furthers a compelling governmental interest and is the least restrictive means of furthering that interest. U.S.C.A. Const.Amend. 1; Religious Land Use and Institutionalized Persons Act of 2000, § 3(a), 42 U.S.C.A. § 2000cc–1(a).

Cases that cite this headnote

[22] **Prisons**

Religious Practices and Materials

Whether or not a prisoner sufficiently pleads a substantial burden on a sincerely held religious belief under RLUIPA involves the same threshold analysis as under the First Amendment. U.S.C.A. Const.Amend. 1; Religious Land Use and Institutionalized Persons Act of 2000, § 3(a), 42 U.S.C.A. § 2000cc–1(a).

Cases that cite this headnote

[23] **Prisons**

Religious Practices and Materials

Under RLUIPA, where a prisoner adduces evidence sufficient to show that the government practice substantially burdens his or her religious exercise, the onus shifts to the government to demonstrate that the practice furthers a compelling governmental interest, and that the burden imposed on religion is the least restrictive means of achieving that interest. Religious Land Use and Institutionalized Persons Act of 2000, § 4(b), 42 U.S.C.A. § 2000cc–2(b).

Cases that cite this headnote

[24] **Constitutional Law**

Religious services and ceremonies; study and prayer groups

**Prisons**

Services, ceremonies, texts, study, and prayer

Prisoner's allegation that prison officials prohibited her from attending two religious

services that were not central or important to her faith was insufficient to make threshold showing that the officials' alleged conduct substantially burdened her sincerely held religious beliefs, as required to entitle the prisoner to protection under the Free Exercise Clause of the First Amendment. U.S.C.A. Const.Amend. 1.

Cases that cite this headnote

[25] **Civil Rights**

Availability in general

RLUIPA does not offer monetary damages against state officers in either their official or individual capacities; instead, a plaintiff may only seek injunctive relief. Religious Land Use and Institutionalized Persons Act of 2000, § 2, 42 U.S.C.A. § 2000cc.

Cases that cite this headnote

[26] **Civil Rights**

Criminal law enforcement; prisons

**Prisons**

Services, ceremonies, texts, study, and prayer

Dismissal of prisoner's RLUIPA claim against prison officials, in which she sought monetary damages and injunctive relief, based on allegations that the officials prohibited her from attending two religious services, was warranted; monetary damages were unavailable under RLUIPA, and, because prisoner was no longer incarcerated, to extent that she requested injunctive relief, the request was moot. Religious Land Use and Institutionalized Persons Act of 2000, § 2, 42 U.S.C.A. § 2000cc.

Cases that cite this headnote

[27] **Sentencing and Punishment**

Other particular conditions

Allegations of verbal harassment or threats, unaccompanied by any injury, no matter how inappropriate, unprofessional, or reprehensible it might seem, are generally an insufficient basis for an inmate's § 1983 claim, alleging

violations of the Eighth Amendment. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[28]  Sentencing and Punishment**
    👉 Other particular conditions

Generally, an inmate's alleged injury must be physical in nature to constitute an Eighth Amendment violation, although, under certain circumstances, a prison official's infliction of psychological pain on an inmate may constitute an Eighth Amendment violation if the psychological pain is: (1) intentionally inflicted, and (2) more than de minimis in nature. U.S.C.A. Const.Amend. 8.

Cases that cite this headnote

**[29]  Prisons**
    👉 Threats, intimidation, and harassment; abusive language
**Sentencing and Punishment**
    👉 Other particular conditions

Prison official's alleged act of making statements regarding prisoner's hair and her sexuality, if proven, did not rise to the level of a constitutional violation under the Eighth Amendment, where official did not cause prisoner any physical injury and prisoner did not suffer humiliation or mental anguish that rose to the level of psychological pain that was more than de minimis in nature. U.S.C.A. Const.Amend. 8.

Cases that cite this headnote

**[30]  Constitutional Law**
    👉 Similarly situated persons; like circumstances

The Equal Protection Clause of the Fourteenth Amendment requires that all persons similarly situated be treated in the same manner. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[31]  Constitutional Law**

    👉 Similarly situated persons; like circumstances

The Equal Protection Clause bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious bad faith intent to injure a person. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[32]  Constitutional Law**
    👉 Intentional or purposeful action requirement
**Constitutional Law**
    👉 Similarly situated persons; like circumstances

To state a violation of the Equal Protection Clause, a plaintiff must allege that he or she was treated differently from others similarly situated as a result of intentional or purposeful discrimination. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[33]  Constitutional Law**
    👉 Prisons and other confinement
**Constitutional Law**
    👉 Prisons
**Prisons**
    👉 Services, ceremonies, texts, study, and prayer

Prisoner's allegation that prison official prevented her from attending two religious services "because of her hair" and because of "her sexuality," while other prisoners in the facility were not prevented from attending those services, was sufficient to allege that she was treated differently from others similarly situated, as required to support claim that prison officials discriminated against her in violation of the Equal Protection Clause, since there was no legitimate penological interest that would be served by denying former prisoner the right to attend religious services based on her hair and/or sexuality. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**Attorneys and Law Firms**

Jason Lopez, New York, NY, pro se.

Maria Barous Hartofilis, Esq., Assistant Attorney General of the State of New York, New York, NY, for Defendants.

### *OPINION AND ORDER*

KENNETH M. KARAS, District Judge:

**\*1** Pro se Plaintiff Jason Lopez ("Plaintiff") filed the instant Amended Complaint pursuant to 42 U.S.C. § 1983 against Sergeant Cipolini ("Cipolini") and Correction Officer Burguess ("Burguess") (collectively, "Defendants"). Plaintiff alleges that Cipolini violated Plaintiff's Free Exercise Clause rights under the First Amendment, the Religious Land and Institutionalized Person Act ("RLUIPA"), 42 U.S.C. § 2000cc et seq., and the Fourteenth Amendment Equal Protection Clause when he prohibited Plaintiff from attending religious services on two different occasions. (Am. Compl. ¶ II.D (Dkt. No. 33).) Plaintiff also alleges that Cipolini harassed Plaintiff based on this conduct. (*See* Letter from Plaintiff to Court (Sept. 17, 2014) ("Pl.'s Sept. 17, 2014 Letter"), at unnumbered 2 (Dkt. No. 24).) Plaintiff alleges that Burguess violated her Eighth Amendment rights by verbally harassing Plaintiff during recreation, (Am. Compl. ¶ II.D), and, further, violated Title VII and the Equal Protection Clause when Burguess fired Plaintiff from her work position in the prison, (Pl.'s Sept. 17 Letter, at unnumbered 2). Before the Court is Defendants' Motion to Dismiss the Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6). (*See* Mot. To Dismiss ("Mot.") (Dkt. No. 38).) [1] Defendants claim that Plaintiff's Action is barred for failure to exhaust available administrative remedies, pursuant to the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), and, alternatively, that Plaintiff's claims cannot survive on the merits. (*Id.*) For the following reasons, Defendants' Motion is granted in part and denied in part.

### *I. Background*

#### *A. Factual Background*

The following facts are drawn from Plaintiff's Amended Complaint, (Dkt. No. 33), and papers submitted in response to Defendants' request for a pre-motion conference, (Dkt. No. 22), and are taken as true for the purpose of resolving the instant Motion. Plaintiff is a male-to-female transgender individual, [2] and was housed in Downstate Correctional Facility, an all-male prison, during the time of the alleged events. [3] (Am. Compl. Ex. B (Dkt. No. 33).)

On February 9, 2014, at approximately 8:30 a.m., Cipolini "told [Plaintiff in [ ] front of the inmates going to religious services [that] [Plaintiff] could not attend because of [her] [h]air and [her] sexuality."(Pl.'s Sept. 17, 2014 Letter, at unnumbered 2; *see also* Am. Compl. ¶¶ II.C–D.) On February 16, 2014, at approximately the same time, "[w]hile going to Catholic services [,] ... Cipolini had [Plaintiff] escorted out of [the] services[,] stating [that she was] not authorized to go to any relig[i]ous service."(Am. Compl. ¶¶ II.C–D.) On March 28, 2014, at approximately 1:30 p.m., Plaintiff "was setting up for gallery recreation" when Burguess "asked [Plaintiff] to lock in because [Burguess] needed two men to work."(*Id.*) Other inmates witnessed the incident. (*Id.*) Burguess also "fired [Plaintiff] [from] [her] [two-and-a-half] month position," stating that Downstate Correctional Facility was a "[m]en's facility." (Pl.'s Sept. 17, 2014 Letter, at unnumbered 2.) [4] As a result of Defendants' conduct, Plaintiff suffered mental anguish and went to see the mental health doctor at the prison. (Am. Compl. ¶ III.) Plaintiff is asking for one million dollars to compensate her for her mental anguish and requests that the Court acknowledge that Defendants discriminated against her and publicly humiliated her. (*Id.*)

**\*2** With respect to Cipolini, Plaintiff "wrote to [her] lawyer and stated what had happen[ed]." (*Id.* ¶ IV.E.1.) "[Plaintiff's lawyer,] in t[u]rn[,] wrote to the [s]uperintendent[,] but it did not help because [Plaintiff] was [ ][f]urther harassed and [d]iscriminated [against] instead."(*Id.* ¶ IV.F.2.) No grievance against Cipolini was filed. (*Id.*) [5] With respect to Burguess, Plaintiff filed a grievance about the incident on March 28, 2014, and after receiving an adverse response, she appealed the decision on April 23, 2014. (*Id.* ¶¶ IV.E.1, IV.E.3); (Letter from Plaintiff to Court (Oct. 29, 2014) ("Pl.'s Oct. 29, 2014 Letter"), at unnumbered 1 (Dkt. No. 29).) Plaintiff pleads that she "appealed [her] appeal [but] did not get [an] answer [ ] [through] the proper grievance prot[o]col[.] [The Central Office Review Committee ("CORC") ] had 45 days to give [her][a] decision [but] it took them 161 days to get [her] decision back."(*Id.* ¶ IV.E.3.) Plaintiff subsequently

provided the Court with a copy of her adverse appeal decision from the CORC, which indicates the "date filed" was April 14, 2014 and the CORC appeal was decided on September 3, 2014. (Pl.'s Oct. 29, 2014 Letter, at unnumbered 2.) [6]

**B. Procedural Background**

Plaintiff filed the original Complaint on April 7, 2014 against Defendants Cipolini, Burguess, and the New York State Department of Corrections and Community Supervision ("DOCCS"). (Dkt. No. 2.) The Court granted Plaintiff's request to proceed in forma pauperis on May 14, 2014. (Dkt. No. 7.) The Court issued an Order dismissing Plaintiff's claims against the DOCCS on May 20, 2014. (Dkt. No. 9.) On June 11, 2014 the Court received a letter from Plaintiff dated May 30, 2014 requesting $1.2 million in damages for the mental anguish that she suffered when Defendants discriminated against and humiliated Plaintiff based on her appearance and sexual orientation. (Dkt. No. 11.) The Court issued an Order on June 16, 2014 allowing Plaintiff more time to amend her Complaint, given the further information Plaintiff submitted in her May 30, 2014 Letter. (Dkt. No. 16.) The Court did not receive an amended complaint from Plaintiff pursuant to the June 16, 2014 Order. Defendants submitted a letter for a pre-motion conference on September 12, 2014, indicating the grounds on which Defendants would move to dismiss. (Dkt. No. 22.) Thereafter, Plaintiff submitted numerous papers in response to Defendants' September 12, 2014 Letter, including a letter explaining the steps that Plaintiff took to grieve her claim against Burguess. (Dkt. Nos. 24–26, and 29.) On November 12, 2014, based on the information that Plaintiff submitted in her October 6, 2014 Letter and the CORC's decision appended thereto, the Court issued an Order directing Plaintiff to show cause as to why her Complaint should not be dismissed for failure to exhaust the relevant administrative remedies. (Dkt. No. 31.) In response, Plaintiff filed a Motion for Compensation, (Dkt. No. 32), and an Amended Complaint on November 17, 2014, (Dkt. No. 33). Pursuant to a Scheduling Order issued by the Court on December 17, 2014, (Dkt. No. 37), Defendants filed a Motion to Dismiss and accompanying papers on January 30, 2015, (Dkt. Nos. 38–41). Plaintiff did not submit papers in opposition to the Motion. [7]

**II. Discussion**

*A. Standard of Review*

**\*3** The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his [or her] entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."*Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (second alteration in original) (internal quotation marks omitted). Instead, the Court has emphasized that "[f]actual allegations must be enough to raise a right to relief above the speculative level,"*id.,* and that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint,"*id.* at 563, 127 S.Ct. 1955. A plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face."*Id.* at 570, 127 S.Ct. 1955. But if a plaintiff has "not nudged [his or her] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed."*Id.; see also Ashcroft v. Iqbal,* 556 U.S. 662, 679, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show [n]'—'that the pleader is entitled to relief.'" (alteration in original) (citation omitted) (quoting Fed.R.Civ.P. 8(a)(2))).

**[1]**    In considering Defendants' Motion to Dismiss, the Court is required to consider as true the factual allegations contained in the Amended Complaint. *See Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) ("We review de novo a district court's dismissal of a complaint pursuant to Rule 12(b)(6), accepting all factual allegations in the complaint and drawing all reasonable inferences in the plaintiff's favor."(italics and internal quotation marks omitted)); *Gonzalez v. Caballero,* 572 F.Supp.2d 463, 466 (S.D.N.Y.2008) (same). Moreover, a pro se litigant's submissions "are held to less stringent standards than [those] drafted by lawyers. Courts liberally construe pleadings and briefs submitted by pro se litigants, reading such submissions to raise the strongest arguments they suggest."*Johnson v. Schriro,* No. 12–CV–7239, 2013 WL 5718414, at *2 (S.D.N.Y. Oct. 15, 2013) (internal quotation marks and citations omitted).

**[2]**    **[3]**    Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to

facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken."*Leonard F. v. Isr. Disc. Bank of N.Y.,* 199 F.3d 99, 107 (2d Cir.1999) (internal quotation marks omitted). In deciding a motion to dismiss a pro se complaint, however, it is appropriate to consider "materials outside the complaint to the extent that they are consistent with the allegations in the complaint,"*Alsaifullah v. Furco,* No. 12–CV–2907, 2013 WL 3972514, at *4 n. 3 (S.D.N.Y.2013) (internal quotation marks omitted), including, "documents that a pro se litigant attaches to his opposition papers,"*Agu v. Rhea,* No. 09–CV–4732, 2010 WL 5186839, at *4 n. 6 (E.D.N.Y.2010), "allegations contained in plaintiff's memorandum of law, at least where those allegations are consistent with the allegations in the complaints[,]"*Donahue v. U.S. Dep't of Justice,* 751 F.Supp. 45, 49 (S.D.N.Y.1990), information provided in affidavits, *Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986) (considering a pro se plaintiff's submitted memorandums and affidavits), and statements by the plaintiff "submitted in response to [a] defendant's request for a pre-motion conference,"*Jones v. Fed. Bureau of Prisons,* No. 11–CV–4733, 2013 WL 5300721, at *2 (E.D.N.Y. Sept. 19, 2013); *see also Rodriguez v. Rodriguez,* No. 10–CV–891, 2013 WL 4779639, at *1 (S.D.N.Y.2013) ("Although the Court is typically confined to the allegations contained within the four corners of the complaint, when analyzing the sufficiency of a pro se pleading, a court may consider factual allegations contained in a pro se litigant's opposition papers and other court filings."(internal citations and quotation marks omitted)). Finally, it is worth noting that the "failure to oppose [Defendants'] [M]otion [T]o [D]ismiss does not, by itself, require the dismissal of [Plaintiff's] claims." *Leach v. City of New York,* No. 12–CV–2141, 2013 WL 1683668, at *2 (S.D.N.Y. Apr. 17, 2013). Rather, even though "a party is of course to be given a reasonable opportunity to respond to an opponent's motion, the sufficiency of a complaint is a matter of law that the court is capable of determining based on its own reading of the pleading and knowledge of the law."*McCall v. Pataki,* 232 F.3d 321, 322–23 (2d Cir.2000).

## B. Exhaustion

### 1. Applicable Law

**\*4** **[4]** **[5]** The PLRA provides that "[n]o action shall be brought with respect to prison conditions under [§ ] 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."*42 U.S.C. § 1997e(a).* The exhaustion requirement applies to all personal incidents while in prison, *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002) (holding exhaustion is required for "all inmate suits about prison life, whether they involve general circumstances or particular episodes"); *see also Johnson v. Killian,* 680 F.3d 234, 238 (2d Cir.2012) (same), and includes actions for monetary damages despite the fact that monetary damages are not available as an administrative remedy, *Booth v. Churner,* 532 U.S. 731, 741, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001) (holding exhaustion is required "regardless of the relief offered through administrative procedures"). Moreover, the PLRA mandates " 'proper exhaustion'—that is, 'using all steps that the agency holds out, and doing so properly,'... [which] entails ...'completing the administrative review process in accordance with the applicable procedural rules.'"*Amador v. Andrews,* 655 F.3d 89, 96 (2d Cir.2011) (quoting *Woodford v. Ngo,* 548 U.S. 81, 88, 90, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006)).

**[6]** **[7]** **[8]** The Second Circuit has made clear that "administrative exhaustion is not a jurisdictional predicate," but rather "failure to exhaust is an affirmative defense."*Giano v. Goord,* 380 F.3d 670, 675 (2d Cir.2004) (citation omitted). Accordingly, "defendants bear the burden of proof [,] and prisoner plaintiffs need not plead exhaustion with particularity."*McCoy v. Goord,* 255 F.Supp.2d 233, 248 (S.D.N.Y.2003); *see also Miller v. Bailey,* No. 05–CV–5493, 2008 WL 1787692, at *3 (E.D.N.Y. Apr. 17, 2008) (explaining that the exhaustion requirement "must be pleaded and proved by a defendant" (citing *Jones v. Bock,* 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007))). Further, " '[a] court may not dismiss for failure to exhaust administrative remedies unless it determines that such remedies are available.'"*Rossi v. Fishcer,* No. 13–CV–3167, 2015 WL 769551, at *4 (S.D.N.Y. Feb. 24, 2015) (quoting *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004)). The Second Circuit has recently made clear that "[w]hether an administrative remedy was available to a prisoner in a particular prison or prison system is ultimately a question of law," and "defendants bear the initial burden of establishing, by pointing to legally sufficient sources such as statutes, regulations, or grievance procedures, that a grievance process exists and applies to the underlying dispute."*Hubbs v. Suffolk Cty. Sheriff's Dep't,* 788 F.3d 54, 59 (2d Cir.2015) (citation, alteration, and internal quotation marks omitted);

*see also Perez v. City of New York,* No. 14–CV–7502, 2015 WL 3652511, at *2 (S.D.N.Y. June 11, 2015) (same).

**[9]** Finally, the Second Circuit has recognized certain exceptions to the exhaustion requirement that apply when "(1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense ... or acted in such a[ ] way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement." *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006). "[T]he resolution of the exhaustion issue does not necessarily fit exactly into any of these three categories, and a particular fact pattern may implicate one or a combination of these factors." *Pagan v. Brown,* No. 08–CV–724, 2009 WL 2581572, at *5 (N.D.N.Y. Aug. 19, 2009) (citing *Giano,* 380 F.3d at 677 n. 6). Therefore, a motion to dismiss pursuant to Rule 12(b)(6) for failure to exhaust should be granted only if "nonexhaustion is clear from the face of the complaint, and none of the exceptions outlined by the Second Circuit are germane." *Lovick v. Schriro,* No. 12–CV–7419, 2014 WL 3778184, at *4 (S.D.N.Y. July 25, 2014) (alterations and internal quotation marks omitted); *see also Lee v. O'Harer,* No. 13–CV–1022, 2014 WL 7343997, at *3 (N.D.N.Y. Dec. 23, 2014) ("Dismissal under Rule 12(b)(6) for failure to exhaust is appropriate if such failure is evidenced on the face of the complaint and incorporated documents."); *Sloane v. Mazzuca,* No. 04–CV–8266, 2006 WL 3096031, at *4 (S.D.N.Y. Oct. 31, 2006) ("[B]y characterizing non-exhaustion as an affirmative defense, the Second Circuit suggests that the issue of exhaustion is generally not amenable to resolution by way of a motion to dismiss."(internal quotation marks omitted)).

### 2. Application

**\*5** Defendants move to dismiss the Amended Complaint on exhaustion grounds as to each Defendant. Accordingly, the Court addresses whether it is clear from the face of the Amended Complaint and the documents that Plaintiff submitted in connection with the instant Motion whether the claims should be dismissed because of Plaintiff's failure to exhaust.

### a. Burgess

**[10]** To begin, Defendants "point[ ] to legally sufficient sources ... [to show] that a grievance process exists and applies to the underlying dispute" involving Burgess. *Hubbs,* 788 F.3d at 59. In particular, Defendants point out that prisoners in the DOCCS's facilities, like Plaintiff, must exhaust all three levels of the applicable grievance procedure, (Defs.' Mem. of Law in Supp. of Defs.' Mot. To Dismiss the Am. Compl. ("Defs.' Mem.") 6 (Dkt. No. 39)), which requires that "first, the prisoner files a grievance with the Inmate Grievance Resolution Committee ('IGRC'). Second, the prisoner may appeal an adverse IGRC decision to the facility superintendent, and third, the prisoner may appeal an adverse decision by the superintendent to [the CORC]," *Mateo v. Corebine,* No. 09–CV–4811, 2010 WL 3629515, at *3 (S.D.N.Y.2010); *accord* 7 N.Y. Comp.Codes R. & Regs. § 701.5(a)(2). It is clear from the face of the Amended Complaint and the documents that Plaintiff submits in response to Defendants' pre-motion letter that this grievance procedure was available to Plaintiff concerning her claims against Burgess. Indeed, Plaintiff filed a grievance regarding these claims, appealed it, and received a decision from the CORC. (*See generally* Pl.'s Oct. 6, 2014 Letter.) *See McCoy,* 255 F.Supp.2d at 254 ("[T]he inmate grievance program was 'available' to [the plaintiff] ... for he filed a number of grievances concerning some of the misconduct he alleges."); *Banks v. Stewart,* No. 08–CV–7463, 2010 WL 2697075, at *6 (S.D.N.Y.2010) (holding that the plaintiff could not contest the "availability" of administrative remedies where he did not claim he was unaware of the grievance process, and he had partially grieved the incident).

It is also clear from Plaintiff's filings that Plaintiff failed to exhaust her administrative remedies before filing suit in federal court. Specifically, Plaintiff's claims against Burgess arise from events that took place on March 28, 2014. (*See* Am. Compl. II.D.) That same day, Plaintiff filed a grievance regarding Burgess's conduct. (Am. Compl. ¶ IV.E.1; *see also* Pl.'s Oct. 6, 2014 Letter, at unnumbered 1.) Plaintiff then filed this Action on April 7, 2014, 10 days after the day that the alleged events occurred and she filed the relevant grievance. (*See* Compl. (Dkt. No. 2).) The regulations applicable to the grievance procedure in New York facilities provide that the first step of the grievance process should be completed within 16 calendar days after receipt of the grievance. *See* 7 N.Y. Comp.Codes R. & Regs § 701.5(b). If an inmate appeals an adverse decision to the Superintendent, the Superintendent must generally decide the issue within 20 calendar days from the time the appeal was received. *Id.* § 701.5(c). Finally, the CORC must decide an appeal within 30 calendar days from

the date that such an appeal is filed. *Id.* § 701.5(d). In light of this procedure and based on the facts alleged in the Amended Complaint, it is implausible that Plaintiff was able to exhaust her administrative remedies within 10 days. *See Perez,* 2015 WL 3652511, at *3 (noting that "[t]he timing of the [c]omplaint ... show[ed] that the grievance process could not have been completed when [the plaintiff] commenced th[e] action"); *Price v. City of New York,* No. 11–CV–6170, 2012 WL 3798227, at *3 (S.D.N.Y. Aug. 30, 2012) (granting the defendant's motion to dismiss on exhaustion grounds where "given the timelines for the grievance procedure outlined in the [applicable] regulations, it would have been impossible for [the plaintiff to have fully pursued his grievance through all of the steps of the grievance procedure] in the 21 days between the alleged incident and the filing of his initial complaint"). Indeed, in her October 6, 2014 Letter, Plaintiff states that she appealed the grievance on April 23, 2014, which is after the date that she filed her initial Complaint in this case. (Pl.'s Oct. 6, 2014 Letter, at unnumbered 1.) It is clear, therefore, based on the materials Plaintiff submitted that, despite the fact that administrative remedies were available to her concerning her claims against Burgess, she failed to exhaust her administrative remedies before initiating this Action. *See Harris,* 2013 WL 3816590, at *7 (granting the defendant's motion to dismiss on exhaustion issues, in part, because the time limit for the superintendent to render a decision had yet to lapse when the plaintiff filed his federal action, and the plaintiff, therefore, could not "argue he was denied an opportunity to exhaust his administrative remedies").

**\*6** **[11]** A plaintiff must exhaust his administrative remedies *before* filing his initial complaint in federal court. Indeed, "[w]hen a prisoner does not properly exhaust his [or her] administrative remedies before filing suit, the action *must* be dismissed."*Mateo v. Alexander,* No. 08–CV–8797, 2010 WL 431718, at *3 (S.D.N.Y. Feb. 9, 2010); *see also Harris v. Gunsett,* No. 12–CV–3578, 2013 WL 3816590, at *6 (S.D.N.Y. July 22, 2013) (same)."This is so even if the claim has since been exhausted."*Mateo v. Ercole,* No. 08–CV–10450, 2010 WL 3629520, at *3 (S.D.N.Y. Sept. 17, 2010) (collecting cases). In other words, "subsequent exhaustion after suit is filed ... is insufficient,"*Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001), *overruled on other grounds by*Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *see also Harris,* 2013 WL 3816590, at *6 (same), even where, as here, " 'it might seem more efficient simply to proceed with the lawsuit rather than dismiss it only to see it immediately re-filed,' "*Harris,* 2013 WL 3816590,

at *6 (quoting *Alexander,* 2010 WL 431718, at *3) (brackets omitted).

On November 12, 2014, after the Court received Plaintiff's October 6, 2014 Letter with the attached grievance from the CORC, the Court issued an Order stating that "[i]n light of the fact that CORC's decision in this matter was not issued until September 3, 2014, and therefore that Plaintiff did not exhaust [her] administrative remedies prior to filing the instant Complaint, Plaintiff is ordered to show cause ... as to why an exception to exhaustion should apply here, or why [her] Complaint should not otherwise be dismissed without prejudice so that [s]he may reinstitute [her] suit."(Order 2 (Dkt. No. 31).) Plaintiff did not directly respond to the Order to Show Cause, but rather filed the Amended Complaint in which she explained that she "appealed [her] appeal [but] did not get [an] answer[ ] [through] the proper grievance prot [o]col[.] They had 45 days to give [Plaintiff] a decision [but] it took them 161 days to get [her] decision back."(Am. Compl. ¶ IV.E.3.) The Court construes this statement as an allegation that an administrative remedy was not available to Plaintiff because of the CORC's delay.

**[12]** The Court notes that "[a] number of federal circuit courts have held that a failure to respond to a grievance within the time limit prescribed by the prison grievance process renders an administrative remedy unavailable for the purposes of exhaustion[,]"*Rossi,* 2015 WL 769551, at *4 (collecting cases), and that the Second Circuit has cited these decisions favorably, *see Hemphill v. New York,* 380 F.3d 680, 686 n. 6 (2d Cir.2004) (explaining that if the plaintiff had "wrote in a timely fashion to the Superintendent pursuant to a possibly valid interpretation of DO[C]CS grievance procedures, there might be a question as to the availability of remedies, since [the plaintiff] received no response to his letter, and there is no indication in the record that his grievance was ever recorded, as required by DO[C]CS regulations" but "express[ing] no view on whether [the plaintiff's] allegations can support such a theory"). The Court also notes that "[j]udges in [the Southern District of New York] ... have also agreed with the proposition that administrative remedies may be deemed unavailable when the prison fails to timely respond to a grievance,"*Rossi,* 2015 WL 769551, at *5 (collecting cases). Accordingly, if this were a case where Plaintiff filed the instant Action *after* the Superintendent or the CORC failed to render a decision within the time frame mandated by the applicable regulations, it may be appropriate to decide that administrative remedies were not available to Plaintiff, and therefore, to deny Defendants'

Motion on exhaustion grounds as to the claims against Burguess.

**\*7** Here, however, at the time that Plaintiff filed her initial complaint, administrative remedies were available to her based on her pleadings and filings. As noted, Plaintiff filed her initial complaint on April 7, 2014, (Dkt. No. 2), which was *before* she filed an appeal of her grievance on April 23, 2014, as Plaintiff contends in her letter. (Pl.'s October 6, 2014 Letter, at unnumbered 1). Accordingly, at the time that Plaintiff filed her Complaint, Plaintiff had yet to, at the very least, complete the third step in exhausting her administrative remedies, namely appealing the adverse grievance to the CORC. Furthermore, failing to file an appeal, even when a plaintiff does not receive a response from the IGRP or the Superintendent, does not excuse exhaustion. *See Garvin v. Rivera,* No. 13–CV–7054, 2015 WL 876464, at \*4 (S.D.N.Y. Feb. 28, 2015) ("Courts in [the Second Circuit] have consistently held that the failure to take an available administrative appeal, even when the initial grievance receives no response, constitutes a failure to exhaust available administrative remedies.")

**[13]** **[14]** In sum, while the Court heeds that nonexhaustion is an affirmative defense and, therefore, that "the issue of exhaustion is generally not amenable to resolution by way of a motion to dismiss,"*Sloane,* 2006 WL 3096031, at \*4, here, dismissal based on exhaustion grounds is appropriate. Nonexhaustion is clear from the face of the Amended Complaint and the documents that Plaintiff has submitted. In an abundance of caution, the Court provided Plaintiff an opportunity to explain why she should not re-file her claim based on the date of the grievance she received from the CORC and submitted to the Court. In light of Plaintiff's subsequent explanation for her failure to exhaust, it is clear that "none of the exceptions outlined by the Second Circuit [to excuse the failure to exhaust] are germane."*Lovick,* 2014 WL 3778184, at \*4 (alterations and internal quotation marks omitted). In particular, Plaintiff complains of the CORC's delay. Although delay may make administrative remedies unavailable, here, at the time Plaintiff filed her Complaint—ten days after the alleged events occurred and she filed her grievance—she had not yet filed an appeal to the CORC. [8] Finally, the Court emphasizes that "a prisoner's failure to exhaust administrative remedies is merely a procedural flaw that can be cured simply by exhausting those remedies and reinstituting suit."*Wagnoon v. Johnson,* No. 02–CV–10282, 2004 WL 583764, at \*3 (S.D.N.Y.2004) (dismissing the plaintiff's case without prejudice so that he

could reinstitute suit). Therefore, Plaintiff's claims against Burguess are dismissed, without prejudice, for failure to exhaust her administrative remedies so that she may properly re-institute her suit. *See Berry v. Kerik,* 366 F.3d 85, 87 (2d Cir.2004) (holding that, where a plaintiff has failed to exhaust administrative remedies, dismissal without prejudice is proper because plaintiff can simply re-plead after exhaustion); *McCoy,* 255 F.Supp.2d at 252 ("A dismissal for failure to exhaust is usually without prejudice ... because failure to exhaust is ordinarily a 'temporary, curable, procedural flaw.' " (quoting *Snider v. Melindez,* 199 F.3d 108, 111 (2d Cir.1999) (internal citations omitted))).

### b. Cipolini

**\*8** In her Amended Complaint, Plaintiff alleges that she did not file a grievance against Cipolini, but instead that she wrote to her lawyer, who in turn wrote to the Superintendent. (Am. Compl. ¶ IV.F.2.) Plaintiff attaches two letters to her Amended Complaint. One letter, dated March 11, 2014, is from Stephanie Kozic, a legal intern at the Legal Aid Society, to Plaintiff, explaining, among other things, that she enclosed "a copy of the letter sent to the Superintendent on [Plaintiff's] behalf."(*Id.* Ex. A.) The second letter, dated March 14, 2014, is from Mik Kinkead, an attorney at the Prisoners' Legal Services of New York, stating that "it is very distressing that [Plaintiff is] being harassed and possibly even denied [her] religious rights because of who [Plaintiff is[,]" offering Plaintiff assistance, enclosing "several releases for [Plaintiff] to fill out," and providing various resources. (*Id.* Ex. B.)

**[15]** **[16]** The Court notes that in general "[m]erely [a]lert[ing] ... prison officials as to the nature of the wrong for which redress is sought does not constitute proper exhaustion."*Macias v. Zenk,* 495 F.3d 37, 44 (2d Cir.2007) (internal citations and quotation marks omitted); *see also Perez,* 2015 WL 3652511, at \*4 (explaining that the "[p]laintiff's allegation that he advised others of his [or her] grievance does not excuse his failure to exhaust the administrative process specified in the IGRP")."Regardless of whether ... informal complaints put the prison officials on notice of his grievance *in a substantive sense,'* ... to satisfy the PLRA, a prisoner must also *procedurally* exhaust his [or her] available remedies."*Macias,* 495 F.3d at 43 (quoting *Johnson v. Testman,* 380 F.3d 691, 697–98 (2d Cir.2004)). Substantive notice alone is insufficient because "[t]he benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the

grievance," and "[t]he prison grievance system will not have such an opportunity unless the grievant complies with the system's critical procedural rules."*Woodford,* 548 U.S. at 95, 126 S.Ct. 2378. Thus, for example, "[c]ourts have repeatedly held that complaint letters to the ... facility [s]uperintendent do not satisfy the PLRA's exhaustion requirement."*Nelson v. Rodas,* No. 01–CV–7887, 2002 WL 31075804, at *3 (S.D.N.Y. Sept. 17, 2002) (collecting cases); *see also Muhammad v. Pico,* No. 02–CV–1052, 2003 WL 21792158, at *8 (S.D.N.Y. Aug. 5, 2003) (same). Moreover, writing to the superintendent does not "preclude submission of a formal grievance,"*Amador,* 655 F.3d at 97, nor does it preclude the requirement that an inmate must go through the appeal process if the superintendent fails to act, *McNair v. Sgt. Jones,* No. 01–CV–3253, 2002 WL 31082948, at *8 (S.D.N.Y. Sept. 18, 2002) (noting that the failure to follow the appeal process alone "means that [a plaintiff] has not exhausted his administrative remedies"); *accord*7 N.Y. Comp.Codes R. & Regs. §§ 701.5(a), 701.8(g). Even assuming, then, that Plaintiff's lawyer contacted the Superintendent regarding the claims Plaintiff alleges here against Cipolini, this would not, without more, excuse exhaustion.

**\*9** Furthermore, Plaintiff does not contend that Defendants' actions or other special circumstances prevented her from filing a grievance as to her claims against Cipolini. *See Perez,* 2015 WL 3652511, at *4 (explaining that the "[p]laintiff ha[d] not pleaded any additional facts that would excuse his failure to exhaust administrative remedies"); *cf. Macias,* 495 F.3d at 44 (remanding the case after the plaintiff amended his complaint to allege that prison officials' threats prevented him from filing a grievance); *Gonzalez v. Officer in Charge of Barber Shop on Duty on May 13, 1999,* No. 99–CV–3455, 2000 WL 274184, at *3 (S.D.N.Y. Mar. 13, 2000) (denying a motion to dismiss for failure to exhaust where the plaintiff alleged his efforts to file a grievance were "frustrated" by prison officials). Nevertheless, it is not clear from the face of the Amended Complaint and the materials that Plaintiff attaches that there are no legitimate reasons to excuse exhaustion of Plaintiff's claims against Cipolini. Rather, exceptions to the exhaustion requirement, such as the possibility that Plaintiff reasonably misunderstood the grievance procedure, *see Ruggiero,* 467 F.3d at 175, may be applicable here. As noted above, "a prisoner plaintiff need not plead exhaustion with particularity."*McCoy,* 255 F.Supp.2d at 248. Therefore, the fact that Plaintiff's Amended Complaint admits that she did not file a grievance against Cipolini does not, without more, warrant dismissing her claims against

Cipolini at this stage. The Court thus turns to the merits of Plaintiff's claims against Cipolini.

### C. Merits of Plaintiff's Claims Against Cipolini

Plaintiff alleges that on February 9, 2014, Cipolini told her she "could not attend Protestant services because of [her] hair" and "sexuality," (Am. Compl. ¶ II.D; Pl.'s Sept. 17, 2014 Letter, at unnumbered 2), and "[w]hile going to Catholic services [on February 16, 2014,] ... Cipolini had [Plaintiff] escorted out of services[,] stating [that she was] not authorized to go to any religious service," (Am. Compl. ¶ II.D). Plaintiff characterizes Cipolini's behavior as "harassment and discrimination." (Pl.'s Sept. 17, 2014 Letter, at unnumbered 2.) The Court construes these allegations as stating a violation of the Free Exercise Clause of the First Amendment, a claim under RILUPA, a claim of harassment in violation of the Eighth Amendment, and a claim of gender discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment.

### 1. Religious Liberty Claims

#### a. Applicable Law

**[17]** "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause,"*Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003), which includes the right to participate in religious services, *see Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993). A prisoner's First Amendment rights, however, are "[b]alanced against ... the interests of prison officials charged with complex duties arising from the administration of the penal system."*Ford,* 352 F.3d at 588 (internal quotation marks omitted); *see also Weathers v. Rock,* No. 12–CV–1301, 2014 WL 4810309, at *4 (N.D.N.Y. Sept. 23, 2014) (explaining that the right of inmates to freely exercise a chosen religion "is not limitless, and may be subject to restrictions relating to legitimate penological concerns"). Accordingly, a prisoner's free exercise claims are "judged under a reasonableness test less restrictive than ordinarily applied to alleged infringements of fundamental constitutional rights."*Ford,* 352 F.3d at 588 (internal quotation marks omitted).

**\*10** **[18]** **[19]** **[20]** "To be entitled to protection under the free exercise clause of the First Amendment, a prisoner must make a threshold showing that the disputed conduct

substantially burdened his [or her] sincerely held religious beliefs."*Washington v. Chaboty,* No. 09–CV–9199, 2015 WL 1439348, at *9 (S.D.N.Y. Mar. 30, 2015) (internal quotation marks omitted); *see also Salahuddin v. Goord,* 467 F.3d 263, 274–75 (2d Cir.2006) ("The prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs."); *Shapiro v. Cmty. First Servs., Inc.,* No. 11–CV–4061, 2014 WL 1276479, at *10 (E.D.N.Y. Mar. 27, 2014) ("At the motion to dismiss stage, a complaint must assert sufficient allegations necessary to establish that plaintiff's claim is based upon a sincerely held religious belief."(internal quotation marks omitted)).[9] In determining whether a belief is "sincere" "an individual ... need only demonstrate that the beliefs professed are sincerely held and in the individual's own scheme of things, religious."*Ford,* 352 F.3d at 588 (citations, alterations, and internal quotation marks omitted). Moreover, "[a] substantial burden on religious exercise exists where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs."*Rossi,* 2015 WL 769551, at *7 (internal citations and quotation marks omitted). The Second Circuit has further specified that "[t]he relevant question in determining whether [the plaintiff's] religious beliefs were substantially burdened is whether participation in the [religious activity], in particular, is considered central or important to [the plaintiff's religious] practice ..."*Ford,* 352 F.3d at 593–94. "Once [a] plaintiff establishes this burden, '[t]he defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct.'"*Smith v. Perlman,* No. 11–CV–20, 2012 WL 929848, at *7 (N.D.N.Y. Mar. 19, 2012) (quoting *Salahuddin,* 467 F.3d at 275). The burden then shifts to the inmate "to show that these articulated concerns were irrational."*Salahuddin,* 467 F.3d at 275.

**[21]** **[22]** **[23]** RLUIPA, in turn, "protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion,"*Cutter v. Wilkinson,* 544 U.S. 709, 723, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005), and "provides a more stringent standard than does the First Amendment, barring the government from imposing a substantial burden on a prisoner's free exercise unless the challenged conduct or regulation furthers a compelling governmental interest and is the least restrictive means of furthering that interest,"*Holland v. Goord,* 758 F.3d 215, 224 (2d Cir.2014) (alterations and internal quotation marks omitted); *see also Salahuddin,* 467 F.3d at 273 ("RLUIPA protects inmates by providing that

a government shall not 'impose a substantial burden' on the 'religious exercise' of inmates in certain institutions unless the government shows that the burden furthers a compelling governmental interest by the least restrictive means.' " (quoting 42 U.S.C. § 2000cc–1(a)) (footnote omitted)). While "RLUIPA does not define 'substantial burden,' ... the Second Circuit has assumed that '[s]ince substantial burden is a term of art in the Supreme Court's free exercise jurisprudence we assume that Congress, by using it, planned to incorporate the cluster of ideas associated with the Court's use of it.'"*Panayoty v. Annucci,* 898 F.Supp.2d 469, 481–82 (N.D.N.Y.2012) (quoting *Westchester Day Sch. v. Village of Mamaroneck,* 504 F.3d 338, 348 (2d Cir.2007)). "The Supreme Court has held that a substantial burden is one that 'put[s] substantial pressure on an adherent to modify his behavior and to violate his [or her] beliefs.'"*Id.* at 482 (quoting *Thomas v. Review Bd. of Ind. Emp't Sec. Div.,* 450 U.S. 707, 718, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981)). Whether or not a prisoner sufficiently pleads a substantial burden on a sincerely held religious belief under RLUIPA involves the same threshold analysis as under the First Amendment. *See Valdez v. City of New York,* No. 11–CV–5194, 2013 WL 8642169, at *12 (S.D.N.Y. Sept. 3, 2013) ("To state a claim under both the Free Exercise Clause of the First Amendment and RLUIPA, an inmate must first allege that the government imposed a 'substantial burden' on his religious exercise."(citing *Salahuddin,* 467 F.3d at 274–75)), *report and recommendation adopted by*2014 WL 2767201 (S.D.N.Y. June 17, 2014); *Ramsey v. Goord,* 661 F.Supp.2d 370, 395 n. 12 (W.D.N.Y.2009) (explaining that "the threshold inquiry of a religious freedom claim under both the First Amendment and the RLUIPA is the same"); *Pugh v. Goord,* 571 F.Supp.2d 477, 504 (S.D.N.Y.2008) (engaging in the same analysis for determining a plaintiff's sincerely held religious belief under both the RLUIPA and the Free Exercise Clause)."Where a plaintiff adduces evidence sufficient to show that the government practice substantially burdens [his or] her religious exercise, the onus shifts to the government to demonstrate that the practice furthers a compelling governmental interest, and that the burden imposed on religion is the least restrictive means of achieving that interest."*Jova v. Smith,* 582 F.3d 410, 415 (2d Cir.2009) (citing 42 U.S.C. § 2000cc–2(b)).

### *b. Application*

**\*11** Although Plaintiff does not plead that she practices any specific religion, Defendants do not contest the sincerity of

Plaintiff's religious beliefs. The Court, therefore, will assume for the purpose of resolving the instant Motion that Plaintiff's religious beliefs are sincerely held.

[24] The Court turns, then, to whether Plaintiff has adequately alleged that her ability to exercise her religious beliefs was substantially burdened. In the Second Circuit, courts have held that preclusion from attending two religious services is not, without more, a "substantial burden" on a plaintiff's free exercise of religion. *See Jean–Laurent v. Los,* No. 12–CV–132, 2015 WL 1015383, at *6 (W.D.N.Y. Mar. 8, 2015) (explaining that "[c]ourts within the Second Circuit have consistently held that missing two religious services does not pose a substantial burden on an inmate's religion" and collecting cases); *Blalock v. Jacobsen,* No. 13–CV–8332, 2014 WL 5324326, at *7 (S.D.N.Y. Oct. 2, 2014) (same); *Shapiro,* 2014 WL 1276479, at *11 ("[N]ot permitting a prisoner to attend two religious services 'is a de minimis, or insubstantial, burden on an inmate's ability to freely exercise his religion.'" (quoting *Smith v. Graziano,* No. 08–CV–469, 2010 WL 1330019, at *9 (N.D.N.Y. Mar. 2010), *report and recommendation adopted by* 2010 WL 1332503 (N.D.N.Y. Apr.6, 2010))). Here, Plaintiff only claims that she missed two religious services on February 9, 2014 and February 16, 2014, (*see* Am. Compl. ¶ II.D,) and Plaintiff does not allege that the specific services were " 'central or important' to [her] faith," *Rossi,* 2015 WL 769551, at *8 (quoting *Ford,* 352 F.3d at 593–94) *cf. Harnett v. Barr,* 538 F.Supp.2d 511, 521 (N.D.N.Y.2008) (denying the defendant's motion to dismiss where the plaintiff alleged that he was denied, among other things, one Ramadan meal). [10] Accordingly, the Court grants Defendants' Motion to Dismiss Plaintiff's First Amendment claim on the grounds that Plaintiff has failed to "make a threshold showing that the disputed conduct substantially burdened [her] sincerely held religious beliefs." *Washington,* 2015 WL 1439348, at *9 (internal quotation marks omitted).*See Blalock,* 2014 WL 5324326, at *7 (granting the defendant's motion to dismiss because prohibition from attending two religious services is not a substantial burden on the plaintiff's free exercise rights); *Shapiro,* 2014 WL 1276479, at *11 (granting the defendant's motion to dismiss where the plaintiff only alleged the denial of two religious services); *cf. JCG v. Ercole,* No. 11–CV–6844, 2014 WL 1630815, at *23 (S.D.N.Y. Apr. 24, 2014) (denying the defendant's motion to dismiss when the plaintiff claimed that the defendant denied him the right to attend religious services and celebrate religious holidays for his entire stay noting that "this is sufficient, *albeit barely,* at the pleading stage to allege a substantial burden

on [the plaintiff's] beliefs in that he was completely denied any occasion to worship or practice his religion, particularly given that [the] [d]efendants offer no legitimate penological objective that might justify such a denial" (emphasis added)), *report and recommendation adopted by* 2014 WL 2769120 (S.D.N.Y. June 18, 2014); *Smith,* 2012 WL 929848, at *7 (denying the defendants' motion to dismiss because "[a]t [the motion to dismiss] stage, the [c]ourt [found] that [the] plaintiff ha[d] alleged sufficient facts to establish that missing three consecutive Jum'ah services while housed in keeplock substantially burden[ed] his religion"). This claim is dismissed without prejudice so that Plaintiff may have an opportunity to allege additional facts or otherwise explain why missing the two services placed a substantial burden on her religious beliefs.

**\*12** [25] [26] To the extent that Plaintiff raises a RLUIPA claim, this claim also fails. "RLUIPA does not offer monetary damages against state officers in either their official or individual capacities."*Holland,* 758 F.3d at 224 (citing *Washington v. Gonyea,* 731 F.3d 143, 145–46 (2d Cir.2013) (per curiam)); *see also Keitt v. Hawk,* No. 13–CV–850, 2015 WL 1246058, at *11 (N.D.N.Y. Jan. 8, 2015) (same). Instead, a plaintiff may only seek injunctive relief. *Holland,* 758 F.3d at 224; *see also Fortress Bible Church v. Feiner,* 734 F.Supp.2d 409, 520 (S.D.N.Y.2010) ("It is readily apparent that injunctive relief constitutes appropriate relief under RLUIPA."(internal citations and quotation marks omitted)). Here, Plaintiff requests one million dollars in monetary damages, (Am. Compl. ¶ V.), which is an unavailable remedy against a state actor in his official or individual capacity under RLUIPA. *See Holland,* 758 F.3d at 224. Further, because Plaintiff is no longer incarcerated, to the extent Plaintiff requests any injunctive relief, this request is moot. *See Pugh,* 571 F.Supp.2d at 498–490 (explaining that "[w]here a prisoner has been released from prison, his [or her] claims for injunctive relief based on the conditions of his [or her] incarceration must be dismissed as moot," citing cases, and dismissing a former inmate's RLUIPA claims as moot); *see also Martin–Trigona v. Shiff,* 702 F.2d 380, 386 (2d Cir.1983) ("The hallmark of a moot case or controversy is that the relief sought can no longer be given or is no longer needed."); *Casey v. Pallito,* No. 12–CV–284, 2013 WL 6673623, at *19 (D.Vt. Dec. 18, 2013) ("[Plaintiff's] claim for [monetary] damages is not cognizable under RLUIPA, and his claim for injunctive relief is rendered moot by his transfer away from the facility where the events giving rise to his claim took place"), *report and recommendation adopted in relevant part by* 2013 WL 682800 (D.Vt. Feb. 25, 2013). Defendants' Motion, therefore,

is granted as to Plaintiff's claims under the First Amendment and RLUIPA.

### 2. Harassment

#### a. Applicable Law

[27]  [28]  "It is well established in the Second Circuit that verbal harassment of inmates by prison officials, unaccompanied by any injury—no matter how inappropriate, unprofessional, or reprehensible it might seem—does not rise to the level of a violation of the Eighth Amendment." *Cusamano v. Sobek,* 604 F.Supp.2d 416, 459 (N.D.N.Y.2009); *see also Little v. Municipal Corp.,* 51 F.Supp.3d 473, 500 (S.D.N.Y.2014) (" '[V]erbal harassment or profanity alone, unaccompanied by any injury, no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983.' " (quoting *Hare v. Hayden,* No. 09–CV–3135, 2011 WL 1453789, at *7 (S.D.N.Y. Apr. 14, 2011)) (alteration and internal quotation marks omitted)). In other words, "allegations of verbal harassment or threats are generally an insufficient basis for an inmate's § 1983 claim." *Rosales v. Kikendall,* 677 F.Supp.2d 643, 648 (W.D.N.Y.2010) (citing *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986)). In general, the alleged injury must be physical in nature, although, "under certain circumstances, a prison official's infliction of psychological pain on an inmate may constitute an Eighth Amendment violation ... [if] the psychological pain [is] (1) intentionally inflicted and (2) more than de minimis in nature." *Cusamano,* 604 F.Supp.2d at 490–91.

#### b. Application

*13  [29]  Plaintiff alleges that Cipolini's conduct constituted harassment. (Pl.'s Sept. 17, 2014 Letter, at unnumbered 2.) Plaintiff does not claim that Cipolini caused her any physical injury. Although Plaintiff states that Defendants "publicly humiliated [her]" and "caused [her] mental anguish," (Pl.'s Am. Compl. ¶ V), Plaintiff has not sufficiently alleged that her humiliation or mental anguish rose to the level of psychological pain that was more than de minimis in nature. *See Cusamano,* 604 F.Supp.2d at 491. To begin, it is far from clear that Cipolini's statements regarding Plaintiff's hair and sexuality could be construed as verbal

harassment. *See Jordan v. Fischer,* 773 F.Supp.2d 255, 276 n. 25 (N.D.N.Y.2011) (noting that although the plaintiff claimed that an officer used "sexual slurs" about the plaintiff, the court did not find that "such comments, while they may have been inappropriate, would even come close to 'verbal harassment' "). Indeed, Defendants move to dismiss any claim of verbal harassment as to Burguess, not as to Cipolini. (*See* Defs.' Mem. 10–11.) In an abundance of caution, however, the Court will construe Plaintiff's allegations against Cipolini as alleging a claim for verbal harassment as well. In any event, while any verbal harassment based on an individual's sexuality or gender is unacceptable, Plaintiff's allegations as to Cipolini, without more, do not rise to the level of a constitutional violation under the Eighth Amendment. *See Vega v. Artus,* 610 F.Supp.2d 185, 209 (N.D.N.Y.2009) (dismissing the plaintiff's claim based on the allegations that the defendants "made harassing comments against him because they believed that he was [a] homosexual" because "allegations of verbal harassment are insufficient to support a constitutional violation"); *cf. Abney v. Jopp,* 655 F.Supp.2d 231, 234 (W.D.N.Y.2009) (explaining that the plaintiff's allegations that the defendant officer called the plaintiff a " 'pussy' and accused him of being afraid of 'little women' " did not give rise to a constitutional claim). Any claim under the Eighth Amendment, therefore, fails and is accordingly dismissed.

### 3. Equal Protection Claim

#### a. Applicable Law

[30]  [31]  [32]  "The Equal Protection Clause of the Fourteenth Amendment requires that all persons similarly situated be treated in the same manner." *Allen v. Cuomo,* 100 F.3d 253, 260 (2d Cir.1996) (internal citations and quotation marks omitted). In other words, "the Equal Protection Clause bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious bad faith intent to injure a person." *Bizzarro v. Miranda,* 394 F.3d 82, 86 (2d Cir.2005) (internal quotation marks omitted); *see also Bailey v. Town of Evans,* 443 F.Supp.2d 427, 430 (W.D.N.Y.2006) (same). To state a violation of the Equal Protection Clause, a plaintiff must allege "that he [or she] was treated differently than others similarly situated as a result of intentional or purposeful

discrimination." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005); *see also Barrow v. Buren,* No. 12–CV–1268, 2015 WL 417084, at *22 (N.D.N.Y. Jan. 30, 2015) (same); *Nash v. McGinnis,* 585 F.Supp.2d 455, 462 (W.D.N.Y.2008) ("In order to plead a facially valid equal protection claim ... [a] plaintiff must allege: (1) that he [or she] has been treated differently from similarly-situated inmates, and (2) that the discrimination is based upon a constitutionally impermissible basis, such as race."). [11]

### b. Application

*14   [33]   Plaintiff sufficiently alleges a claim of discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment. Plaintiff claims that Cipolini prevented her from attending the two religious services "because of [her] hair" and because of "her sexuality." (Am. Compl. ¶ II.D; Pl.'s Sept. 17, 2014 Letter, at unnumbered 2.) The Court concludes that Plaintiff has sufficiently alleged that she was treated differently than others similarly situated. Plaintiff claims that the incident on February 9, 2014 occurred "in[ ]front of the inmates going to religious services," (Pl.'s Sept. 17, 2014 Letter, at unnumbered 2), and, therefore, the Court reasonably infers that these inmates attended services on this day, whereas Plaintiff did not. Although Plaintiff's Amended Complaint lacks any other allegations that the prisoners who attended religious services were similarly situated to Plaintiff, the Amended Complaint as a whole suggests that while Plaintiff was prevented from attending religious service because of her hair and sexuality, the other prisoners in the male facility were not. As such, Plaintiff sufficiently pleads that she was treated differently to others similarly situated. *See Richard v. Fischer,* 38 F.Supp.3d 340, 355 (W.D.N.Y.2014) (finding that the plaintiff's "allegation that he was discriminated against because of his race and religion, coupled with the allegation that others were not subject to the discriminatory employment policy, carrie[d] with it the presumption that similarly-situated inmates were not mixed-race Muslims"); *cf. Vaher v. Town of Orangetown,* 916 F.Supp.2d 404, 434 (S.D.N.Y.2013) (dismissing the plaintiff's Equal Protection claim where the amended complaint was "completely devoid of any reference to 'similarly situated' or 'substantially similar' individuals").

Second, Plaintiff sufficiently pleads that Cipolini intentionally discriminated against her. At the motion to dismiss stage, viewing the evidence in the light most favorable to Plaintiff, Plaintiff satisfies this requirement by stating that she was prohibited from attending religious services "*because of* [her] hair and [her] sexuality." (Pl.'s Sept. 17, 2014 Letter, at unnumbered 2 (emphasis added); *see also* Am. Compl. ¶ II.D.) Assuming, as the Court must at this stage, that Cipolini prohibited Plaintiff, but not others, from attending services because of Plaintiff's sexuality, these facts sufficiently state a plausible claim to relief, especially in light of the fact that the Court is unable to conceive of any legitimate penological interest that would be served by denying Plaintiff the right to attend religious services based on her hair and/or sexuality. *See Rosado v. Herard,* No. 12–CV–8943, 2014 WL 1303513, at *8 (S.D.N.Y. Mar. 25, 2014) (explaining that because there was "no obvious or administrative reason" for excluding "Spanish speaking inmates" from attending group sessions "discriminatory intent—at least at the pleading stage—can be inferred"); *Phillips,* 408 F.3d at 130 (holding that plaintiff's allegations of racial discrimination sufficed to state an Equal Protection violation where the Court could not "imagine a legitimate penological reason for the conduct alleged"); *Bussey v. Phillips,* 419 F.Supp.2d 569, 584 (S.D.N.Y.2006) (finding that where the plaintiff alleged he was subject to different punishment for the same act as white inmates, plaintiff sufficiently plead discriminatory intent to survive summary judgment); *cf. Benjamin v. Coughlin,* 905 F.2d 571, 579 (2d Cir.1990) (holding that "the unlimited right granted to Jewish and Muslim inmates, as opposed to Rastafarian prisoners, to wear religious headgear [does not] establish[ ] an equal protection violation" because of the differences in the security concerns that the type of headgear pose); *Kole v. Lappin,* 551 F.Supp.2d 149, 156 (D.Conn.2008) (finding that because "the government offered two penological interests" supporting why certain holiday food was offered for some religious holidays but not all, the plaintiff's Equal Protection claim failed). Accordingly, Plaintiff has adequately alleged an Equal Protection claim, and Defendants' Motion to Dismiss this claim as to Cipolini is denied.

### III. Conclusion

*15   For the foregoing reasons, Defendants' Motion to Dismiss is granted in part and denied in part. In particular, Defendants' Motion is granted as to the claims against Burguess, without prejudice to Plaintiff's re-filing another Action based on the fact that she has now exhausted her administrative remedies as to these claims. With respect to the claims against Cipolini, Defendants' Motion is granted as

to the First Amendment, RLUIPA, and Eighth Amendment claims and denied as to Plaintiff's Equal Protection claim. The Clerk of the Court is respectfully requested to terminate Defendants' Motion to Dismiss, (Dkt. No. 38), and Plaintiff's Motion for an Order of compensation, (Dkt. No. 32). Plaintiff may file a Second Amended Complaint within thirty days of this Opinion and Order. Moreover, in light of the fact that Plaintiff has failed to respond to Defendants' Motion to Dismiss and failed to appear at the last several conferences in this Action, Plaintiff is ordered to notify the Court of her intention to pursue this Action and/or re-institute another action against Burguess within 30 days or risk dismissal of her case for failure to prosecute.

SO ORDERED.

**All Citations**

--- F.Supp.3d ----, 2015 WL 5732076

## Footnotes

1      Plaintiff also filed a Motion for an Order granting compensation for trauma and mental anguish in the amount of one million dollars on November 17, 2014. (Dkt. No. 32.) Because Plaintiff subsequently filed an Amended Complaint, (Dkt. No. 33), and no discovery in this Action has occurred, this Motion is denied as untimely.

2      Neither Plaintiff's Amended Complaint nor her opposition papers clearly state that Plaintiff is a male-to-female transgender individual. There is, however, reference to Plaintiff's "sexuality" in her opposition papers, as well as a letter appended to her Amended Complaint from the Prisoner Legal Services of New York that refers to Plaintiff as a transgender individual. (Am. Compl. Ex. B.) Defendants do not contest that Plaintiff is a transgender individual and indeed rely on this fact in moving to dismiss.

3      Plaintiff left Downstate Correctional Facility on April 28, 2014, (Letter from Plaintiff to Court (Oct. 6, 2014), at unnumbered 1 (Dkt. No. 26)), has since been released from prison, and lives in New York City, (Pro Se Mem. re: Change of Address (Dkt. No. 30)).

4      Plaintiff later states that Burguess only "attempt[ed] to fire [her] from [her] porter position."(Letter from Plaintiff to Court (Oct. 29, 2014) ("Pl.'s Oct. 29, 2014 Letter"), at unnumbered 1 (Dkt. No. 29).) For purpose of resolving the instant Motion, the Court will take as true the allegation that Plaintiff was fired.

5      The Court notes that in the grievance appeal decision issued by the Central Office Review Committee ("CORC") to Plaintiff, sent to the Court by Plaintiff in her October 6, 2014 Letter, the report mentions two separate events, one involving a "CO B" on March 28, 2014 and one involving a "Sgt. S" on April 7, 2014. (Pl.'s Oct. 6, 2014 Letter, at unnumbered 2.) This document is consistent with the charge that Plaintiff alleges against Burguess. To the extent it could be inferred that "Sgt. S" is "Sgt. Cipolini," the Court notes that any suggestion that the CORC considered a grievance against Cipolini is inconsistent with Plaintiff's own assertion that "[she] did not grieve" "the [first] two inc[i]dents," on February 9, 2014 and February 16, 2014, involving Cipolini. (Am. Compl. ¶ IV.F.2.) Moreover, the document notes that the incident involving "Sgt. S" took place in April, rather than in February. As such, the Court cannot infer from the CORC decision that a grievance against Cipolini was considered by, or submitted to, the CORC because it is inconsistent with the allegations in the Amended Complaint. *See Alsaifullah v. Furco,* No. 12–CV–2907, 2013 WL 3972514, at *4 n. 3 (S.D.N.Y.2013) (explaining that in deciding a motion to dismiss, a court may consider "materials outside the complaint to the extent that they are consistent with the allegations in the complaint."(internal quotation marks omitted)).

6      There is no indication on the CORC decision if the "date filed" refers to the date the original grievance was filed, or the date the appeal was filed. This difference is immaterial for the purpose of resolving the instant Motion.

7      The Court also notes that a status conference for this case was scheduled on September 9, 2015. (*See* Dkt. No. 44.) Although the Calendar Notice was mailed to Plaintiff's address, as indicated on the docket, Plaintiff failed to appear. (*See* Docket Minute Entry Sept. 9, 2015.)

8      The Court notes it is also very unlikely, based on the time line described above, that Plaintiff filed an appeal with the Superintendent and/or received a response before filing this case.

9      The Second Circuit recently explained that "[i]t has not been decided in this Circuit whether, to state a claim under the First Amendment's Free Exercise Clause, a prisoner must show at the threshold that the disputed conduct substantially burdens his [or her] sincerely held religious beliefs."*Holland v. Goord,* 758 F.3d 215, 220 (2d Cir.2014). The Second Circuit chose not to confront this question—or rather, not to alter the previous assumption that the substantial burden test is a threshold question. *Id.* at 220. Accordingly, this Court "will follow the analysis in *Holland* and proceed to consider

the First Amendment analysis, assuming that the substantial burden test is still valid."*Weathers,* 2014 WL 4810309, at *4; *see also Williams v. Fisher,* No. 11–CV–379, 2015 WL 1137644, at *16 (N.D.N.Y. Mar. 11, 2015) (same).

10    Indeed, it is worth noting that Plaintiff alleges she was denied the opportunity to attend services for two different religious denominations.

11    In the prison context, the Second Circuit has also held that in addition to alleging that he or she was treated differently than others similarly situated as a result of discrimination, a prisoner must also allege that the "disparity in treatment cannot survive the appropriate level of scrutiny which, in the prison setting, means that he [or she] must demonstrate that his [or her] treatment was not 'reasonably related to any legitimate penological interests.'"*Phillips,* 408 F.3d at 129 (quoting *Shaw v. Murphy,* 532 U.S. 223, 225, 121 S.Ct. 1475, 149 L.Ed.2d 420 (2001)); *see also Pugh,* 571 F.Supp.2d at 502 (explaining that "even if [a] plaintiff can demonstrate that two groups are similarly situated, disparate treatment may still be warranted if the government can demonstrate that the distinctions are 'reasonably related to legitimate penological interests' " (quoting *Benjamin v. Coughlin,* 905 F.2d 571, 575 (2d Cir.1990))); *Vega v. Lantz,* No. 04–CV–1215, 2009 WL 3157586, at *8 (D.Conn. Sept. 25, 2009) (same). Nevertheless, some classifications in the prison setting "raise special fears that they are motivated by an invidious purpose," and, therefore, at the very least "[t]he right not to be discriminated against based on one's race is not susceptible to the [requirement that a prisoner must demonstrate that his or her treatment was not reasonably related to any legitimate penological interest]."*Johnson v. California,* 543 U.S. 499, 505, 125 S.Ct. 1141, 160 L.Ed.2d 949 (2005); *see also Barnes v. Ross,* 926 F.Supp.2d 499, 506 (S.D.N.Y.2013) (same); *cf. Wolff v. McDonnell,* 418 U.S. 539, 556, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) ("Prisoners are protected under the Equal Protection Clause of the Fourteenth Amendment from invidious discrimination based on race."). Because there is no obvious legitimate penological interest for Plaintiff's exclusion from religious services based on her hair and sexuality from the face of the Amended Complaint, the Court need not decide at this stage whether any classifications based on Plaintiff's identity as a transgender individual or on Plaintiff's gender or sexual orientation "raise special fears that they are motivated by an invidious purpose," such that "[t]he right not to be discriminated against based on [these factors] is not susceptible to the [requirement that a prisoner must demonstrate that his or her treatment was not reasonably related to any legitimate penological interest]."*Johnson,* 543 U.S. at 510, 125 S.Ct. 1141.

---

**End of Document**        © 2016 Thomson Reuters. No claim to original U.S. Government Works.


Not Reported in F.Supp., 1997 WL 160124 (N.D.N.Y.)
(Cite as: 1997 WL 160124 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Larry TINSLEY, Plaintiff,
v.
Gary GREENE, Deputy Superintendent of Great
Meadow Correctional Facility; Jim Lanfear,
Maintenance Supervisor, Great Meadow Correctional
Facility; Gary Yule, Corrections Officer, Great Meadow
Correctional Facility; and David Roberts, Senior
Counselor, Great Meadow Correctional Facility,
Defendants.
**No. 95-CV-1765 (RSP/DRH).**

March 31, 1997.

Larry Tinsley, Pro Se.

Dennis C. Vacco, New York State Attorney General,
Darren O'Connor, Assistant Attorney General, of counsel,
for Defendants.

ORDER

POOLER, District Judge.

**\*1** The above matter comes to me following a
report-recommendation and order by Magistrate Judge
David R. Homer, duly filed on the 13th day of September,
1996. Dkt. No. 24. Following ten days from the service
thereof, the clerk has sent me the entire file, including any
objections thereto. Plaintiff Larry Tinsley filed objections.
Dkt. Nos. 25, 26.

In his report-recommendation, Magistrate Judge Homer
advises that Tinsley failed to establish or raise a genuine
issue of material fact regarding the nature of his

confinement. Report-recommendation, Dkt. No. 24, at
9-10. There is no dispute that prison officials confined
Tinsley to keeplock and loss of some privileges for 60
days after they conducted a search of his cell, found a
marijuana cigarette in the cell, and found Tinsley guilty of
possessing a controlled substance after a Tier III
disciplinary hearing. Tinsley's conviction and sentence
were affirmed on administrative appeal. In his lawsuit
under 42 U.S.C. § 1983, Tinsley raises several charges to
the manner in which defendants conducted the search and
disciplinary hearing. However, Tinsley failed to specify in
any manner that his punishment posed an "atypical and
significant hardship on [him] in relation to the ordinary
incidents of prison life." *Sandin v. Connor*, 515 U.S. 472,
----, 115 S.Ct. 2293, 1300, 132 L.Ed.2d 418, ---- (1995).
Without this showing, plaintiff failed to allege a
deprivation of his Fourteenth Amendment due process
liberty interest, and his civil rights claim must fail. *Id.*

In his objections to the report-recommendation, Tinsley
makes general attacks regarding the alleged bias of
Magistrate Judge David Homer and argues that the
magistrate judge has misconstrued his claims. Plaintiff
also asks me to reconsider defendants' summary judgment
motion and review plaintiffs memorandum opposing the
motion. However, Tinsley has not raised any allegation
regarding the nature of his punishment, which is the
threshold issue under *Sandin*. I have reviewed the entire
file in this matter, including plaintiff's many submissions,
and I find that he failed to raised any issue of fact to
support an alleged deprivation of his due process liberty
interests. Magistrate Judge Homer's thorough
report-recommendation is neither biased nor a
mischaracterization of plaintiffs claims.

For the foregoing reasons, it is therefore

ORDERED that the report-recommendation of September
13, 1996, is approved, and

ORDERED that plaintiffs' motion for default summary
judgment is denied as moot, and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 160124 (N.D.N.Y.)
(Cite as: 1997 WL 160124 (N.D.N.Y.))

ORDERED that defendants' motion for summary judgment is granted, and it is further

ORDERED that the clerk serve a copy of this order upon the parties by regular mail.

IT IS SO ORDERED.

HOMER, United States Magistrate Judge.

REPORT-RECOMMENDATION AND ORDER [FN1]

     FN1. This matter was referred to the undersigned for report and recommendation by United States District Judge Rosemary S. Pooler pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

The plaintiff a New York State Department of Correctional Services (DOCS) inmate currently confined at the Great Meadow Correctional Facility (Great Meadow), brought this pro se action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that defendants violated his rights under the Fourth and Fourteenth Amendments in connection with a search of his cell and ensuing disciplinary hearing. Plaintiff seeks compensatory and punitive damages as well as injunctive relief.

**2** Presently pending are defendants' motion for summary judgment (Docket No. 17), plaintiff's letter-memorandum requesting summary judgment by default (Docket No. 11), and plaintiff's motions for a pre-trial conference (Docket No. 20) and for appointment of counsel (Docket No. 21). For the reasons stated below, it is recommended that the defendants' motion be granted and that plaintiff's motions be denied.

## I. BACKGROUND

On October 30, 1995, while plaintiff was incarcerated at Great Meadow, defendant Greene received information from a confidential source that plaintiff was concealing escape materials. Defendant Greene ordered the search of plaintiff's prison cell. The search was executed by

Corrections Officer Rando and defendant Yule and was supervised by Sergeant Smith. No escape materials were found. However, the officers found a rolled cigarette in plaintiff's cell. The cigarette tested positive for marijuana. Plaintiff was placed in keeplock [FN2] and was given a contraband receipt for the cigarette that was removed from his cell.

     FN2. "Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." *Green v. Bauvi*, 46 F.3d 189, 192 (2d Cir.1995); N.Y. Comp.Codes R. & Regs. tit. 7, § 301.6 (1995).

Plaintiff was served with a misbehavior report which charged him with possession of a controlled substance. A Tier III disciplinary hearing [FN3] was commenced on November 3, 1995 before defendant Lanfear as the hearing officer. During the hearing, plaintiff claimed that defendant Greene failed to corroborate the reliability of the confidential informant, the search was improperly supervised, he did not receive the requisite contraband slip, defendants did not remove any contraband item from plaintiff's cell, and defendants failed to sign the misbehavior report. Plaintiff also objected when witnesses were not called in the order he had requested.

     FN3. DOCS regulations provide for three tiers of disciplinary hearings depending on the seriousness of the misconduct charged. A Tier III hearing, or superintendent's hearing, is required whenever disciplinary penalties exceeding thirty days may be imposed. N.Y. Comp.Codes R. & Regs. tit. 7, §§ 254.7(iii), 270.3(a) (1995); *Walker v. Bates*, 23 F.3d 652, 654 (2d Cir.1994), *cert. denied*, 515 U.S. 1157, 115 S.Ct. 2608, 132 L.Ed.2d 852 (1995).

At the conclusion of the hearing on November 7, 1995, defendant Lanfear found plaintiff guilty based upon the

statement in the misbehavior report submitted by C.O. Rando endorsed by C.O. Yule. Testimony during hearing by C.O. Yule verified the report and stated the substance

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 160124 (N.D.N.Y.)
(Cite as: 1997 WL 160124 (N.D.N.Y.))

was found in Tinsley's cell. Testimony during hearing by Sgt. Sawyer stated he received the item found by C.O. Rando and tested same which proved positive for controlled substance. Testimony was considered during hearing by Tinsley.

Defs.' Statement Pursuant to Rule 7.1(f) (Docket No. 17), Ex. A, p. 16. Plaintiff was sentenced to confinement in keeplock for sixty days and loss of packages, commissary and telephone privileges for sixty days. Shortly after this action was commenced, plaintiff's conviction and sentence were affirmed on administrative appeal.

## II. SUMMARY JUDGMENT

### A. Legal Standard

Under Fed.R.Civ.P. 56(c), if there is "no genuine issue as to any material fact ... the moving party is entitled to judgment as a matter of law ... where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The burden to demonstrate that no genuine issue of material fact exists falls solely on the moving party. *Federal Deposit Ins. Corp. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994); *see also Heyman v. Commerce and Industry Ins. Co.,* 524 F.2d 1317, 1320 (2d Cir.1975). Once the moving party has provided sufficient evidence to support a motion for summary judgment, the opposing party must "set forth specific facts showing that there is a genuine issue for trial" and cannot rest on "mere allegations or denials" of the facts asserted by the movant. Fed.R.Civ.P. 56(e); *accord Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994).

**\*3** The trial court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmovant. *American Cas. Co. of Reading Pa. v. Nordic Leasing, Inc.,* 42 F.3d 725, 728 (2d Cir.1994); *see also Eastway Construction Corp. v. City of New York,* 762 F.2d 243, 249 (2d Cir.1985). The nonmovant may defeat summary judgment by producing specific facts showing that there is a genuine issue of material fact for trial. *Celotex Corp. v.*

*Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### B. Discussion

The defendants move for summary judgment on the grounds that (1) plaintiff's due process allegations fail to state a claim, (2) plaintiff's hearing was conducted in accordance with constitutional requirements, (3) the search of plaintiff's cell did not violate any of plaintiff's constitutional rights, and (4) defendants are entitled to qualified immunity.

### 1. Due Process Liberty Interest

Plaintiff contends that his due process rights were violated because the November 3-7, 1995 disciplinary hearing was improperly executed, and as a result, he was wrongly confined to sixty days keeplock.[FN4] In their motion for summary judgment, defendants contend that under *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), plaintiff lacked any liberty interest protected by the Due Process Clause.

> FN4. New York regulations permit placement in keeplock for both disciplinary and administrative reasons. These include, among others, punishment for misconduct and protective custody. N.Y. Comp.Codes R. & Regs. tit. 7, § 301.1-.7 (1995).

A due process claim as alleged by plaintiff will lie under section 1983 only where the alleged violation infringed a cognizable liberty interest. *Allison v. Kyle,* 66 F.3d 71, 74 (5th Cir.1995). Under *Sandin,* a court must first determine whether the deprivation of which an inmate complains merits the protections afforded by the Due Process Clause. A protected liberty interest

will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force. nonetheless imposes *atypical and*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

*significant hardship on the inmate in relation to the ordinary incidents of prison life.*

*Id.* at 2300 (emphasis added). The Court held that confinement of the plaintiff for thirty days in a segregated housing unit infringed no liberty interest protected by the Due Process Clause. *Id.* at 2302.

At first blush *Sandin* appeared to mark a radical change in the litigation of inmates' due process claims. It appeared to suggest that the number of sufficiently stated claims would be drastically reduced. *See Orellana v. Kyle,* 65 F.3d 29, 31-32 (5th Cir.1995), *cert. denied,* 516 U.S. 1059, 116 S.Ct. 736, 133 L.Ed.2d 686 (1996) ("it is difficult to see that any other deprivations in the prison context, short of those that clearly impinge on the duration of confinement, will henceforth qualify for constitutional 'liberty' status.... [T]he ambit of [inmates'] due process liberty claims has been dramatically narrowed.").

Indeed, several circuit courts have rejected prisoners' due process claims under *Sandin* where the deprivation complained of was solely confinement in segregated housing. *See, e.g., Pichardo v. Kinker,* 73 F.3d 612, 613 (5th Cir.1996) (indefinite confinement in administrative segregation for affiliation with gang not atypical and significant under *Sandin* ); *Luken v. Scott,* 71 F.3d 192, 193 (5th Cir.1995), *cert. denied,* 517 U.S. 1196, 116 S.Ct. 1690, 134 L.Ed.2d 791 (1996) (segregation without more implicates no liberty interest); *Rimmer-Bey v. Brown,* 62 F.3d 789, 790-91 (6th Cir.1995)(placement in administrative segregation not atypical and significant in context of life sentence).

**4** Several judges in this district have adopted this position. *See Polanco v. Allan,* No. 93-CV-1498, 1996 WL 377074, at *2 (N.D.N.Y. July 5, 1996) (McAvoy, C.J.) (confinement in a special housing unit (SHU) for up to one year not protected by Due Process Clause); *Figueroa v. Selsky,* No. 91-CV-510 (N.D.N.Y. Oct. 5, 1995) (Scullin, J.) (seven and one-half months in SHU not protected); *Delaney v. Selsky,* 899 F.Supp. 923, 927 (N.D.N.Y.1995) (McAvoy, C.J.) (197 days in SHU not protected); *Ocasio v. Coughlin,* No. 94-CV-530 (N.D.N.Y. Feb. 5, 1996) (Scullin, J.) (180 days in SHU not protected); *Gonzalez v. Coughlin,* No. 94-CV-1119

(N.D.N.Y. Jan. 10, 1996) (Report-Recommendation of M.J. Hurd) (163 days in keeplock not protected), *adopted,* (N.D.N.Y. May 6, 1996) (Cholakis, J.), *appeal docketed,* No. 96-2494 (2d Cir. June 10, 1996); *Taylor v. Mitchell,* No. 91-CV-1445 (N.D.N.Y. Feb. 5, 1996) (Cholakis, J.) (sixty days in SHU not protected); *Cargill v. Casey,* No. 95-CV-1620, 1996 WL 227859, at *2 (N.D.N.Y. May 2, 1996) (Pooler, J.) (dismissing as frivolous complaint alleging due process violation resulting in keeplock confinement for thirty days). Under these cases, based solely on its duration, plaintiff's confinement in keeplock for sixty days would not constitute a cognizable liberty interest under *Sandin.*

Other circuits, however, have viewed *Sandin* less as a durational, bright line bar to statement of a claim than as an additional issue of fact for litigation. *See, e.g., Bryan v. Duckworth,* 88 F.3d 431, 433-34 (7th Cir.1996) (question of fact whether disciplinary segregation was atypical and significant under *Sandin* ); *Williams v. Fountain,* 77 F.3d 372, 374 n. 3 (11th Cir.1996) (noting *Sandin* decided by only 5-4 majority and holding that segregation for one year provided basis for assuming atypical and significant deprivation under *Sandin* ); *Gotcher v. Wood,* 66 F.3d 1097, 1101 (9th Cir.1995) (placement in disciplinary segregation presents issue of fact whether it constitutes an atypical and significant deprivation under *Sandin* ).

The Second Circuit appears generally to be following the Seventh, Ninth and Eleventh Circuits. The Second Circuit has not yet definitively addressed the effect of *Sandin* on its prior holdings. *See Rodriguez v. Phillips,* 66 F.3d 470, 480 (2d Cir.1995). It has recently held, however, that *Sandin* does apply retroactively and, it appears, that a plaintiff bears the burden of proving that the deprivation in question imposed an atypical and significant hardship. *See Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996); *Samuels v. Mockry,* 77 F.3d 34, 37-38 (2d Cir.1996); *see also Giakoumelos v. Coughlin,* 88 F.3d 56, 62 (2d Cir.1996) (dicta that whether confinement in SHU is "atypical and significant" under *Sandin* presents question of fact). One judge in this district has concluded from these cases that fact-finding is required to resolve whether a deprivation is atypical and significant. *Compare Silas v. Coughlin,* No. 95-CV-1526, 1996 WL 227857, at *1 (N.D.N.Y. April 29, 1996) (Pooler, J.) (denying motion to dismiss due process claim where plaintiff was confined in SHU for 182 days, holding that Second Circuit's

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 160124 (N.D.N.Y.)
(Cite as: 1997 WL 160124 (N.D.N.Y.))

interpretation of *Sandin* mandated further fact-finding as to nature of plaintiff's alleged deprivation from confinement), *with Cargill v. Casey, supra* (due process claim based on confinement in keeplock for thirty days dismissed as frivolous).

**\*5** Under these cases, consideration must be given to whether a plaintiff has established, or raised, a genuine question of fact concerning his disciplinary confinement. Here, plaintiff has raised no question of fact concerning his confinement in keeplock. Plaintiff has not alleged rare, unique or unusual hardships of the kind cited in *Sandin* as examples of atypical and significant deprivations. 515 U.S. at ----, 115 S.Ct. at 2300 (transfer to a mental hospital and involuntary administration of psychotropic drugs), or that detention in keeplock imposed a hardship on plaintiff because of his special, unique or unusual condition while incarcerated. *See Delaney v. Selsky,* 899 F.Supp. at 927-28 (question of fact whether confinement in SHU created atypical and significant deprivation for inmate who alleged such confinement caused back problems because of his unusual height of nearly seven feet).

Segregated confinement is a known and usual aspect of incarceration in the New York prison system. *See Sandin v. Conner,* 515 U.S. at ----, 115 S.Ct. at 2301 ("Discipline by prison officials in response to a wide range of misconduct falls within the expected parameters of the sentence imposed by a court of law."). The existence of keeplock has been authorized by statute, N.Y. Correct. Law § 112(1) (McKinney 1987), and implemented by DOCS regulations. N.Y. Comp.Codes R. & Regs. tit. 7, § 301.6 (1995). Those regulations describe the conditions and restrictions of confinement in keeplock. *Id.* at pts. 302-05. The deprivations are, therefore, part of the New York prison "regime ... to be normally expected" by one serving a sentence in that system. *Sandin v. Conner,* 515 U.S. at ----, 115 S. Ct. at 2302.

Moreover. confinement in keeplock or SHU may result not only from the imposition of discipline, as here. Inmates may also be placed in keeplock or SHU for reasons of administration, N.Y. Comp.Codes R. & Regs. tit. 7, § 301.4(b) (1995); protection, *id.* at § 301.5; detention, *id.* at § 301.3; reception, diagnosis and treatment, *id.* at pt. 306; or for any other reason. *Id.* at 301.7(a). The conditions for inmates confined in keeplock,

including plaintiff, are the same regardless of the reason for placement there. *Id.* at pts. 302-05.[FN5]

> FN5. Inmates confined for reasons of protection receive somewhat greater privileges. *See, e.g.,* N.Y. Comp.Codes R. & Regs. tit. 7, § 330.4 (1995) (three hours per day outside cell).

Inmates in the New York system have no right to be incarcerated in any particular institution, cell or block of cells, nor do they enjoy a right to be housed in the general prison population or to participate in any particular program offered at an institution. *Cf. Meachum v. Fano,* 427 U.S. 215, 226, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976) (no right to remain in particular prison created by state law); *Wolff v. McDonnell,* 418 U.S. 539, 557, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (right to good time credits created by state statute). Such matters are committed to the discretion of prison authorities. This grant of broad discretion to prison authorities comports with a principle rationale of *Sandin* that

federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment.... Such flexibility is especially warranted in the fine-tuning of the ordinary incidents of prison life, a common subject of prisoner claims....

**\*6** 515 U.S. at ---- - ----, 115 S.Ct. at 2299-2300.

Here, plaintiff contends at best that his keeplock confinement was "atypical and significant" under *Sandin* because it subjected him to retaliation, caused closer monitoring by DOCS, affected his transfer to other institutions, and impaired his eligibility for certain prison programs. Pl. Mem. of Law at p. 21. These contentions are conclusory and unsupported in any way. They are also unsworn and unsigned. For these reasons alone, plaintiff's contentions should be rejected as failing to raise any issue of fact under *Sandin.*

On their merits as well, however, these contentions should be rejected. While there may be cases where confinement in keeplock might subject an inmate to retaliation from

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

other inmates or guards such that keeplock confinement imposed "atypical and significant" hardships, no such hardship has been demonstrated here by the non-specific, conclusory assertions of plaintiff. As to the contentions regarding plaintiff's monitoring status and his eligibility for transfer and prison programs, all concern matters for which plaintiff has no special rights or interests, all were known to follow from disciplinary confinement as a regular part of DOCS' regime, and plaintiff has asserted no hardship atypical or significant as to him concerning these matters.

For these reasons plaintiff has failed to meet his burden of demonstrating the existence of any factual issue under *Sandin.* Accordingly, defendants' motion on this ground should be granted.

## 2. Due Process

Defendants assert that, notwithstanding *Sandin,* plaintiff was not denied due process.

The Due Process Clause requires that an inmate faced with disciplinary confinement has a right to at least twenty-four hours advance notice of the charges against him and to be informed of the reasons for the action taken and the evidence relied upon by the hearing officer. In addition, an inmate has the right to call witnesses and present evidence in his defense "when permitting him to do so would not be unduly hazardous to institutional safety or correctional goals." *Wolff v. McDonnell,* 418 U.S. 539, 564-66, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *McCann v. Coughlin,* 698 F.2d 112, 121-22 (2d Cir.1983). These rights implicitly include the right to make a statement in the inmate's defense and the right to marshal the facts. *See Hewitt v. Helms,* 459 U.S. 460, 472, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983); *see also Patterson v. Coughlin,* 761 F.2d 886, 890 (2d Cir.1985), *cert. denied,* 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 916 (1986).

Where an inmate is illiterate or where the charges are unusually complex, the inmate is entitled to seek the assistance of another inmate or an employee. *Wolff v. McDonnell,* 418 U.S. at 570. The Second Circuit has extended this right, and directed that inmates who are

confined pending a hearing be provided with some form of assistance. *Eng v. Coughlin,* 858 F.2d 889, 897-98 (2d Cir.1988). Corrections officials are required only to provide inmates with the opportunity to exercise these due process rights. *See, e.g., Maiid v. Henderson,* 533 F.Supp. 1257, 1273 (N.D.N.Y.), *aff'd,* 714 F.2d 115 (2d Cir.1982) ("although [the inmate] had the right to call witnesses at his hearing, there is no evidence in the record that he ever invoked this right").

**\*7** Here, plaintiff argues first that the hearing officer failed to call witnesses in the requested order. However, due process does not mandate that plaintiff be permitted to call his witnesses in a particular order.

Second, plaintiff alleges that the hearing officer failed to conduct an in camera inquiry into the original source of information on which the search was authorized to determine if that source was reliable. However, the issues at the hearing were the results of the search, not the reasons why the search was initiated. The hearing officer's decision did not rest in any part on the information from the confidential informant. Due process thus did not require inquiry into the reliability of the original information.

Third, plaintiff contends that although the original misbehavior report contains the signatures of both defendant Yule and Officer Rando, his copy reflects only defendant Yule's signature. However, an inmate has no right to receive a statement of charges signed by any particular official.[FN6]

> FN6. A misbehavior report is to be made by the employee who has observed the incident. Where another employee has personal knowledge of the facts, he shall, where appropriate, endorse his name on the other employee's report. N.Y. Comp.Codes R. & Regs. tit. 7, § 251-3.1(b) (1995). The misbehavior report here was signed by J. Rando and endorsed by G. Yules as an employee witness, and it is endorsed by the area supervisor. *See* Defs.' Statement Pursuant to Rule 7.1(f), Ex. A, p. 1, Inmate Misbehavior Report.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 160124 (N.D.N.Y.)
(Cite as: 1997 WL 160124 (N.D.N.Y.))

Fourth, plaintiff claims that defendant Roberts failed to provide him with various documents plaintiff requested pursuant to New York's Freedom of Information Law after the disciplinary hearing concluded. This claim as well falls outside the scope of the Due Process Clause as described by the cases discussed above. Defendants' failure to provide the requested documents did not violate plaintiff's constitutional right.

Accordingly, defendants' motion should be granted on this ground as well. FN7

> FN7. Throughout his complaint and pleadings, plaintiff refers jointly to his right to due process/equal protection. The facts and arguments in plaintiff's complaint and pleadings point only to a due process claim. No facts or arguments relating to the Equal Protection Clause are asserted. Nevertheless, to the extent plaintiff's complaint is deemed to assert a claim for violation of the Equal Protection Clause, defendants' motion for summary judgment should be granted as to that claim as well.

3. Cell Search

Plaintiff alleges that the search of his cell on October 30, 1995 violated his Fourth Amendment protection against unreasonable searches and seizures. FN8 In *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), the Supreme Court held that "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell." *Id.* at 526. Searches of prison cells, even arbitrary searches, implicate no protected constitutional rights. *DeMaio v. Mann,* 877 F.Supp. 89, 95 (N.D.N.Y.1995) (Kaplan, J.). Plaintiff thus may assert no cause of action here based on an alleged violation of his Fourth Amendment rights. FN9 Defendants' motion for summary judgment as to claims regarding the search of plaintiff's cell should be granted.

> FN8. In his complaint plaintiff also appears to allege that the search violated his Fourteenth Amendment right to due process because he received a receipt for the seizure of the

marijuana five hours after the search was conducted and never received any report of the search. To the extent plaintiff asserts such a claim, summary judgment should be granted to the defendants for the reasons set forth in subsections 1 and 2 above.

> FN9. Nor can an inmate recover under section 1983 for intentional destruction of his personal property by a state employee, as long as the state provides a meaningful post-deprivation remedy. *Hudson v. Palmer,* 468 U.S. at 533. New York provides such a remedy in section 9 of the New York Court of Claims Act. *Smith v. O'Connor,* 901 F.Supp. 644, 647 (S.D.N.Y.1995). Plaintiff may pursue any claim regarding destruction of his personal property in state court.

4. *Qualified Immunity*

Defendants argue in the alternative that they are entitled to summary judgment on the ground of qualified immunity.

A government official is entitled to qualified immunity if his or her conduct did not violate "a clearly established" constitutional right of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *see also Wright v. Smith,* 21 F.3d 496, 500 (2d Cir.1994). The contours of the right must be established to the extent that a reasonable official would recognize his acts violated that right. *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

The following factors must be considered to determine whether a right is clearly established:

**8** (1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question, and (3) whether under pre-existing law a reasonable defendant official would have understood that his or her acts were unlawful.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 8

Not Reported in F.Supp., 1997 WL 160124 (N.D.N.Y.)
(Cite as: 1997 WL 160124 (N.D.N.Y.))

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991), *cert. denied,* 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992). A determination in favor of a public officer based on qualified immunity is appropriate when, at the time the officer was acting, the right in question was not clearly established or, even if the right was established, it was not objectively reasonable for the official to recognize that his conduct violated the right. *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993); *Ying Jing Gan v. City of New York,* 996 F.2d 522 (2d Cir.1993).

Here, among other reasons, the defendants could not reasonably have known that the search of plaintiff's cell violated any of his Fourth Amendment rights or that plaintiff's due process rights were violated by the failure to call witnesses in the order requested by plaintiff. *Cf. Walker v. Bates,* 23 F.3d 652, 656-57 (2d Cir.1994), *cert. denied,* 515 U.S. 1157, 115 S.Ct. 2608, 132 L.Ed.2d 852 (1995) (prison disciplinary hearing officer entitled to qualified immunity in suit claiming violation of due process from denial of prisoner's right to call witnesses in disciplinary hearing); *Cookish v. Powell,* 945 F.2d 441, 449 (1st Cir.1991) (prison official entitled to qualified immunity from charge of violating prisoner's Fourth Amendment rights by conducting body cavity search in view of prison guards of opposite sex). Therefore, the defendants' motion on this ground should be granted.

### III. APPOINTMENT OF COUNSEL

Also pending is a renewed application by plaintiff for appointment of counsel (Docket No. 21). A review of the file in this matter reveals that the issues in dispute in this case are not overly complex. Further, there has been no indication that plaintiff has been unable to investigate the critical facts of this case. Finally, no special reason appears why appointment of counsel at this time would be more likely to lead to a just determination of this litigation. Therefore, based upon the existing record in this case, appointment of counsel is unwarranted.[FN10]

> **FN10.** Also pending is plaintiff's motion for a pre-trial conference and evidentiary hearing (Docket No. 23). This motion is untimely and is hereby denied. Plaintiff has also moved for summary judgment by default (Docket No. 11) in

response to defendants' request for an extension of time to answer the complaint. This extension was granted by order dated March 15, 1996 and defendants have answered. Accordingly, it is recommended that this motion be denied as moot.

### IV. CONCLUSION

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion for summary judgment be GRANTED; and it is further

RECOMMENDED that plaintiff's motion for summary judgment by default be DENIED; and it is hereby

ORDERED that plaintiff's renewed motion for appointment of counsel is DENIED without prejudice; and it is further

ORDERED that plaintiff's motion for a pre-trial conference and an evidentiary hearing is DENIED; and it is further

ORDERED that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon the parties to this action.

**\*9** Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1997.
Tinsley v. Greene

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 160124 (N.D.N.Y.)
(Cite as: 1997 WL 160124 (N.D.N.Y.))

Not Reported in F.Supp., 1997 WL 160124 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.